B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | Southern District of Florida | PROOF OF CLAIM |
|---|---|---|

| | |
|---|---|
| Name of Debtor: U.S. Medical Care Holdings, LLC | Case Number: 08-24027-BKC-EPK |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property): Flo-Mar, LLC | ☑ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent: Randy R. Dow, Esq.; Page, Mrachek, Fitzgerald & Rose P.A.; 505 S. Flagler Dr. Suite 600, West Palm Beach, FL 33401 | Court Claim Number: 22 (If known) |
| Telephone number: (561) 655-2250 | Filed on: 11/20/2009 |
| Name and address where payment should be sent (if different from above): Same as Above | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Telephone number: | ☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:** $ 1,005,562.00

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Breach/elect contract
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $_____ Annual Interest Rate____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:
$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| | | |
|---|---|---|
| Date: 4/9/10 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. *[signature]* Randy Dow, Esq. | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Flo-Mar LLC

Expenditures:

| | |
|---|---|
| Franchise fee | $160,000 |
| Fixed assets | $219,751 |
| Rent | $167,177 |
| Advertising | $96,642 |
| Management fees | $99,900 |
| Supplies | $101,152 |
| Royalty Payments | $27,218 |
| Future Rent | $133,722 |

| | |
|---|---|
| Total | $1,005,562 |



3350 NW Boca Raton Blvd. • Ste B-38
Boca Raton, FL • 33431
Phone 561.394.5300
Fax 561.362.5818

**Via Hand Delivery**

Marian Zable
Partner- Flo-Mar

October 30, 2006

RE: Flo-Mar, LLC

Dear Marian;

Enclosed for your files is one original set each of the Area Development documentation and the Franchise documentation.

Also enclosed are two original "Conditional Assignment of Lease" documents which must be completed and then signed by the Lessor. Once the Lessor has signed, please retain one original for your files and return one original to me for my files.

We are glad to have you as one of our Area Developers/Franchisees and look forward to working with you as you open your first Franchise in Sarasota.

Should you have any questions, please do not hesitate to contact me.

Regards,

Randy Sue Valdve
Manager Franchise Administration and Compliance
Smart for Life Weight Management Centers™

Original Enclosures

## RECEIPT

THIS OFFERING CIRCULAR SUMMARIZES PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.

IF U.S. MEDICAL CARE HOLDINGS, L.L.C. OFFERS YOU A FRANCHISE, IT MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIEST OF:

a.   THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE; OR

b.   TEN BUSINESS DAYS BEFORE THE SIGNING OF A BINDING AGREEMENT; OR

c.   TEN BUSINESS DAYS BEFORE ANY PAYMENT TO U.S. MEDICAL CARE HOLDINGS, L.L.C.

YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN ANY FRANCHISE AGREEMENT.

IF U.S. MEDICAL CARE HOLDINGS, L.L.C. DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND THE APPROPRIATE STATE AGENCY IDENTIFIED ON EXHIBIT "N."

U.S. MEDICAL CARE HOLDINGS, L.L.C. authorizes the respective state agencies identified on Exhibit "N" to receive service of process for it in the particular state.

I have received a Uniform Franchise Offering Circular with an information date of March 31, 2006 (for state specific effective date, see Exhibit "N"). This offering circular included the following Exhibits:

A.   Our Financial Statements
B.   SM Licensing Corporation's Financial Statements
C.   Application and Deposit Agreement
D.   Franchise Agreement
D-1  NCP Addendum to Franchise Agreement
E.   Area Development Agreement
F.   Conditional Assignment of Telephone Numbers and Listings
G.   Conditional Assignment of Lease
H.   Manual Table of Contents
I.   Principal Owner's Guaranty
J.   Principal Owner's Statement
K.   List of Franchise Owners and Area Developers
L.   List of Franchisees and Area Developers Who Have Left the System
M.   State Specific Addenda and Riders
N.   List of State Agencies/Agents for Service of Process
O.   Franchise Compliance Certificate

FLO-MAR, LLC

_9-21-06_
Date

Franchisee: Marion Zable, Member

Date: _2. Sep hop_

[Our Copy]

Franchisee: Floyd Cohen, MD, Member

You

US

CAL. 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

## RECEIPT

THIS OFFERING CIRCULAR SUMMARIZES PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.

IF U.S. MEDICAL CARE HOLDINGS, L.L.C. OFFERS YOU A FRANCHISE, IT MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIEST OF:

a.      THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE; OR

b.      TEN BUSINESS DAYS BEFORE THE SIGNING OF A BINDING AGREEMENT; OR

c.      TEN BUSINESS DAYS BEFORE ANY PAYMENT TO U.S. MEDICAL CARE HOLDINGS, L.L.C.

YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN ANY FRANCHISE AGREEMENT.

IF U.S. MEDICAL CARE HOLDINGS, L.L.C. DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND THE APPROPRIATE STATE AGENCY IDENTIFIED ON EXHIBIT "N."

U.S. MEDICAL CARE HOLDINGS, L.L.C. authorizes the respective state agencies identified on Exhibit "N" to receive service of process for it in the particular state.

I have received a Uniform Franchise Offering Circular with an information date of March 31, 2006 (for state specific effective date, see Exhibit "N"). This offering circular included the following Exhibits:

      A.      Our Financial Statements
      B.      SM Licensing Corporation's Financial Statements
      C.      Application and Deposit Agreement
      D.      Franchise Agreement
      D-1     NCP Addendum to Franchise Agreement
      E.      Area Development Agreement
      F.      Conditional Assignment of Telephone Numbers and Listings
      G.      Conditional Assignment of Lease
      H.      Manual Table of Contents
      I.      Principal Owner's Guaranty
      J.      Principal Owner's Statement
      K.      List of Franchise Owners and Area Developers
      L.      List of Franchisees and Area Developers Who Have Left the System
      M.      State Specific Addenda and Riders
      N.      List of State Agencies/Agents for Service of Process
      O.      Franchise Compliance Certificate

FLO-MAR, LLC.

_____9-21-06_____          _____
Date                          Franchisee: Marian Zable, Member

Date 21 Sep 06               _____
                              Franchisee: Floyd Cohen, MD, Member

                    [Your Copy]

CAL- 1st Franchise            You _____  You _____          US _____
Flo-Mar, LLC
Sarasota-Bradenton
September 2006





SUPPLEMENT
TO
U.S. MEDICAL CARE HOLDINGS, L.L.C.
UNIFORM FRANCHISE OFFERING CIRCULAR

U.S. MEDICAL CARE HOLDINGS, L.L.C.
a Florida Limited Liability Company
3350 NW Boca Raton Boulevard, Suite B-38
Boca Raton, Florida 33431
(561) 394-5300
www.togetthin.com

This Supplement is given to you because we, the Franchisor ended our relationship with Clinic Supply Corporation ("CSC") and SM Licensing Corporation ("SMLC") on August 8, 2006. Accordingly, as part of our franchise program, we no longer license any of the Siegal-related trademarks and service marks and no longer offer and sell food products produced by CSC. Instead, our franchises will do business under the Smart for Life Weight Management Centers™ trade mark and such other marks as we may license from time to time. In addition, our supplier for our core meal replacement proprietary products has changed from CSC to our affiliate, Doctors Nutrition, LLC ("DN"). Therefore, all information relating to SMLC and CSC in the UFOC should not be relied upon in any way as it is no longer relevant to our Franchise Offering.

Supplement
2006
Flo-Mar, LLC
Sarasota-Bradenton

you ___ you ___ is ___

# TABLE OF CONTENTS*

Page

ITEM 1.     THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES ..................... 1

ITEM 2.     BUSINESS EXPERIENCE ................................................................ 1

ITEM 8.     RESTRICTIONS ON SOURCES ........................................................ 1

ITEM 13.    TRADEMARKS ........................................................................... 2

ITEM 21.    FINANCIAL STATEMENTS ............................................................ 2

*The Item numbers in this Supplement correspond to the applicable Item numbers in our Offering Circular.

Supplement
2006
Flo-Mar, LLC
Sarasota-Bradenton

YOU      YOU      US

## ITEM 1.
## THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES

We ended our relationship with SMLC and CSC on August 8, 2006. Accordingly, we no longer have any association with them. Therefore, you should not rely on any information relating to SMLC and CSC in the UFOC. Our affiliate, DN, is a Nevada limited liability company formed on February 16, 2006. DN's principal business office is located at 102 NE 2nd Street, Suite 317, Boca Raton, Florida 33432. Its agent for service of process is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324. DN is affiliated with us through common ownership. DN is our approved supplier for the core meal replacement proprietary products such as the cookies, shakes, soups, and non-dairy creamer (the "Core Products") and certain other products that the SMART FOR LIFE WEIGHT MANAGEMENT CENTERS$^{TM}$ market, promote and sell to clients at the Centers. These products replace the products that were formerly obtained from CSC by the Franchisor and supplied to the Franchisees through Oyster. Oyster will continue to supply the products to the Franchisees and the Franchisor will obtain the products from DN.

All of the Weight Management Centers that we franchise operate under the trade name, trademark and service mark SMART FOR LIFE WEIGHT MANAGEMENT CENTERS$^{TM}$ and are therefore known as SMART FOR LIFE WEIGHT MANAGEMENT CENTERS$^{TM}$. They are no longer operated under the names Siegal$^{TM}$ Smart for Life Weight Management Centers$^{TM}$ and all reference to Centers, Siegal$^{TM}$ Smart for Life Weight Management Centers$^{TM}$ or Smart for Life Weight Management Centers in the Franchise Offering Circular now refer to SMART FOR LIFE WEIGHT MANAGEMENT CENTERS$^{TM}$.

## ITEM 2.
## BUSINESS EXPERIENCE

Since we are no longer associated with SMLC and CSC, all information relating to their management are no longer relevant and should not be relied upon in any way.

## ITEM 8.
## RESTRICTIONS ON SOURCES

SMLC and CSC are no longer our suppliers for the Core Products and the Secondary Products. You will be required to purchase all of your requirements for them from our affiliates, DN or Oyster. Prior to the ending of our relationship with SMLC and CSC, you were required to purchase all of your Core Products (including the Dr. Siegal$^{TM}$ and SIEGAL$^{TM}$ products) and the Secondary Products from CSC through Oyster. Now, you will purchase the Core Products produced by DN and Secondary Products through Oyster or directly from DN as we may specify from time to time. Unless otherwise specified, you will continue to deal directly with Oyster for all of your products purchased.

Supplement
2006
Flo-Mar, LLC
Sarasota-Bradenton

you___   you___   us___

## ITEM 13.
## TRADEMARKS

Due to the end of our relationship with SMLC and CSC, we no longer license the various Siegal-related marks described as SMLC Marks in Item 13 of the Franchise Offering Circular. Instead, we grant you a license to use only Our Marks.

## ITEM 21.
## FINANCIAL STATEMENTS

Since we no longer have any relationship with SMLC, all financial information relating to SMLC is no longer relevant and should not be relied upon for any purpose.

IN WITNESS WHEREOF, BOTH PARTIES ACKNOWLEDGE THE INTENT OF THIS SUPPLEMENT AND BY SIGNING BELOW AGREE TO SUCH.

"US":                                                "YOU":

U.S. MEDICAL CARE HOLDINGS, L.L.C.                  FLO-MAR, LLC

A Florida limited liability company                 A Florida limited liability company

By: _____                         By: _____
Name: Sasson Moulavi, MD                            Name: Marian Zable
Title: Manager                                      Title: Member
Date: Sept 21 2006                                  Date: Sept 21 2006

                                                    By: _____
                                                    Name: Floyd Cohen, MD
                                                    Title: Member
                                                    Date: 21 Sept 06

Supplement
2006
Flo-Mar, LLC
Sarasota-Bradenton

2

YOU        YOU    US

EXHIBIT O TO THE OFFERING CIRCULAR

---

FORM OF

FRANCHISE COMPLIANCE CERTIFICATE

---

BG- ADA
Flu-Mar, LLC
Sarasota-Bradenton
September 2006

## FORM OF FRANCHISE COMPLIANCE CERTIFICATION

The purpose of this Certification is to determine whether any statements or promises were made to you that we have not authorized and that may be untrue, inaccurate or misleading. Please review each of the following questions and statements carefully and provide honest and complete responses to each.

1.  You had your first face-to-face meeting with our representative on: __8/1/06__ 200___

2.  Have you received and personally reviewed our Franchise Agreement ☐ or Area Development Agreement ☐ and any attachments to them?

    Yes ___✓___          No _____

3.  Do you understand all of the information contained in our Franchise Agreement ☐ or Area Development Agreement ☐ and any attachments provided to you?

    Yes ___✓___          No _____

    If no, what parts of the Franchise Agreement ☐ or Area Development Agreement ☐ and any attachments do you not understand? (Attach additional pages, if necessary.)

    _____

    _____

    _____

4.  Have you received and personally reviewed our Uniform Franchise Offering Circular ("UFOC")?

    Yes ___✓___          No _____

5.  Did you sign a receipt for the UFOC indicating the date you received it?

    Yes ___✓___          No _____

6.  Do you understand all of the information contained in the UFOC and any state-specific Addendum to the UFOC?

    Yes ___✓___          No _____

    If no, what parts of the UFOC and/or Addendum do you not understand? (Attach additional pages if necessary.)

    _____

    _____

    _____

FC- ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____    You _____          US _____

7. Have you discussed the benefits and risks of purchasing a SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchise with an attorney, accountant or other professional advisor?

   Yes _____          No _____

   If no, do you wish to have more time to do so?

   Yes _____          No _____

8. Do you understand that the success or failure of your SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchise will depend in large part upon your skills and abilities, competition from other businesses and other economic and business factors?

   Yes _____          No _____

9. Has any employee or other person speaking on our behalf made any statement or promise concerning the revenues, profits or operating costs of a SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchise?

   Yes _____          No _____

10. Has any employee or other person speaking on our behalf made any statement or promise regarding the amount of money you may earn in operating a SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchise?

   Yes _____          No _____

11. Has any employee or other person speaking on our behalf made any statement or promise concerning the likelihood of success that you should or might expect to achieve from operating a SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchise?

   Yes _____          No _____

12. Has any employee or other person speaking on our behalf made any statement, promise or agreement concerning the advertising, marketing, training, support service or assistance that we will furnish to you that is contrary to, or different from, the information contained in the UFOC?

   Yes _____          No _____

13. Have you paid any money to us concerning the purchase of your SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchise before today other than pursuant to our Application and Deposit Agreement?

   Yes _____          No _____

FC- ADA
Fla-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          US _____

14. If you have answered "Yes" to any one of questions 9-13, please provide a full explanation of each "Yes" answer in the following blank lines. (Attach additional pages, if necessary, and refer to them below.)

_____

_____

_____

15. You signed the Franchise Agreement, Area Development Agreement and/or Addendum (if any) on __9-21-06__ and acknowledge that no Agreement or Addendum is effective until signed and dated by us.

You understand that your responses to these questions are important to us and that we will rely on them.

By signing this Compliance Certification, you are representing that you have responded truthfully to the above questions.

APPLICANT:

FLO-MAR, LLC

By: _____

Marian Zuble, Member

Dated: __9 - 21__ 2006

By: _____

Floyd Cohen, MD, Member

Dated: __9 - 21__ 2006

FC-ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You____ You____    US____

EXHIBIT J TO THE OFFERING CIRCULAR

---

## FORM OF

## PRINCIPAL OWNER'S STATEMENT

---

POS- ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

## PRINCIPAL OWNER'S STATEMENT

This form must be completed by the Franchisee and/or Developer ("I," "me," or "my") if I have multiple owners or if I, or my franchised business, is owned by a business organization (like a corporation, partnership or limited liability company). Franchisor is relying on the truth and accuracy of this form in awarding the Franchise and/or Development Agreement to me.

1.  **Form of Owner.** I am a (check one):

    (a)  General Partnership  ☐
    (b)  Corporation  ☐
    (c)  Limited Partnership  ☐
    (d)  Limited Liability Company  ☒
    (e)  Other  ☐
         Specify: _____

I was formed under the laws of **Florida.**

2.  **Business Entity.** I was incorporated or formed on _9-13-06_ under the laws of the State of Florida. I have not conducted business under any name other than my corporate, limited liability company or partnership name and _N/A_. The following is a list of all persons who have management rights and powers (e.g., officers, managers, partners, etc.) and their positions are listed below:

| Name of Person | Position(s) Held |
|---|---|
| Marian Zable | Member |
| Floyd Cohen | Member |

3.  **Owners.** The following list includes the full name and mailing address of each person who is one my owners and fully describes the nature of each owner's interest. Attach additional sheets if necessary.

| Owner's Name and Address | Description of Interest | % of Ownership |
|---|---|---|
| Marian Zable | Member | 50 |
| Floyd Cohen | Member | 50 |
| | | |
| | | |
| | | |

POS-ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____   US _____

4.     Governing Documents. Attached are copies of the documents and contracts governing the ownership, management and other significant aspects of the business organization (e.g., articles of incorporation or organization, partnership or shareholder agreements, etc.).

This Statement of Principal Owners is current and complete as of _____9-21-06_____

OWNER

INDIVIDUALS:

_____
[Signature]

Marian Zable
[Print Name]

_____
[Signature]

Floyd Cohen, MD
[Print Name]

_____
[Signature]

_____
[Print Name]

CORPORATION, LIMITED
LIABILITY COMPANY OR
PARTNERSHIP: FLO-MAR, LLC

By: _____
Marian Zable
Title: Member

By: _____
Floyd Cohen, MD
Title: Member

2.

POS-ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

EXHIBIT I TO THE OFFERING CIRCULAR

---

PRINCIPAL OWNER'S GUARANTY

---

POG· I"ADA
Rio-Ator, LLC
Barasota-Bradenton
September 2006

## PRINCIPAL OWNER'S GUARANTY

This Guaranty must be signed by the principal owners (referred to as "you" for purposes of this Guaranty only) Flo-Mar, LLC (the "Business Entity") under the Area Development Agreement dated September ___, 2006 (the "Agreement") with U.S. MEDICAL CARE HOLDINGS, L.L.C. ("us," or "our" or "we").

1.   Scope of Guaranty.   In consideration of and as an inducement to our signing and delivering the Agreement, each of you signing this Guaranty personally and unconditionally: (a) guarantee to us and our successors and assigns that the Business Entity will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (b) agree to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.

2.   Waivers.   Each of you waive: (a) acceptance and notice of acceptance by us of your obligations under this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations guaranteed by you; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations guaranteed by you; (d) any right you may have to require that an action be brought against the Business Entity or any other person as a condition of your liability; (e) all rights to payments and claims for reimbursement or subrogation which you may have against the Business Entity arising as a result of your execution of and performance under this Guaranty; and (f) all other notices and legal or equitable defenses to which you may be entitled in your capacity as guarantors.

3.   Consents and Agreements.   Each of you consent and agree that: (a) your direct and immediate liability under this Guaranty are joint and several; (b) you must render any payment or performance required under the Agreement upon demand if the Business Entity fails or refuses punctually to do so; (c) your liability will not be contingent or conditioned upon our pursuit of any remedies against the Business Entity or any other person; (d) your liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which we may grant to Business Entity or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims and no such indulgence will in any way modify or amend this Guaranty; and (e) this Guaranty will continue and is irrevocable during the term of the Agreement and, if required by the Agreement, after its termination or expiration.

4.   Enforcement Costs.   If we are required to enforce this Guaranty in any judicial or arbitration proceeding or any appeals, you must reimburse us for our enforcement costs. Enforcement costs include reasonable accountants', attorneys', attorney's assistants', arbitrators' and expert witness fees, costs of investigation and proof of facts, court costs, arbitration filing fees, other litigation expenses and travel and living expenses, whether incurred before, in preparation for, or in contemplation of the filing of any written demand, claim, action, hearing or proceeding to enforce this Guaranty.

5.   Effectiveness.   Your obligations under this Guaranty are effective on the Agreement Date, regardless of the actual date of signature. Terms not otherwise defined in this Guaranty have the meanings as defined in the Agreement. This Guaranty is governed by Florida law and we may enforce our rights regarding it in the courts of Palm Beach County, Florida. Each of you irrevocably submits to the jurisdiction and venue of such courts.

Each of you now sign and deliver this Guaranty effective as of the date of the Agreement regardless of the actual date of signature.

PERCENTAGE OF OWNERSHIP
INTEREST IN BUSINESS ENTITY
_____50%_____

GUARANTOR(S)
_____
Floyd Cohen, MD
DATE _____

POG- 1" ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____  You _____          US _____

# U.S. MEDICAL CARE HOLDINGS, L.L.C.

## AREA DEVELOPMENT AGREEMENT

21 Sept 2006
_____
AGREEMENT DATE

FLO-MAR LLC
_____
DEVELOPER

THIS AGREEMENT REQUIRES CERTAIN DISPUTES TO BE SUBMITTED TO BINDING ARBITRATION.

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

# TABLE OF CONTENTS

Page

1. INTRODUCTION ............................................................................................................. 1
    1.1. THE SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ SYSTEM ...... 1
    1.2. ACKNOWLEDGMENTS ................................................................................................ 2
    1.3. REPRESENTATIONS .................................................................................................. 2
    1.4. NO WARRANTIES .................................................................................................... 3
    1.5. BUSINESS ORGANIZATION ....................................................................................... 4

2. TERM AND SUCCESSION ............................................................................................. 4
    2.1. TERM OF AGREEMENT ............................................................................................ 4
    2.2. MODIFICATION OF TERM ......................................................................................... 4
    2.3. RIGHTS WE RESERVE .............................................................................................. 5

3. DEVELOPMENT RIGHTS AND OBLIGATIONS ....................................................... 5
    3.1. DEVELOPMENT RIGHTS ........................................................................................... 5
    3.2. DEVELOPMENT OBLIGATIONS .................................................................................. 5
    3.3. EFFECT OF FAILURE ................................................................................................ 6

4. DEVELOPMENT FEE ..................................................................................................... 6

5. GRANT OF FRANCHISES ............................................................................................. 7
    5.1. FRANCHISE AGREEMENTS ....................................................................................... 7

6. MARKS ............................................................................................................................. 7
    6.1. OWNERSHIP AND GOODWILL OF MARKS ................................................................ 7
    6.2. LIMITATIONS ON YOUR USE OF MARKS .................................................................. 8
    6.3. NOTIFICATION OF INFRINGEMENTS AND CLAIMS ..................................................... 8
    6.4. DISCONTINUANCE OF USE OF MARKS ..................................................................... 8
    6.5. INDEMNIFICATION .................................................................................................. 8

7. CONFIDENTIAL INFORMATION ................................................................................ 9
    7.1. TYPES OF CONFIDENTIAL INFORMATION ................................................................. 9
    7.2. DISCLOSURE AND LIMITATIONS ON USE ................................................................. 10
    7.3. CONFIDENTIALITY OBLIGATIONS .......................................................................... 10
    7.4. EXCEPTIONS TO CONFIDENTIALITY ....................................................................... 10

8. EXCLUSIVE RELATIONSHIP ..................................................................................... 10

9. TRANSFER ..................................................................................................................... 11
    9.1. BY US .................................................................................................................... 11
    9.2. BY YOU .................................................................................................................. 11
    9.3. CONDITIONS FOR APPROVAL OF TRANSFER ........................................................... 12
    9.4. TRANSFER TO A BUSINESS ENTITY ......................................................................... 13
    9.5. TRANSFER UPON DEATH OR DISABILITY ................................................................. 13
    9.6. OPERATION UPON DEATH OR DISABILITY ............................................................... 14
    9.7. EFFECT OF CONSENT TO TRANSFER ....................................................................... 14
    9.8. OUR RIGHT OF FIRST REFUSAL .............................................................................. 14

10. TERMINATION OF AGREEMENT ............................................................................ 15

3 Store ADA
Flo-Mer, LLC
Sarasota-Bradenton
September 2006

Yes \_\_\_\_ You \_\_\_\_    Us \_\_\_\_

i

| | | |
|---|---|---|
| 10.1. | On Notice | 15 |
| 10.2. | After Notice | 16 |
| 11. | **RIGHTS AND OBLIGATIONS UPON TERMINATION.** | 16 |
| 11.1. | Payment of Amounts Owed To Us | 16 |
| 11.2. | Marks | 17 |
| 11.3. | Confidential Information | 17 |
| 11.4. | Competitive Restrictions | 17 |
| 12. | **RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.** | 18 |
| 12.1. | Independent Contractors | 18 |
| 12.2. | No Liability for Acts of Other Party | 18 |
| 12.3. | Indemnification | 18 |
| 13. | **ENFORCEMENT.** | 18 |
| 13.1. | Severability; Substitution of Valid Provisions | 18 |
| 13.2. | Waivers | 19 |
| 13.3. | Limitation of Liability | 19 |
| 13.4. | Approval and Consents | 19 |
| 13.5. | Waiver of Punitive Damages | 19 |
| 13.6. | Limitations of Claims | 19 |
| 13.7. | Governing Law | 20 |
| 13.8. | Jurisdiction | 20 |
| 13.9. | Waiver of Jury Trial | 20 |
| 13.10. | Cumulative Remedies | 20 |
| 13.11. | Costs and Attorneys Fees | 21 |
| 13.12. | Binding Effect | 21 |
| 13.13. | Entire Agreement | 21 |
| 13.14. | No Liability to Others; No Other Beneficiaries | 21 |
| 13.15. | Construction | 21 |
| 13.16. | Certain Definitions | 21 |
| 13.17. | Timing is of the Essence | 21 |
| 14. | **DISPUTE RESOLUTION.** | 22 |
| 14.1. | Mediation | 22 |
| 14.2. | Agreement to Arbitrate | 22 |
| 14.3. | Place and Procedure | 22 |
| 14.4. | Awards and Decisions | 23 |
| 14.5. | Specific Performance | 23 |
| 14.6. | Third Parties | 23 |
| 14.7. | Survival | 23 |
| 15. | **NOTICES AND PAYMENTS.** | 23 |

## EXHIBITS

| | | |
|---|---|---|
| EXHIBIT A | - | GLOSSARY |
| EXHIBIT B | - | DEVELOPMENT AREA |

ii

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

## U.S. MEDICAL CARE HOLDINGS, L.L.C.
## AREA DEVELOPMENT AGREEMENT

THIS AREA DEVELOPMENT AGREEMENT (the "Agreement") is effective as of September 21, 2006 (the "Agreement Date"). The parties to this Agreement are U.S. MEDICAL CARE HOLDINGS, L.L.C., a Florida limited liability company, with its principal business address at 3350 NW Boca Raton Boulevard, Suite B-38, Boca Raton, Florida 33431 (referred to in this Agreement as "we," "us" or "our"), and FLO-MAR, LLC, whose principal business address is 370 Golfview Road, #701, North Palm Beach, FL 33408 (referred to in this Agreement as "you," "your" or "Developer").

1.     INTRODUCTION. Various terms are defined in context throughout this Agreement, and a glossary is attached as Exhibit "A" for convenience.

1.1.     The SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ System. We and SM Licensing Corporation have expended considerable time and effort developing a system of franchised weight reduction and weight management, nutritional and health businesses specializing in providing medical-based physician monitored and supervised weight reduction and weight management program, health and nutritional management services and other services we designate or approve periodically (the "Services") and the sale of weight management, nutritional and other products that we may periodically designate or approve, including SIEGAL™ Cookies, SIEGAL™ Shakes, SIEGAL™ Soups, SIEGAL™ Drops and DR. SIEGAL'S NOTHING™ (non-dairy creamer) ("Core Products"); sauces, syrups, dips, barbecue sauces, dressings, dressing packets, candies and our educational products, vitamins, minerals and weight reduction supplements (the "Secondary Products"); and SMART FOR LIFE Scales for consumer use, SMART FOR LIFE Water Bottles, SMART FOR LIFE Pedometers, SMART FOR LIFE Tote Bags, SMART FOR LIFE Shirts, SMART FOR LIFE Hats and all other SMART FOR LIFE logo products for resale to the public (the "Tertiary Products") (collectively, the "Products") (the "SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™" or "Center(s)"). We offer Services to adults who have weight problems and do not target customers based on sex, age group or any other categories. We or our designees are the source of nearly all of the Core Products, Secondary Products and Tertiary Products that Centers offer. We use, promote and license in the operation of a Center certain trademarks, service marks and other commercial symbols, including the trade and service marks "SIEGAL™ MEDICAL WEIGHT MANAGEMENT," "DR. SIEGAL'S™," "SIEGAL WEIGHT MANAGEMENT®," "SIEGAL™ SHAKE," "SIEGAL™ DROPS," "SIEGAL™ DIET PROGRAM," "SIEGAL™ SYSTEM," "THE SIEGAL™ COOKIE," "SIEGAL™," "DR. SIEGAL'S NOTHING,™" "SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™," "SMART FOR LIFE," and other associated logos, designs, artwork and trade dress, trademarks, service marks, commercial symbols, and e-names, which have gained and continue to gain public acceptance and goodwill, and may create, use and license additional trademarks, service marks, e-names and commercial symbols in conjunction with the operation of Centers (collectively, the "Marks") (see Item 13). The Centers operate under the Marks and under distinctive business formats, methods, procedures, designs, layouts, signs, equipment, recipes, trade dress, standards and specifications, all of which we may improve, further develop or otherwise modify periodically (the "System").     We grant to persons who meet our qualifications and are willing to undertake the investment and effort, the right to acquire franchises to own and operate a certain number of Centers within a specific geographic area (a "Development Area"). You have applied for to right to operate a business (your "Development Business") which is granted the right to develop, own and operate a certain number of Centers within a specific Development Area.

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You ___  You ___          us ___

1.2.    Acknowledgments.  You acknowledge and agree that:

    (a)    you have read this Agreement and our Franchise Offering Circular;

    (b)    you understand and accept the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain our high standards of quality and service and the uniformity of those standards at each Center and to protect and preserve the goodwill of the Marks;

    (c)    you have conducted an independent investigation of the business venture contemplated by this Agreement and recognize that, like any other business, the nature of the business conducted by a Center developer may evolve and change over time;

    (d)    an investment in a SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ development business involves business risks;

    (e)    your business abilities and efforts are vital to the success of the venture and the success or failure of your Center is predominately based on your skills in operating and managing it;

    (f)    any information you acquire from other SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchisees or developers relating to their sales, profits or cash flows does not constitute information obtained from us, nor do we make any representation as to the accuracy of any such information;

    (g)    in all of their dealings with you, our officers, directors, employees and agents act only in a representative, and not in an individual, capacity.  All business dealings between you and such persons as a result of this Agreement are solely between you and us;

    (h)    we have advised you to have this Agreement reviewed and explained to you by an attorney.

1.3.    Representations.  Our approval of your request to purchase a franchise is made in reliance on all of your representations and warranties.  Any violation of these representations or warranties, or any Anti-Terrorism Laws by you or your owners, or your or your owners' agents or employees, or any "blocking" of your or their assets under the Anti-Terrorism Laws, will constitute grounds for immediate termination of this Agreement and any other agreements you have entered into with us or any of our affiliates.  As an inducement to our entry into this Agreement, you represent and warrant to us that:

    (a)    all statements you have made and all materials you have submitted to us in connection with your purchase of these development rights and the unit franchises are accurate and complete and that you have made no misrepresentations or material omissions in obtaining these rights or the franchises;

2.

3 Store ADA
Pro-Mer, LLC
Sarasota-Bradenton
September 2006

You ___    You ___    US ___

(b)    you will at all times faithfully, honestly and diligently perform your obligations, continuously exert your best efforts to promote and enhance the Development Business and not engage in any other business or activity that conflicts with your obligations to operate Development Business in compliance with this Agreement.

(c)    you will comply with and/or assist us to the fullest extent possible in our efforts to comply with Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war (the "Anti-Terrorism Laws");

(d)    neither you nor any of your owners, employees, or agents, property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that neither you nor they are otherwise in violation of any of the Anti-Terrorism Laws; and

(e)    Our approval of your request to purchase these development rights is made in reliance on all of your representations and warranties. Any violation of these representations or warranties, or any Anti-Terrorism Laws by you or your owners, or your or your owners' agents or employees, or any "blocking" of your or their assets under the Anti-Terrorism Laws, will constitute grounds for immediate termination of this Agreement and any other agreements you have entered into with us or any of our affiliates.

1.4.    No Warranties. We expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any warranty or guaranty, express or implied, as to the revenues, sales, profits or success of the business venture contemplated by this Agreement or the extent to which we will continue to develop and expand the network of SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™. You acknowledge and understand the following:

(a)    any statement regarding the potential or probable revenues, sales or profits of the business venture, or of any services, benefits or commitments we are to make available to you, are made solely in the Franchise Offering Circular delivered to you prior to signing this Agreement;

(b)    any statement regarding the potential or probable revenues, sales or profits of the business venture or statistical information regarding any existing Center or your or other Development Businesses owned by us or our affiliates or that is not contained in our Franchise Offering Circular is unauthorized, unwarranted and unreliable and should be reported to us immediately; and

(c)    you have not received or relied on any representations about us or our franchising program or policies made by us, or our officers, directors, employees or agents, that are contrary to the statements made in our Franchise Offering Circular or to the terms of this Agreement. If there are any exceptions to any of the foregoing, you must: (i) immediately notify our chief executive officer; and (ii) note such exceptions by attaching a statement of exceptions to this Agreement prior to signing it.

3

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

1.5.    **Business Organization.** If you are at any time a business organization ("Business Entity") (including, but not limited to, a corporation, limited liability company or partnership) you agree and represent that:

(a)    you have the authority to execute, deliver and perform your obligations under this Agreement and are duly organized or formed and validly existing in good standing under the laws of the state of your incorporation or formation;

(b)    your organizational or governing documents will recite that the issuance and transfer of any ownership interests in you are restricted by the terms of this Agreement, and all certificates and other documents representing ownership interests in you will bear a legend referring to the restrictions of this Agreement;

(c)    the Principal Owners Statement will completely and accurately describe all of your owners and their interests in you. A copy of our current form of Principal Owners Statement is attached to the Uniform Franchise Offering Circular;

(d)    you and your owners agree to revise the Principal Owners Statement as may be necessary to reflect any ownership changes and to furnish such other information about your organization or formation as we may request (no ownership changes may be made without our approval);

(e)    each of your owners during the Term will sign and deliver to us our standard form of Principal Owner's Guaranty undertaking to be bound jointly and severally by all provisions of this Agreement and any other agreements between you and us. A copy of our current form of Principal Owners Guaranty is attached to the Uniform Franchise Offering Circular; and

(f)    at our request, you will furnish true and correct copies of all documents and contracts governing the rights, obligations and powers of your owners and agents (including, but not limited to, articles of incorporation or organization and partnership, operating or shareholder agreements).

## 2.    TERM AND SUCCESSION

2.1.    **Term of Agreement.** This Agreement commences on the Agreement Date and expires on the earlier of: (i) December 31, 2007; (ii) the last day of the Development Schedule; or (iii) opening of the last Center specified in the Development Schedule. This Agreement may be terminated before it expires in accordance with the termination provisions of this Agreement. Upon expiration or termination of this Agreement, you will not have any further rights to acquire franchises to operate Centers; but you may continue to develop, own and operate all Centers then subject to fully executed franchise agreements (the "Franchise Agreement(s)") with us in accordance with their terms.

2.2.    **Modification of Term.** At the end of the 3rd Development Year, and every 36 months thereafter, we will reassess the prospects for the development of Centers in the Development Area. At that time, we may adjust the number of Centers to be developed within the Development Area to account for growth in population and other relevant demographics. If we do so, you and we will agree on a new Development Schedule based on 1 new Centers open and in operation every 6 months by increasing the

4

You _____ You _____    US _____

number of Centers that you are to develop and extending the Development Period (the "New Schedule"). We may refuse a New Schedule if you are in breach of any agreement between you and us. If you do not agree to the New Schedule, then we may develop additional Centers within the Development Area either ourselves or through other franchisees, but you will maintain the right and obligation to own, open and operate the Centers subject to the Development Schedule.

2.3.    Rights We Reserve. We (and our affiliates) retain the right in our sole discretion to:

(a)    to solicit prospective Franchisees and grant other persons Franchises, or other rights to operate Centers or Development Businesses: through national or regional advertising, trade shows or conventions, or using or through the Internet, Intranet or other forms of e-commerce or through similar means;

(b)    to own and operate Centers to Development Businesses ourselves or through affiliates anywhere, except your Development Area:,

(c)    sell, solicit, recruit and provide services for Centers, Development Businesses or any franchised business not defined as an Center in this Agreement;

(d)    to sell, and provide the services authorized for sale by, Centers under the Marks or other trade names, trademarks, service marks and commercial symbols through similar or dissimilar channels (like telephone, mail order, kiosk, co-branded sites and sites located within other retail businesses, stadiums, Intranet, Internet, web sites, wireless, email or other forms of e-commerce) for distribution within and outside of your Marketing Area or Protected Area and pursuant to such terms and conditions as we consider appropriate;

(e)    to solicit prospective franchisees and area developers for, and own and operate businesses of any other kind or nature, anywhere.

3.    DEVELOPMENT RIGHTS AND OBLIGATIONS.

3.1.    Development Rights. If your are in full compliance with all of the provisions of this Agreement and all of the Franchise Agreements, then during the term of this Agreement, we will grant to you franchises to own and operate Centers to be located within the Development Area as further defined on Exhibit "B" attached hereto. Each Center will operate 1 Center.

3.2.    Development Obligations. During the term of this Agreement, you will at all times faithfully, honestly and diligent perform your obligations and continuously exert your best efforts to promote and enhance the development of Centers within the Development Area. You agree to:

(a)    Obtain locations and premises for Centers approved by us; and

(b)    Open a total of 3 Centers within the time periods (the "Development Periods") mandated by the following schedule (the "Development Schedule"):

5

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

| Development Year | Center Openings | Dates Centers Must Be Opened By | Cumulative Number of Centers Open and in Operation |
|---|---|---|---|
| 1 | 1 | December 31, 2006 | 1 |
| 2 | 2 | December 31, 2007 | 3 |
| 3 | N/A | December 31, 200_ | N/A |
| 4 | N/A | December 31, 20___ | N/A |
| 5 | N/A | December 31, 20___ | N/A |

Development Year 1 ends on December 31, 2006. After that, each Development Year begins on January 1 and ends on December 31 of each succeeding year (2007).

(c)    However, we will not grant you a franchise for the second Center until the first Center has met our training requirements (e.g., achieved our certification as a training center for your Franchise organization). We will not grant you a franchise for an additional Center unless (a) each preceding Center has been open and in operation for at least 3 months, unless otherwise specified; (b) is profitable based on the accounting system we specify; (c) is operated in full compliance with their respective Franchise Agreements; and (d) has an approved Medical Director assigned to its Center on a full-time capacity.

3.3.    **Effect of Failure.** Strict compliance with the Development Schedule is of the essence. If you do not timely meet the Development Schedule, you will be in default. Any such default constitutes a material breach of this Agreement and we may:

(a)    Terminate this Agreement;

(b)    Have the right to purchase any of your Centers that are operating within the Development Area;

(c)    Have the right to operate or grant franchises to operate Centers within the Development Area;

(d)    Grant you an extension under the Development Schedule for such time period and for a nonrefundable extension fee equal to the balance of the then current Franchise Fees for the number of Centers remaining to be opened under the Development Schedule; or

(e)    Reduce the Development Area and the Development Schedule to a size and magnitude that we estimate you are capable of operating otherwise in accordance with this Agreement.

4.    **DEVELOPMENT FEE.** You agree to pay us a fee of $120, 000.00 (the "Development Fee"), which is ½ of the then current Franchise Fee times the number of Centers to be developed. The Development Fee constitutes payment only for the exclusive rights we grant you under this Agreement.

6

J.Stone ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____      US _____

The Development Fee must be paid on the Agreement Date. The Development Fee is fully earned by us and non-refundable. If you and we agree to the New Schedule, you will, at that time, pay us an additional nonrecurring and nonrefundable Development Fee in an amount equal to ½ of the then current Franchise Fee due for each additional Center to be developed under on the New Schedule. If we do so, you and we will agree on the New Schedule. The basis of the New Schedule will be that a minimum of one new Center will be open and in operation every 6 months. If this pace does not deliver the number of total Center specified in the New Schedule within the original time frame designated in the original Development Schedule, then the New Schedule will be extended so as to allow for the development of the new total number of units, with a pace of development of 1 Center per 6 months. If you do not agree with the New Schedule, then we may develop additional Centers within the Development Area either ourselves or through other franchisees, but you will maintain the right and obligation to own, open and operate the Centers subject to the original Development Schedule.

5.    **GRANT OF FRANCHISES.**

   5.1.    _Franchise Agreements._ You must enter into our then-current form of franchise agreement for each Center, and your guarantors must personally guaranty your obligations under them pursuant to our then-current forms of Principal Owners Guaranty. However, all such Franchise Agreements will be modified by this Agreement as follows:

      (a)    _Franchise Fee:_ The "Franchise Fee" for each Center will be reduced by an amount equal to ½ of the then current Franchise Fee as of the Agreement Date of this Agreement. For example, if the Franchise Fee is $75,000 as of the Agreement Date, the Franchise Fee for your first Center is $37,500. If the Franchise Fee is $100,000 at the time you seek to acquire the second Center, the Franchise Fee is $62,500 (i.e., $100,000 - $37,500).

      (b)    _Protected Area:_ The Protected Area of each Center will consist of the Site, the zip code in which the Site is located and the entire geographic area within a 1-mile radius unless otherwise specified in the Franchise Agreement.

      (c)    _Initial Training:_ We may require that you are responsible for assisting with the training of the Medical Director for each subsequent Center on your Development Schedule (or New Schedule). At least one Medical Director must be certified by us, via their attendance at our then current Medical Director training class conducted in Boca Raton, Florida (or at an alternative location that we may designate). Approval for the development of subsequent Centers is contingent upon satisfaction of our Medical Director training requirements.

6.    **MARKS.**

   6.1.    _Ownership and Goodwill of Marks._ Your right to use the Marks is derived solely from this Agreement and limited to your operation of your Center and your Development Business pursuant to and in compliance with this Agreement and all System Standards we prescribe from time to time during the Term. Your unauthorized use of the Marks will be a breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that your usage of the Marks and any goodwill established by such use will be exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate your Center(s) and your Development Business in compliance with this Agreement). All provisions of this Agreement applicable to

7

3 Store ADA
FloMar, LLC
Sarasota-Henderson
September 2006

You _[signature]_    You _[signature]_    US _[signature]_

the Marks apply to any additional proprietary trade and service marks and commercial symbols we authorize you to use.

6.2.    **Limitations on Your Use of Marks.** You agree to use the Marks we designate and in the manner we designate as the sole identification of your Center(s) and Development Business, except that you agree to identify yourself as the independent owner in the manner we prescribe. You may not use modifying words, terms, designs or symbols (other than logos we license to you), or in any modified form, nor may you use any Mark in connection with the performance or sale of any unauthorized services or products or in any other manner we have not expressly authorized in writing. No Mark may be used in any advertising concerning the transfer, sale or other disposition of your Center(s), your Development Business or an ownership interest in you. You agree to display the Marks prominently in the manner we prescribe, on supplies or materials we designate and in connection with forms and advertising and marketing materials. You agree to give such notices of trade and service mark registrations as we specify and to obtain any fictitious or assumed name registrations required under applicable law.

6.3.    **Notification of Infringements and Claims.** You agree to notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any claim by any person of any rights in or to any Mark, and you agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim. We have sole discretion to take such action as we deem appropriate and the right to control exclusively any litigation, U.S. Patent and Trademark Office or U.S. Copyright Office proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark. You agree to sign any and all instruments and documents, render such assistance and do such acts and things as, in the opinion of our attorneys, may be necessary or advisable to protect and maintain our interests in any litigation or Patent and Trademark Office, U.S. Copyright Office or other proceeding or otherwise to protect and maintain our interests in the Marks.

6.4.    **Discontinuance of Use of Marks.** If it becomes advisable at any time in our sole judgment for us and/or you to modify or discontinue the use of any Mark and/or use one or more additional or substitute trade or service marks, including the complete replacement of any Mark and usage of other marks (due to merger, acquisition or otherwise), you agree to comply with our directions within a reasonable time after receiving notice. We will not reimburse you for any loss of revenue attributable to any modified or discontinued Mark or for any expenditures you make to change Marks or to promote a modified or substitute trademark or service mark.

6.5.    **Indemnification.** We will indemnify you against and reimburse you for all damages for which you are held liable to third parties in any proceeding arising out of your authorized use of any of our Marks, pursuant to and in compliance with this Agreement, resulting from claims by third parties that your use of any of the Marks infringes their trademark rights, and for all costs you reasonably incur in the defense of any such claim in which you are named as a party, so long as you have timely notified us of the claim and have otherwise complied with the terms of this Agreement. We will not indemnify you against the consequences of your use of the Marks except in accordance with the requirements of this Agreement. You must provide written notice to us of any such claim within 10 days of your receipt of such notice and you must tender the defense of the claim to us. We will have the right to defend any such claim and if we do so, we will have no obligation to indemnify or reimburse you for any fees or disbursements of any attorney retained by you. If we elect to defend the claim, we will have the right to manage the defense of the claim

8

Your _____  Your _____                    US _____

including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim.

## 7.    CONFIDENTIAL INFORMATION.

7.1.    Types of Confidential Information.    We possess (and will continue to develop and acquire) certain confidential information (the "Confidential Information") relating to the development and operation of Centers and Development Businesses, which includes (without limitation):

(a)    the System and the know-how related to its use;

(b)    plans, specifications, size and physical and operational characteristics of the Centers;

(c)    site selection criteria and site development methods;

(d)    methods in obtaining licensing and meeting regulatory requirements;

(e)    sources and design of equipment, furniture, forms, materials and supplies;

(f)    marketing, advertising, contests and promotional programs for Centers and Development Businesses;

(g)    staffing and product or service delivery methods and techniques;

(h)    the selection, testing and training of personnel for Centers and Development Businesses;

(i)    the recruitment, qualification and investigation methods to secure employment for employment candidates;

(j)    any computer software we make available or recommend for Centers or Development Businesses;

(k)    methods, techniques, formats, specifications, procedures, information and systems related to and knowledge of and experience in the development, operation and franchising of Centers or Development Businesses;

(l)    knowledge of specifications for and suppliers of certain products, materials, supplies, furniture, furnishings and equipment;

(m)    treatment methodologies, preparation, methods and servicing techniques for the Service and recipes, serving and preparation methods for the Products;

(n)    knowledge of operating results and financial performance of Centers or Development Businesses other than those operated by you (or your affiliates); and

9

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

(o)     e-commerce related data (e.g., customer data, click-stream data, cookies, user data, hits and the like).

7.2.    **Disclosure and Limitations on Use.** We will disclose much of the Confidential Information to you by furnishing the Manuals to you and by providing training, guidance and assistance to you. In addition, in the course of the operation of your Centers or Development Business, you or your personnel may develop ideas, concepts, methods, techniques or improvements ("Improvements") relating to your Centers or Development Business, which you agree to disclose to us. We will be deemed to own the Improvements and may use them and authorize you and others to use them in the operation of Centers or Development Business. Improvements will then also constitute Confidential Information.

7.3.    **Confidentiality Obligations.** You agree that your relationship with us does not vest in you any interest in the Confidential Information other than the right to use it in the development and operation of your Center, and that the use or duplication of the Confidential Information in any other business would constitute an unfair method of competition. You acknowledge and agree that the Confidential Information is proprietary, includes trade secrets belonging to us and is disclosed to you or authorized for your use solely on the condition that you agree, and you therefore do agree, that you:

(a)     will not use the Confidential Information in any other business or capacity;

(b)     will maintain the absolute confidentiality of the Confidential Information during and after the Term;

(c)     will not make unauthorized copies of any portion of the Confidential Information disclosed via electronic medium, in written form or in other tangible form, including, for example, the Manuals; and

(d)     will adopt and implement all reasonable procedures we may prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including, restrictions on disclosure to your employees and the use of nondisclosure and noncompetition agreements we may prescribe for employees or others who have access to the Confidential Information.

7.4.    **Exceptions to Confidentiality.** The restrictions on your disclosure and use of the Confidential Information will not apply to the following:

(a)     disclosure or use of information, processes, or techniques which are generally known and used in the Centers (as long as the availability is not because of a disclosure by you), provided that you have first given us written notice of your intended disclosure and/or use; and

(b)     disclosure of the Confidential Information in judicial or administrative proceedings when and only to the extent you are legally compelled to disclose it, provided that you have first given us the opportunity to obtain an appropriate protective order or other assurance satisfactory to us that the information required to be disclosed will be treated confidentially.

8.    **EXCLUSIVE RELATIONSHIP.** You acknowledge and agree that we would be unable to protect Confidential Information against unauthorized use or disclosure or to encourage a free exchange of ideas and information among Centers if Developers and franchised owners of Centers were permitted

10

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006        You /// / You        US

to hold interests in or perform services for a Competitive Business (defined below). You also acknowledge that we have granted these development rights to you in consideration of and reliance upon your agreement to deal exclusively with us. You agree that, during the Term, neither you nor any of your owners (nor any of your or your owners' spouses or children) will:

       (a)     have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business operating within 75 miles of the site of any of your franchised Centers;

       (b)     have any direct or indirect controlling interest as a disclosed or beneficial owner in a Competitive Business, wherever located;

       (c)     have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business operating within 75 miles of any Center other than any of your Centers;

       (d)     perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business, wherever located; or

       (e)     recruit or hire any person who is our employee or the employee of any Center without obtaining the prior written permission of that person's employer.

The term "Competitive Business" as used in this Agreement means any business or facility owning, operating or managing, or granting franchises or licenses to others to do so, any Center or any business operating from a mobile or fixed location (or via any form of e-commerce) that offers: physician assisted, or non-physician assisted, medical based physician monitored or supervised weight reduction or weight management, health or nutritional services or weight loss, weight loss or management products, foods, cookies, shakes, supplies, drops, creamers, or the like which are the same as or similar to those Services or Products employed or offered or sold by Centers or which in any way utilize the Confidential Information the copyrights, Art, the System or the Marks (other than a Center operated under a Franchise Agreement with us) or any other health, nutritional or dietary products or vitamins.

## 9.   TRANSFER.

    9.1.    **By Us.** This Agreement is fully transferable by us and will inure to the benefit of any transferee or other legal successor to our interests.

    9.2.    **By You.** You understand and acknowledge that the rights and duties created by this Agreement are personal to you (or, if you are a Business Entity, to your owners) and that we have granted the Franchise to you in reliance upon our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability and financial capacity. Accordingly, neither this Agreement (nor any interest in it) nor any ownership or other interest in you or your Center(s) may be transferred without our prior written approval. Any transfer without such approval constitutes a breach of this Agreement and is void and of no effect. As used in this Agreement, the term "transfer" includes your (or your owners') voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition of any interest in: (a) this Agreement; (b) you; or (c) your Center(s). An assignment, sale, gift or other disposition includes the following events:

(i)    transfer of ownership of 10% or more of any capital stock or a partnership interest or any other interest that affects control over the Business Entity;

(ii)    merger or consolidation or issuance of additional securities or interests representing an ownership interest in you;

(iii)    any issuance or sale of your stock or any security convertible to your stock;

(iv)    transfer of an interest in you, this Agreement, your Center(s) or the Centers in a divorce, insolvency or corporate or partnership dissolution proceeding or otherwise by operation of law;

(v)    transfer of an interest in you, this Agreement, your Center(s) or the Centers, in the event of your death or the death of one of your owners, by will, declaration of or transfer in trust or under the laws of intestate succession; or

(vi)    pledge of this Agreement (to someone other than us) or of an ownership interest in you as security.

9.3.    **Conditions for Approval of Transfer.** If you (and your owners) are in full compliance with this Agreement, then subject to the other provisions of this Section, we will approve a transfer that meets all the applicable requirements of this Section. The proposed transferee and its direct and indirect owners must be individuals of good character and otherwise meet our then applicable standards for Center franchisees and Area Developers. A transfer of ownership, possession or control of the Centers, your Development Business or Centers may be made only in conjunction with a transfer of this Agreement. If the transfer is of this Agreement or a controlling interest in you, or is one of a series of transfers which in the aggregate constitute the transfer of this Agreement or a controlling interest in you, all of the following conditions must be met prior to or concurrently with the effective date of the transfer:

(a)    the transferee has sufficient experience, aptitude and financial resources to operate the Centers and your Development Business(es);

(b)    you have paid all amounts owed to us or to third-party creditors and have submitted all required reports and statements;

(c)    the transferee (or its owners) have agreed to complete our standard training program, at their expense;

(d)    the transferee has agreed to be bound by all of the terms and conditions of this Agreement;

(e)    the transferee has entered into our then-current form of Area Development Agreement for a Term ending on the expiration date of this Agreement and requiring no Development Fee;

12

Vou _____ Vou _____    US _____

(f)     you or the transferee pay us a transfer fee equal to $5,000 to defray expenses we incur in connection with the transfer. If the proposed transfer is among your owners, the transfer fee will be equal to $1,500;

(g)     you (and your transferring owners) have signed a general release, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents;

(h)     we have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of its Center(s);

(i)     if you or your owners finance any part of the sale price of the transferred interest, you and/or your owners have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests that you or your owners have reserved in any Center are subordinate to the transferee's obligation to pay amounts due to us and otherwise to comply with this Agreement;

(j)     you and your transferring owners (and your and your owners' spouses and children) have signed a non-competition covenant in favor of us and the transferee agreeing to be bound, commencing on the effective date of the transfer, by the restrictions contained in this Agreement; and

(k)     you and your transferring owners have agreed that you and they will not directly or indirectly at any time or in any manner (except with respect to other Centers or Development Business you own and operate) identify yourself or themselves or any business as a current or former Center owner or Area Developer, or as one of our licensees or franchisees, use any Mark, any colorable imitation of a Mark, or other indicia of an Center in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with us.

9.4.     **Transfer to a Business Entity.** If you are in full compliance with this Agreement, you may transfer this Agreement to a Business Entity that conducts no business other than the Centers granted under this Agreement and you Development Business and, if applicable, other Center or Development Business so long as you own, control and have the right to vote 51% or more of its issued and outstanding ownership interests (like stock or partnership interests) and you guarantee its performance under this Agreement. All other owners are subject to our approval. The organizational or governing documents of the Business Entity must recite that the issuance and transfer of any ownership interests in the Business Entity are restricted by the terms of this Agreement, are subject to our approval, and all certificates or other documents representing ownership interests in the Business Entity must bear a legend referring to the restrictions of this Agreement. As a condition of our approval of the issuance or transfer of ownership interests to any person other than you, we may require (in addition to the other requirements we have the right to impose) that the proposed owner sign an agreement, in a form provided or approved by us, agreeing to be bound jointly and severally by, to comply with, and to guarantee the performance of, all of the your obligations under this Agreement.

9.5.     **Transfer Upon Death or Disability.** Upon your death or disability or, if you are a Business Entity, the death or disability of the owner of a controlling interest in you, we may require you (or

13

Your _____ You _____          US _____

such owner's executor, administrator, conservator, guardian or other personal representative) to transfer your interest in this Agreement (or such owner's interest in you) to a third party. Such disposition (including, without limitation, transfer by bequest or inheritance) must be completed within the time we designate, not more than 3 months from the date of death or disability. Such disposition will be subject to all of the terms and conditions applicable to transfers contained in this Section. A failure to transfer your interest in this Agreement or the ownership interest in you within this period of time constitutes a breach of this Agreement. For purposes of this Agreement, the term "disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent you or an owner of a controlling interest in you from managing and operating the Centers and your Development Business.

9.6. **Operation Upon Death or Disability.** If, upon your death or disability or the death or disability of the owner of a controlling interest in you, the Centers and Development Business are not being managed by a trained manager, 15 days from the date of death or disability, appoint a manager to operate the applicable Center.

9.7. **Effect of Consent to Transfer.** Our consent to a transfer of this Agreement and the Centers or the Development Business or any interest in you does not constitute a representation as to the fairness of the terms of any contract between you and the transferee, a guarantee of the prospects of success of the Centers, the Development Business or transferee or a waiver of any claims we may have against you (or your owners) or of our right to demand the transferee's exact compliance with any of the terms or conditions of this Agreement.

9.8. **Our Right of First Refusal.** If you (or any of your owners) at any time determine to sell, assign or transfer for consideration an interest in this Agreement and Centers, your Development Business or an ownership interest in you, you (or such owner) agree to obtain a bona fide, executed written offer and earnest money deposit (in the amount of 5% or more of the offering price) from a responsible and fully disclosed offeror (including lists of the owners of record and all beneficial owners of any corporate or limited liability company offeror and all general and limited partners of any partnership offeror and, in the case of a publicly-held corporation or limited partnership, copies of the most current annual and quarterly reports and Form 10K) and within 5 days of receipt submit to us a true and complete copy of such offer, which includes details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be denominated in a dollar amount. The offer must apply only to an interest in you or in this Agreement and Centers and may not include an offer to purchase any of your (or your owners') other property or rights. However, if the offeror proposes to buy any other property or rights from you (or your owners) under a separate, contemporaneous offer, such separate, contemporaneous offer must be disclosed to us, and the price and terms of purchase offered to you (or your owners) for the interest in you or in this Agreement and Center(s) must reflect the bona fide price offered and not reflect any value for any other property or rights.

We have the right, exercisable by written notice delivered to you or your selling owner(s) within 30 days from the date of the delivery to us of both an exact copy of such offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that:

14

J Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          us _____

(a)    we may substitute cash for any form of payment proposed in such offer (with a discounted amount if an interest rate will be charged on any deferred payments);

(b)    our credit will be deemed equal to the credit of any proposed purchaser;

(c)    we will have not less than 30 days after giving notice of our election to purchase to prepare for closing; and

(d)    we are entitled to receive, and you and your owners agree to make, all customary representations and warranties given by the seller of the assets of Center(s) or and your Development Business or the capital stock of an incorporated business, as applicable, including, without limitation, representations and warranties as to:

(e)    ownership and condition of and title to stock or other forms of ownership interest and/or assets;

(f)    liens and encumbrances relating to the stock or other ownership interest and/or assets; and

(g)    validity of contracts and the liabilities, contingent or otherwise, of the corporation whose stock is being purchased.

If we exercise our right of first refusal, you and your selling owner(s) agree that, for a period of 2 years commencing on the date of the closing, you and they will be bound by the noncompetition covenant contained this Agreement. You and your selling owner(s) further agree that you and they will, during this same time period, abide by the restrictions of this Agreement.

If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to our approval of the transfer, provided that, if the sale to such purchaser is not completed within 120 days after delivery of such offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the 30 day period following either the expiration of such 120 day period or notice to us of the material change(s) in the terms of the sale, either on the terms originally offered or the modified terms, at our option.

## 10.    TERMINATION OF AGREEMENT.

10.1.    **On Notice.** We have the right to terminate this Agreement, effective upon delivery of written notice of termination to you, if:

(a)    you (or any of your owners) have made any material misrepresentation or omission in connection with your purchase of these development rights;

(b)    you fail to meet the Development Schedule;

(c)    you surrender or transfer control of this Agreement, the Centers, your Development Business or any Center or Site without our prior written consent;

15

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

Yo\_\_\_\_ You \_\_\_\_    US \_\_\_\_

(d)     you (or any of your owners) are or have been convicted by a trial court of, or plead or have pleaded no contest, or guilty, to, a felony or other serious crime or offense;

(e)     you (or any of your owners) engage in any dishonest or unethical conduct which may adversely affect the reputation of your Business or another Centers or Development Businesses or the goodwill associated with the Marks;

(f)     you (or any of your owners) make an unauthorized assignment of this Agreement or of an ownership interest in you, your Development Business, Centers, the Centers granted under this Agreement, or the owners of those Centers;

(g)     in the event of your death or disability or the death or disability of the owner of a controlling interest in you, this Agreement or such owner's interest in you is not assigned as required under this Agreement;

(h)     you (or any of your owners) make any unauthorized use or disclosure of any Confidential Information;

(i)     you (or any of your owners) fail to comply with any other provision of this Agreement or any other agreements with us our any of our affiliates; or

(j)     you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee or liquidator of all or the substantial part of your property; unless any order appointing a receiver, trustee or liquidator of you is not vacated within 30 days following the entry of such order.

10.2.    After Notice. We may also terminate this Agreement after we notify you of our intention to do so because of the occurrence of any of the following events and your failure to cure it within 30 days of our notice:

(a)     if you are a Business Entity, failure to maintain active status in your state of organization;

(b)     you violate any provision of this Agreement or any other agreement with us our any of our affiliates;

(c)     continued violation of any law, ordinance, rule or regulation of a governmental agency; or

(d)     failure to obtain any approvals or consents required by this Agreement.

11.    RIGHTS AND OBLIGATIONS UPON TERMINATION.

11.1.    Payment of Amounts Owed To Us. You agree to pay us within 15 days after the effective date of termination or expiration of this Agreement, or on such later date that the amounts due to us which are then unpaid.

16

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          US _____

11.2.   Marks. Upon the termination or expiration of this Agreement:

(a)     you may not directly or indirectly at any time or in any manner (except with respect to other Centers or Development Businesses you own and operate) identify yourself or any business as a current or former Center, or as one of our Area Developers, licensees or franchisees, use any Mark, any colorable imitation of a Mark or other indicia of an Center in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that indicates or suggests a connection or association with us;

(b)     you agree to take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark under this Agreement; and

(c)     you agree to furnish us, within 30 days after, as applicable, the effective date of expiration of this Agreement or the Notification Date, with evidence satisfactory to us of your compliance with the foregoing obligations.

11.3.   Confidential Information.   You agree that, upon termination or expiration of this Agreement, you will immediately cease to use any of our Confidential Information in any Centers, your Development Business or otherwise and return to us all copies of the Manual and any other confidential materials that we have loaned to you.

11.4.   Competitive Restrictions. Upon our termination of this Agreement in accordance with its terms and conditions, or  expiration of this Agreement (if we offer, but you elect not to acquire, a successor Area Development Agreement), you and your owners agree that, for a period of 2 years commencing on the effective date of termination or expiration or the date on which a person restricted by this Section begins to comply with this Section, whichever is later, neither you nor any of your owners will have any direct or indirect interest (e.g., through a spouse or child) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity in any Competitive Business operating:

(i)      within 75 miles of any Center or Development Area operated by or granted to you under this Agreement or any Franchise Agreement with us; or

(ii)     within 75 miles of any other Center or Development Area, granted by us, in operation or under construction on the later of the effective date of the termination or expiration or the date on which a person restricted by this Section complies with this Section.

If any person restricted by this Section refuses voluntarily to comply with the foregoing obligations, the 2-year period will commence with the entry of an order of an arbitrator, or court if necessary, enforcing this provision.  You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting such skills.  Consequently, enforcement of the covenants made in this Section will not deprive you of your personal goodwill or ability to earn a living.

17

A Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

12.    RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.

12.1.    Independent Contractors.  You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us, that we and you are and will be independent contractors and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner or employee of the other for any purpose.  You agree to conspicuously identify yourself in all dealings with customers, suppliers, public officials, Center personnel and others as the owner of the Centers under an Area Development Agreement we have granted and to place such notices of independent ownership on such forms, business cards, stationery and advertising and other materials as we may require from time to time.

12.2.    No Liability for Acts of Other Party.  You agree not to employ any of the Marks in signing any contract or applying for any license or permit, or in a manner that may result in our liability for any of your indebtedness or obligations, and that you will not use the Marks in any way we have not expressly authorized.  Neither we nor you will make any, express or implied agreements, warranties, guarantees or representations or incur any debt in the name or on behalf of the other, represent that our respective relationship is other than franchisor and developer or be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized in writing.  We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of the Center(s) you conduct pursuant to this Agreement.

12.3.    Indemnification.  You agree to indemnify, defend and hold harmless us, our affiliates and our respective shareholders, directors, officers, employees, agents, successors and assignees (the "Indemnified Parties") against and to reimburse any one or more of the Indemnified Parties for all claims, obligations and damages described in this Section, any and all taxes described in this Agreement and any and all claims and liabilities directly or indirectly arising out of the operation of your Development Business or the Centers (even if our negligence is alleged) or your breach of this Agreement or any Franchise Agreement.  For purposes of this indemnification, "claims" includes all obligations, damages (actual, consequential or otherwise) and costs reasonably incurred in the defense of any claim against any of the Indemnified Parties, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses.  We have the right to defend any such claim against us.  This indemnity will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.  Under no circumstances will we or any other Indemnified Party be required to seek recovery from any insurer or other third party, or otherwise to mitigate our, their or your losses and expenses, in order to maintain and recover fully a claim against you.  You agree that a failure to pursue such recovery or mitigate a loss will in no way reduce or alter the amounts we or another Indemnified Party may recover from you.

13.    ENFORCEMENT.

13.1.    Severability; Substitution of Valid Provisions.  Except as otherwise stated in this Agreement, each term of this Agreement, and any portion of any term, are severable.  The remainder of this Agreement will continue in full force and effect.  To the extent that any provision restricting your competitive activities is deemed unenforceable, you and we agree that such provisions will be enforced to the fullest extent permissible under governing law.  This Agreement will be deemed automatically modified

3 Store ADA
Flo-Mar, LLC
Saraota-Bradenton
September 2006

18

You _____  You _____          US _____

to comply with such governing law if any applicable law requires: (a) a greater prior notice of the termination of or refusal to renew this Agreement; or (b) the taking of some other action not described in this Agreement; or (c) if any of our System Standards are invalid or unenforceable. We may modify such invalid or unenforceable provision to the extent required to be valid and enforceable. In such event, you will be bound by the modified provisions.

13.2.    **Waivers.** We will not be deemed to have waived our right to demand exact compliance with any of the Terms, even if at any time: (a) we do not exercise a right or power available to us under this Agreement; or (b) we do not insist on your strict compliance with the terms of this Agreement; or (c) if there develops a custom or practice which is at variance with the terms of this Agreement; or (d) if we accept payments which are otherwise due to us under this Agreement. Similarly, our waiver of any particular breach or series of breaches under this Agreement or of any similar term in any other agreement between you and us or between us and any other franchise owner, will not effect our rights with respect to any later breach by you or anyone else.

13.3.    **Limitation of Liability.** Neither of the parties will be liable for loss or damage or deemed to be in breach of this Agreement if failure to perform obligations results from:

(a)    compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof;

(b)    acts of God, war, terror or similar like;

(c)    acts or omissions of a similar event or cause.

However, such delays or events do not excuse payments of amounts owed at any time.

13.4.    **Approval and Consents.** Whenever this Agreement requires our advance approval, agreement or consent, you agree to make a timely written request for it. Our approval or consent will not be valid unless it is in writing. Except where expressly stated otherwise in this Agreement, we have the absolute right to refuse any request by you or to withhold our approval of any action or omission by you. If we provide to you any waiver, approval, consent, or suggestion, or If we neglect or delay our response or deny any request for any of those, we will not be deemed to have made any warranties or guarantees which you may rely on, and will not assume any liability or obligation to you.

13.5.    **Waiver of Punitive Damages.** EXCEPT FOR YOUR OBLIGATIONS TO INDEMNIFY US AND CLAIMS FOR UNAUTHORIZED USE OF THE MARKS OR CONFIDENTIAL INFORMATION, YOU AND WE EACH WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY RIGHT TO, OR CLAIM FOR, ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER. YOU AND WE ALSO AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN YOU AND US, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

13.6.    **Limitations of Claims.** ANY AND ALL CLAIMS ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP AMONG YOU AND US MUST BE MADE BY WRITTEN NOTICE TO THE OTHER PARTY WITHIN 1 YEAR FROM THE OCCURRENCE

19

3 Store ADA
Pro-Mar, LLC
Sarasota-Bradenton
September 2006