OF THE FACTS GIVING RISE TO SUCH CLAIM (REGARDLESS OF WHEN IT BECOMES KNOWN); EXCEPT FOR CLAIMS ARISING FROM: (A) UNDER-REPORTING OF GROSS SALES; (B) UNDER-PAYMENT OF AMOUNTS OWED TO US OR OUR AFFILIATES; (C) CLAIMS FOR INDEMNIFICATION; AND/OR (D) UNAUTHORIZED USE OF THE MARKS. HOWEVER, THIS PROVISION DOES NOT LIMIT THE RIGHT TO TERMINATE THIS AGREEMENT IN ANY WAY.

13.7.   Governing Law.   EXCEPT TO THE EXTENT THIS AGREEMENT OR ANY PARTICULAR DISPUTE IS GOVERNED BY THE U.S. TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. §1051 AND THE SECTIONS FOLLOWING IT) OR OTHER FEDERAL LAW, THIS AGREEMENT AND THE FRANCHISE ARE GOVERNED BY FLORIDA LAW WITHOUT REGARD TO ITS LAWS GOVERNING CONFLICT OF LAWS, AND EXCLUDING ANY LAW REGULATING THE SALE OF FRANCHISES OR GOVERNING THE RELATIONSHIP BETWEEN A FRANCHISOR AND DEVELOPER, UNLESS THE JURISDICTIONAL REQUIREMENTS OF SUCH LAWS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS SECTION. ALL MATTERS RELATING TO ARBITRATION ARE GOVERNED BY THE FEDERAL ARBITRATION ACT. References to any law or regulation also refer to any successor laws or regulations and any implementing regulations for any statute, as in effect at the relevant time. References to a governmental agency also refer to any successor regulatory body that succeeds to the function of such agency.

13.8.   Jurisdiction.   YOU AND WE CONSENT AND IRREVOCABLY SUBMIT TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION LOCATED IN PALM BEACH COUNTY, FLORIDA, AND WAIVE ANY OBJECTION TO THE JURISDICTION AND VENUE OF SUCH COURTS. THE EXCLUSIVE CHOICE OF JURISDICTION DOES NOT PRECLUDE THE BRINGING OF ANY ACTION BY THE PARTIES OR THE ENFORCEMENT BY THE PARTIES IN ANY JUDGMENT OBTAINED IN ANY SUCH JURISDICTION, IN ANY OTHER APPROPRIATE JURISDICTION OR THE RIGHT OF THE PARTIES TO CONFIRM OR ENFORCE ANY ARBITRATION AWARD IN ANY APPROPRIATE JURISDICTION.

13.9.   Waiver of Jury Trial.   YOU AND WE EACH IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER YOU OR US.

13.10.   Cumulative Remedies.   The rights and remedies provided in this Agreement are cumulative and neither you nor we will be prohibited from exercising any other right or remedy provided under this Agreement or permitted by law or equity.

13.11.   Costs and Attorneys Fees.   If a claim for amounts owed by you to us or any of our affiliates is asserted in any legal or arbitration proceeding or, if either you or we are required to enforce this Agreement in a judicial or arbitration proceeding, the party prevailing in such proceeding will be entitled to reimbursement of its costs and expenses, including reasonable accounting and attorneys fees. Attorneys fees will include, without limitation, reasonable legal fees charged by attorneys, paralegal fees, and costs and disbursements, whether incurred prior to, or in preparation for, or contemplation of, the filing of written

20

demand or claim, action, hearing, or proceeding to enforce the obligations of the parties under this Agreement.

13.12.  **Binding Effect.**  This Agreement is binding on and will inure to the benefit of our successors and assigns.  Except as otherwise provided in this Agreement, this Agreement will also be binding on your successors and assigns, and your heirs, executors and administrators.

13.13.  **Entire Agreement.**  This Agreement, including the introduction, addenda and exhibits to it, constitutes the entire agreement between you and us.  There are no other oral or written understandings or agreements between you and us concerning the subject matter of this Agreement.  Except as expressly provided otherwise in this Agreement, this Agreement may be modified only by written agreement signed by both you and us.

13.14.  **No Liability to Others; No Other Beneficiaries.**  We will not, because of this Agreement or by virtue of any approvals, advice or services provided to you, be liable to any person or legal entity who is not a party to this Agreement.  Except as specifically described in this Agreement, no other party has any rights because of this Agreement.

13.15.  **Construction.**  The headings of the sections are for convenience only.  If two or more persons are at any time Developers hereunder, whether or not as partners or joint venturers, their obligations and liabilities to us are joint and several.  This Agreement may be signed in multiple copies, each of which will be an original.  "A or B" means "A" or "B" or both.

13.16.  **Certain Definitions.**  The term "family member" refers to parents, spouses, offspring and siblings, and the parents and siblings of spouses.  The term "affiliate" means any Business Entity directly or indirectly owned or controlled by a person, under common control with a person or controlled by a person.  The terms "Developer, franchisee, franchise owner, you and your" are applicable to one or more persons, a Business Entity, as the case may be.  The singular use of any pronoun also includes the plural and the masculine and neuter usages include the other and the feminine.  The term "person" includes individuals or Business Entities.  The term "section" refers to a section or subsection of this Agreement.  The word "control" means the power to direct or cause the direction of management and policies.  The word "owner" means any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in another person (or a transferee of this Agreement or an interest in you), including any person who has a direct or indirect interest in you or this Agreement and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets.

13.17.  **Timing is of the Essence.**  It will be a material breach of this Agreement to fail to perform any obligation within the time required or permitted by this Agreement.  In computing time periods from one date to a later date, the words "from" and "commencing on" (and the like) mean "from and including"; and the words "to", "until" and "ending on" (and the like) mean "to but excluding."  Indications of time of day mean Boca Raton, Florida time.

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____  You _____                              US _____

21

14.    DISPUTE RESOLUTION.

14.1.    Mediation. During the Term, certain disputes may arise between you and us that may be resolvable through mediation. To facilitate such resolution, you and we agree that each party must, before commencing any arbitration proceeding, submit the dispute for non-binding arbitration at a mutually agreeable location (if you and we cannot agree on a location, the mediation will be conducted at our headquarters) to 1 mediator, appointed under the American Arbitration Association's Commercial Mediation Rules. The mediator will conduct a mediation in accordance with such rules. You and we agree that any statements made by either you or us in any such mediation proceeding will not be admissible in any subsequent arbitration or other legal proceeding. Each party will bear its own costs and expenses of conducting the mediation and share equally the costs of any third parties who are required to participate. Nevertheless, both you and we have the right in a proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction. However, the parties must immediately and contemporaneously submit the dispute for non-binding mediation. If any dispute between the parties cannot be resolved through mediation within 60 days following the appointment of a mediator, the parties must submit the dispute to arbitration subject to the following terms and conditions.

14.2.    Agreement to Arbitrate. Except for claims (as defined below) related to or based on the marks (which at our sole option may be submitted to any court of competent jurisdiction) and except as otherwise expressly provided by section 14.4 of this agreement, any litigation, claim, dispute, suit, action, controversy, proceeding or otherwise ("Dispute") between or involving you and us (and/or involving you and/or any claim against or involving any of our or our affiliates' shareholders, directors, partners, officers, employees, agents, attorneys, accountants, affiliates, guarantors or otherwise), which are not resolved within 45 days of notice from either you or we to the other, will be submitted to arbitration to the office of the American Arbitration Association closest to our headquarters in Boca Raton, Florida. The arbitration will be conducted by the American Arbitration Association pursuant to its commercial arbitration rules. All matters relating to arbitration will be governed by the federal arbitration act (9 U.S.C. §§1 et seq.) And not by any state arbitration law. The parties to any arbitration will execute an appropriate confidentiality agreement, excepting only such disclosures and filings as are required by law.

14.3.    Place and Procedure. The arbitration proceedings will be conducted at our headquarters in Boca Raton, Florida. Any dispute and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. Any such arbitration proceeding will not be consolidated with any other arbitration proceeding involving any other person, except for disputes involving affiliates of the parties to such arbitration. The parties agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the federal rules of civil procedure) within the same proceeding as the dispute to which it relates. Any such dispute which is not submitted or filed in such proceeding will be barred.

14.4.    Awards and Decisions. The proceedings will be heard by 1 arbitrator. The arbitrator will have the right to award any relief which he deems proper in the circumstances, including, for example, money damages (with interest on unpaid amounts from their due date(s)), specific performance, temporary and/or permanent injunctive relief, and reimbursement of attorneys' fees and related costs to the prevailing party. The arbitrator will not have the authority to award exemplary or punitive damages except as otherwise permitted by this agreement, nor the right to declare any mark generic or otherwise invalid. You

22

and we agree to be bound by the provisions of any limitations or the time on which claims must be brought under applicable law or under this agreement, whichever expires earlier. The award and decision of the arbitrator will be conclusive and binding and judgment on the award may be entered in any court of competent jurisdiction. The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award. Without limiting the foregoing, the parties will be entitled in any such arbitration proceeding to the entry of an order by a court of competent jurisdiction pursuant to an opinion of the arbitrator for specific performance of any of the requirements of this agreement. Judgment upon an arbitration award may be entered in any court having jurisdiction and will be binding, final and non-appealable.

14.5.  Specific Performance.  Nothing in this agreement will prevent either you or we from obtaining temporary restraining orders and temporary or preliminary injunctive relief in a court of competent jurisdiction. However, you and we must contemporaneously submit the dispute for arbitration on the merits.

14.6.  Third Parties.  The arbitration provisions of this agreement are intended to benefit and bind certain third party non-signatories, and all of yours and our principal owners and affiliates.

14.7.  Survival.  This provision continues in full force and effect subsequent to and notwithstanding the expiration or termination of this agreement for any reason.

15.  NOTICES AND PAYMENTS.

All notices and reports permitted or required under this Agreement or by the Manuals must be in writing and will be deemed delivered:

(a)  at the time delivered by hand;

(b)  1 business day after transmission by facsimile, telecopy, e-mail, or other electronic system;

(c)  2 business days after being placed in the hands of a commercial airborne courier service for next business day delivery; or

(d)  3 business days after placement in the United States mail by registered or certified mail, return receipt requested, postage prepaid.

23

You _____  You _____         US _____

Delivery by facsimile, e-mailed and electronic means constitutes a writing. All such notices must be addressed to the parties as follows:

If to Us:     U.S. MEDICAL CARE HOLDINGS, L.L.C.
              3350 NW Boca Raton Boulevard, Suite B-38
              Boca Raton, Florida 33431
              Attention: Franchise Administration and Compliance
              notices@togetthin.com

If to You:    FLO-MAR, LLC
              370 Golfview Road, #701
              North Palm Beach, FL 33408
              Attn: Marian Zable
              zablem@bellsouth.net

Either you or we may change the address for delivery of all notices and reports and any such notice will be effective within 10 business days of any change in address. Any required payment or report not actually received by us during regular business hours on the date due (or postmarked by postal authorities at least 2 days prior to such date, or in which the receipt from the commercial courier service is not dated prior to 2 days prior to such date) will be deemed delinquent.

Intending to be bound, you and we sign and deliver this Agreement in 2 counterparts on the Agreement Date.

"US":                                    "YOU":

U.S. MEDICAL CARE HOLDINGS, L.L.C.       FLO-MAR, LLC

A Florida limited liability company      A Florida limited liability company

By: _____             By: _____
Name: Sasson Moulavi, MD                 Name: Marian Zable, Member
Title: Manager                           Title: _____
Date: Sep/11/06                          Date: _____

                                         By: _____
                                         Name: Floyd Cohen, MD, Member
                                         Title: _____
                                         Date: 21 Sept 06

                                    24

3 Store ADA
Flo-Mar, LLC              You_____  You_____        US_____
Sarasota-Bradenton
September 2006

EXHIBIT "A"
TO THE
U.S. MEDICAL CARE HOLDINGS, L.L.C.
FRANCHISE AGREEMENT
DATED ___21 ____ , 2006
WITH

FLO-MAR, LLC
(Name of Developer)

GLOSSARY

This Glossary is intended as a general guideline to assist you in reading the Franchise Agreement.  You must review the Franchise Agreement to get an exact definition of a term.

| Term | Definition |
|---|---|
| Affiliate<br>Section 13.16 | Any Business Entity directly or indirectly owned or controlled by a person, under common control with a person controlled by a person. |
| Agreement Date<br>Introductory Paragraph | Date of this Agreement. |
| Agreement<br>Introductory Paragraph | The Area Development Agreement between us and you  under which we grant you the right to operate your Development Business. |
| Anti-Terrorism   Laws<br>Section 1.3 | Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. |
| Business Entity<br>Section 1.5 | A business organization like a corporation, limited liability company or partnership. |
| Center(s)<br>Section 1.1 | The franchised weight reduction and weight management, nutritional and health businesses specializing in providing medical-based physician monitored and supervised weight reduction and weight management program providing the Services and the Products |
| Claims<br>Section 12.3 | All obligations, damages (actual, consequential or otherwise) and costs reasonably incurred in the defense of any claim against any of the Indemnified Parties, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses. |

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____/You _____          US _____

| Term | Definition |
|---|---|
| **Competitive Business** Section 8 | Any business or facility owning, operating or managing, or granting franchises or licenses to others to do so, any Center or any business operating from a mobile or fixed location (or via any form of e-commerce) that offers: physician assisted, or non-physician assisted, medical based physician monitored or supervised weight reduction or weight management, health or nutritional services or weight loss or weight loss management products, foods, cookies, shakes, supplies, drops, creamers, or the like which are the same as or similar to those Services or Products employed or offered or sold by Centers or which in any way utilize the Confidential Information the copyrights, Art, the System or the Marks (other than a Center operated under a Franchise Agreement with us) or any other health, nutritional or dietary products or vitamins. |
| **Confidential Information** Section 7.1 | Certain confidential information that we have developed relating to the development and operation of Centers or Development Businesses, which includes (a) the System and the know-how related to its use; (b) plans, specifications, size and physical characteristics of Center or Development Businesses; (c) site selection criteria, land use and zoning techniques and criteria; (d) methods in obtaining licensing and meeting regulatory requirements; (e) sources and design of equipment, furniture, forms, materials and supplies; (f) marketing, advertising, contests and promotional programs for Centers or Development Businesses; (g) staffing and product or service delivery methods and techniques; (h) the selection, testing and training of personnel for Centers or Development Businesses; (i) the recruitment, qualification and investigation methods to secure employment for employment candidates; (j) any computer software we make available or recommend for Centers or Development Businesses; (k) methods, techniques, formats, specifications, procedures, information and systems related to and knowledge of and experience in the development, operation and franchising of Centers or Development Businesses; (l) knowledge of specifications for and suppliers of certain products, materials, supplies, furniture, furnishings and equipment; (m) treatment methodologies, preparation, methods, servicing techniques for the Services and recipes, serving and preparation methods for the Products; and (n) knowledge of operating results and financial performance of Centers or Development Businesses other than those operated by you (or your affiliates); (o) e-commerce related data. |
| **Control** Section 13.16 | The power to direct or cause the direction of management and policies. |
| **Core Products** Section 1.1 | SIEGAL™ Cookies, SIEGAL™ Shakes, SIEGAL™ Soups, SIEGAL™ Drops and DR. SIEGAL'S NOTHING™ (non-dairy creamer). |
| **Developer** Introduction | You; one or more persons, a Business Entity, as the case may be. |
| **Development Area** Section 1.1 | The specific geographic area in which you are granted the right to develop Centers. |

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

2

You _____ You _____    US _____

| Term | Definition |
|------|------------|
| Development Business Section 1.1 | The business you will operate under which you are granted the right to own and operate a certain number of Centers, within the Development Area. |
| Development Fee Section 4 | The non-refundable fully earned fee you must pay to us when you sign this Agreement which is the full Franchise Fee for the first Center plus ½ of Franchise Fee times the number of Centers to be developed after the first one. |
| Development Periods Section 3.2 | The time periods within which the Centers must be developed under the Development Schedule. |
| Development Schedule Section 3.2 | The schedule designating the required number of Centers to be opened within each year of the Development Period. |
| Disability Section 9.5 | A mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent you or an owner of a controlling interest in you from managing and operating the Centers and Development Businesses. |
| Dispute Section 14.2 | Any litigation, claim, dispute, suit, action, controversy, proceeding or otherwise between or involving you and us (and/or involving you and/or any claim against or involving any of our or our affiliates' shareholders, directors, partners, officers, employees, agents, attorneys, accountants, affiliates, guarantors or otherwise). |
| Family Member Section 13.16 | Parents, spouses, offspring and siblings, and the parents and siblings of spouses. |
| Franchise Agreement(s) Section 2.1 | The franchise agreements between you and us to operate Centers. |
| Franchise Fee Section 5.1(a) | The Franchise Fee for each Center will be reduced to an amount between the amount of our then current Franchise Fee and the Development Fee paid for that Center and must be paid on the date of the Franchise Agreement for that Center. |
| Improvements Section 7.2 | Ideas, concepts, methods, techniques or improvements relating to your Centers or Development Business that you or your personnel may develop in the course of the operation of your Centers or Development Business. |
| Indemnified Parties Section 12.3 | Us, our affiliates and our respective shareholders, directors, officers, employees, agents, successors and assignees that you must agree to indemnify, defend and hold harmless against and to reimburse any one or more of for all claims, obligations and damages and any and all taxes and any and all claims and liabilities directly or indirectly arising out of the Development Business' or the Centers' operations (even if our negligence is alleged) or your breach of this Agreement or any Franchise Agreement. |

3

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ /You _____

US _____

| Term | Definition |
|------|------------|
| Marks<br>Section 1.1 | Certain trademarks, service marks and other commercial symbols, including the trade and service marks "SIEGAL™ MEDICAL WEIGHT MANAGEMENT," "DR. SIEGAL'S™," "SIEGAL WEIGHT MANAGEMENT®," "SIEGAL™ SHAKE," "SIEGAL™ DIET PROGRAM," "SIEGAL™ DROPS," "SIEGAL™ SYSTEM," "THE SIEGAL™ COOKIE," "SIEGAL™," "DR. SIEGAL'S NOTHING™," "SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™," "SMART FOR LIFE," and other associated logos, designs, artwork and trade dress, trademarks, service marks, commercial symbols, and e-names, which have gained and continue to gain public acceptance and goodwill, and may create, use and license additional trademarks, service marks, e-names and commercial symbols in conjunction with the operation of Centers. |
| New Schedule<br>Section 2.2 | The Development Schedule that you and we may agree upon beginning at the end of the 3rd development year that adjusts the number of Centers to be developed to account for growth in population and other relevant demographics. |
| Owner<br>Section 13.16 | Any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in another person (or a transferee of this Agreement or an interest in you), including any person who has a direct or indirect interest in you or this Agreement and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets. |
| Person<br>Section 13.16 | Any individual or Business Entity. |
| Products<br>Section 1.1 | The products we designate or approve for offer or sale by Centers. |
| Secondary Products<br>Section 1.1 | Sauces, syrups, dips, barbecue Sauces, dressings, dressing packets, candies and our educational products, vitamins, minerals and weight reduction supplements |
| Section<br>Section 13.16 | A section or subsection of this Agreement. |
| Services<br>Section 1.1 | The services we designate or approve for offer or sale by Centers. |
| SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™<br>Section 1.1 | The franchised weight reduction and weight management, nutritional and health businesses specializing in providing medical-based physician monitored and supervised weight reduction and weight management program providing the Services and the Products. |

3 Store ADA
Mo-Mas, LLC
Sarasota-Bradenton
September 2006

4

| Term | Definition |
|------|------------|
| System<br>Section 1.1 | The Marks and under distinctive business formats, employee selection and training programs, methods, procedures, designs, layouts, signs, physician relationships, reports, customer communication procedures, trade dress, standards and specifications, accounting methods, advertising, sales and promotional techniques, weight loss and management techniques, recopies, personnel training, use of products and intellectual property owned or licensed to us, equipment and specifications for authorized equipment, methods of inventory and operations control and certain business practices and policies, all of which we may improve, further develop, or otherwise modify from time to time |
| Tertiary Products<br>Section 1.1 | SMART FOR LIFE Scales for consumer use, SMART FOR LIFE Water Bottles, SMART FOR LIFE Pedometers, SMART FOR LIFE Tote Bags, SMART FOR LIFE Shirts, SMART FOR LIFE Hats and all other SMART FOR LIFE logo products for resale to the public. |
| Transfer<br>Section 9.2 | Your (or your owners') voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition of any interest in: (1) this Agreement; (2) you; or (3) your Centers or Development Business. |

5

3 Store ADA
Pio-Man, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          US _____

EXHIBIT "F"
TO THE
U.S. MEDICAL CARE HOLDINGS, LLC
AREA DEVELOPMENT AGREEMENT
DATED _____, 2006
WITH

FLO-MAR, LLC
(Name of Area Development Owner)

A.    Your Development Area:  The area described as follows: <u>Sarasota/Bradenton, Florida</u>

☐ Check if map is attached.

_____ Your initials          _____ Our Initials

_____ Your initials          _____ Our Initials

YOU: FLO-MAR, LLC                    US: U.S. Medical Care Holdings, LLC

_____               _____
Print Name: Marian Zable            Print Name: Sasson Moulavi, MD, Manager
Date:                               Date: _____

_____
Print Name: Floyd Cohen, MD
Date: _____

6

3 Store ADA
Flo-Mar, LLC
Sarasota-Bradenton
September 2006          _____ You _____          US _____

## U.S. MEDICAL CARE HOLDINGS, L.L.C.

### FRANCHISE AGREEMENT

SEPTEMBER 2/ 2006
AGREEMENT DATE

FLO-MAR, LLC
FRANCHISE OWNER

Marian Zoble, Member

Floyd Cohen, MD, Member

UNIT #1 (Sarasota)

MAILING ADDRESS OF UNIT

THIS AGREEMENT REQUIRES CERTAIN DISPUTES TO BE SUBMITTED TO BINDING ARBITRATION.

CAL- 1ˢᵗ Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ ou _____

US _____

## TABLE OF CONTENTS

Page

1. INTRODUCTION ........................................................................................................ 1

    1.1.   THE SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ SYSTEM ............ 1
    1.2.   ACKNOWLEDGMENTS ....................................................................................... 2
    1.3.   REPRESENTATIONS ........................................................................................... 2
    1.4.   NO WARRANTIES ............................................................................................. 3
    1.5.   BUSINESS ORGANIZATION ................................................................................ 4
    1.6.   SUBFRANCHISE RELATIONSHIP ........................................................................ 4

2. GRANT AND TERM ................................................................................................... 5

    2.1.   GRANT OF FRANCHISE ...................................................................................... 5
    2.2.   PROTECTED AREA ............................................................................................ 5
    2.3.   RIGHTS WE RESERVE ....................................................................................... 5
    2.4.   CORPORATE OR INSTITUTIONAL ACCOUNTS ..................................................... 6

3. SITE, PROTECTED AREA AND MARKETING AREA SELECTION AND CENTER
   DEVELOPMENT ....................................................................................................... 7

    3.1.   SITE SELECTION ............................................................................................... 7
    3.2.   ACKNOWLEDGEMENTS REGARDING AREA OF OPERATIONS ............................... 8
    3.3.   LEASES ............................................................................................................ 8
    3.4.   OWNERSHIP AND FINANCING .......................................................................... 10

4. PHYSICIANS AND OTHER PROFESSIONALS ............................................................ 11

    4.1.   PHYSICIANS ................................................................................................... 11
    4.2.   RN'S, PA'S, TECHNICIANS AND MEDICAL ASSISTANTS ...................................... 11
    4.3.   COMPLIANCE WITH HEALTHCARE-RELATED LAWS ........................................... 11
    4.4.   MEDICAL PRACTICE ........................................................................................ 12

5. CENTER DEVELOPMENT, DÉCOR AND OPERATING ASSETS ..................................... 13

    5.1.   DEVELOPMENT OF THE CENTER ...................................................................... 13
    5.2.   SECURITY INTEREST/ASSIGNMENT .................................................................. 14
    5.3.   PLANS ............................................................................................................ 16
    5.4.   PRE-OPENING OBLIGATIONS ........................................................................... 17
    5.5.   UPDATES ........................................................................................................ 18
    5.6.   SHIPPING AND INSTALLATION ......................................................................... 18
    5.7.   NO RESALE ..................................................................................................... 18
    5.8.   SHIPMENT AND ALLOCATION .......................................................................... 18
    5.9.   INSPECTION AND ACCEPTANCE ....................................................................... 18
    5.10.  DUE CARE ...................................................................................................... 18
    5.11.  UNIT PREPARATION ....................................................................................... 19
    5.12.  RISK OF LOSS ................................................................................................. 19
    5.13.  MAINTENANCE ............................................................................................... 19
    5.14.  THIRD PARTY RIGHTS ..................................................................................... 19
    5.15.  DÉCOR ........................................................................................................... 19
    5.16.  OPERATING ASSETS AND CENTER MATERIALS .................................................. 19
    5.17.  CHANGES TO APPROVED SUPPLIERS ................................................................ 20
    5.18.  PREFERRED VENDOR PROGRAMS .................................................................... 20
    5.19.  MUSIC AND OTHER AUDIO AND VISUAL ENTERTAINMENT ................................. 21
    5.20.  FORMS AND INVOICES .................................................................................... 21
    5.21.  UNIFORM, DRESS AND INSIGNIA ...................................................................... 21

5.22.   HIRING AND TRAINING OF EMPLOYEES BY YOU ........................ 21
5.23.   CENTER OPENING ........................ 22

6.   FEES. ........................ 22
6.1.   FRANCHISE FEE ........................ 22
6.2.   FINANCING FRANCHISE FEE ........................ 22
6.3.   ROYALTY ........................ 22
6.4.   INITIAL ORDER ........................ 23
6.5.   ADVERTISING FUND CONTRIBUTION ........................ 23
6.6.   COMPUTER SYSTEM FEE ........................ 23
6.7.   ADMINISTRATIVE FEE ........................ 23
6.8.   ELECTRONIC FUNDS TRANSFER ........................ 23
6.9.   DEFINITION OF "GROSS SALES" ........................ 24
6.10.   INTEREST ON LATE PAYMENTS ........................ 24
6.11.   LATE PAYMENT FEE ........................ 24
6.12.   APPLICATION OF PAYMENTS ........................ 24
6.13.   PAYMENT OFFSETS ........................ 24
6.14.   CPI ADJUSTMENT ........................ 25

7.   TRAINING AND ASSISTANCE. ........................ 25
7.1.   OWNER TRAINING ........................ 25
7.2.   PROFESSIONAL TRAINING ........................ 25
7.3.   ADDITIONAL TRAINING ........................ 26
7.4.   GENERAL GUIDANCE ........................ 26

8.   MARKS. ........................ 26
8.1.   OWNERSHIP AND GOODWILL OF MARKS AND COPYRIGHTS ........................ 26
8.2.   CREATION OF COPYRIGHTS ........................ 27
8.3.   LIMITATIONS ON YOUR USE OF MARKS AND COPYRIGHTS ........................ 27
8.4.   NOTIFICATION OF INFRINGEMENTS AND CLAIMS ........................ 28
8.5.   DISCONTINUANCE OF USE OF MARKS ........................ 28
8.6.   INDEMNIFICATION ........................ 28

9.   CONFIDENTIAL INFORMATION. ........................ 28
9.1.   TYPES OF CONFIDENTIAL INFORMATION ........................ 28
9.2.   DISCLOSURE AND LIMITATIONS ON USE ........................ 29
9.3.   CONFIDENTIALITY OBLIGATIONS ........................ 30
9.4.   EXCEPTIONS TO CONFIDENTIALITY ........................ 30

10.   EXCLUSIVE RELATIONSHIP ........................ 30

11.   OPERATION AND SYSTEM STANDARDS. ........................ 32
11.1.   OPERATIONS MANUAL ........................ 32
11.2.   COMPLIANCE WITH SYSTEM STANDARDS ........................ 32
11.3.   MODIFICATION OF SYSTEM STANDARDS ........................ 34
11.4.   INTERIOR AND EXTERIOR UPKEEP ........................ 34
11.5.   HOURS OF OPERATION ........................ 34
11.6.   ACCOUNTING, COMPUTERS AND RECORDS ........................ 34

ii

CAL-1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You ___  You ___     US ___

| 11.7. | TRADE ACCOUNTS AND TAXES | 35 |
|---|---|---|
| 11.8. | PROPRIETARY MATERIALS | 35 |
| 11.9. | APPROVED PRODUCTS | 35 |
| 11.10. | MANAGEMENT | 36 |
| 11.11. | PERSONNEL | 36 |
| 11.12. | INSURANCE REQUIRED | 36 |
| 11.13. | INSURANCE COVERAGE REQUIREMENTS | 37 |
| 11.14. | INSURANCE POLICY TERMS | 37 |
| 11.15. | EVIDENCE OF COVERAGE | 37 |
| 11.16. | AFFILIATION DEVELOPMENT | 38 |

12. ADVERTISING AND PROMOTION ............ 38

| 12.1. | ESTABLISHMENT OF ADVERTISING FUND | 38 |
|---|---|---|
| 12.2. | USE OF THE FUNDS | 38 |
| 12.3. | ACCOUNTING FOR THE FUND | 39 |
| 12.4. | ADVERTISING FUND LIMITATIONS | 39 |
| 12.5. | LOCAL ADVERTISING AND PROMOTION | 39 |
| 12.6. | CO-OP PARTICIPATION AND CONTRIBUTIONS | 40 |
| 12.7. | WEBSITES | 40 |
| 12.8. | PROMOTION OF THE FRANCHISE SYSTEM | 41 |

13. RECORDS, REPORTS AND FINANCIAL STATEMENTS ............ 41

| 13.1. | ACCOUNTING SYSTEM | 41 |
|---|---|---|
| 13.2. | REPORTS | 42 |
| 13.3. | ACCESS TO INFORMATION | 42 |

14. INSPECTIONS AND AUDITS ............ 42

| 14.1. | OUR RIGHT TO INSPECT THE CENTER | 42 |
|---|---|---|
| 14.2. | OUR RIGHT TO AUDIT | 43 |

15. TRANSFER ............ 43

| 15.1. | BY US | 43 |
|---|---|---|
| 15.2. | BY YOU | 43 |
| 15.3. | CONDITIONS FOR APPROVAL OF TRANSFER | 44 |
| 15.4. | TRANSFER TO A BUSINESS ENTITY | 45 |
| 15.5. | TRANSFER UPON DEATH OR DISABILITY | 46 |
| 15.6. | OPERATION UPON DEATH OR DISABILITY | 46 |
| 15.7. | EFFECT OF CONSENT TO TRANSFER | 46 |
| 15.8. | OUR RIGHT OF FIRST REFUSAL | 47 |

16. SUCCESSOR TERMS ............ 48

| 16.1. | ACQUISITION | 48 |
|---|---|---|
| 16.2. | GRANT | 48 |
| 16.3. | AGREEMENTS/RELEASES | 49 |
| 16.4. | TRAINING AND REFRESHER PROGRAMS | 49 |
| 16.5. | FEES AND EXPENSES | 49 |
| 16.6. | SUBSEQUENT SUCCESSOR FRANCHISES | 49 |

iii

You

US

17.  TERMINATION OF AGREEMENT..................................................................................49
  17.1.   TERMINATION OF SERVICE RIGHTS ...............................................................49
  17.2.   ON NOTICE ....................................................................................................50
  17.3.   AFTER NOTICE ...............................................................................................51
18.  RIGHTS AND OBLIGATIONS UPON TERMINATION.................................................52
  18.1.   PAYMENT OF AMOUNTS OWED TO US ...........................................................52
  18.2.   MARKS............................................................................................................52
  18.3.   CONFIDENTIAL INFORMATION........................................................................53
  18.4.   COMPETITIVE RESTRICTIONS .........................................................................53
  18.5.   OUR RIGHT TO PURCHASE .............................................................................54
  18.6.   CONTINUING OBLIGATIONS.............................................................................56
  18.7.   BUYOUT OPTION.............................................................................................56
19.  RELATIONSHIP OF THE PARTIES/INDEMNIFICATION............................................59
  19.1.   INDEPENDENT CONTRACTORS.........................................................................59
  19.2.   NO LIABILITY FOR ACTS OF OTHER PARTY ....................................................59
  19.3.   TAXES .............................................................................................................60
  19.4.   INDEMNIFICATION ...........................................................................................60
20.  ENFORCEMENT.........................................................................................................60
  20.1.   SEVERABILITY; SUBSTITUTION OF VALID PROVISIONS....................................60
  20.2.   WAIVERS.........................................................................................................60
  20.3.   LIMITATION OF LIABILITY ...............................................................................60
  20.4.   APPROVAL AND CONSENTS .............................................................................61
  20.5.   WAIVER OF PUNITIVE DAMAGES.....................................................................61
  20.6.   LIMITATIONS OF CLAIMS.................................................................................61
  20.7.   GOVERNING LAW............................................................................................61
  20.8.   JURISDICTION ..................................................................................................62
  20.9.   WAIVER OF JURY TRIAL..................................................................................62
  20.10.  CUMULATIVE REMEDIES .................................................................................62
  20.11.  COSTS AND ATTORNEYS FEES .........................................................................62
  20.12.  BINDING EFFECT .............................................................................................62
  20.13.  ENTIRE AGREEMENT........................................................................................62
  20.14.  NO LIABILITY TO OTHERS; NO OTHER BENEFICIARIES ...................................62
  20.15.  CONSTRUCTION...............................................................................................63
  20.16.  CERTAIN DEFINITIONS .....................................................................................63
  20.17.  TIMING IS OF THE ESSENCE .............................................................................63
21.  DISPUTE RESOLUTION.............................................................................................63
  21.1.   MEDIATION .....................................................................................................63
  21.2.   AGREEMENT TO ARBITRATE............................................................................63
  21.3.   PLACE AND PROCEDURE..................................................................................64
  21.4.   AWARDS AND DECISIONS ................................................................................64
  21.5.   SPECIFIC PERFORMANCE .................................................................................64
  21.6.   THIRD PARTIES................................................................................................64
  21.7.   SURVIVAL........................................................................................................65

CAL- 1st Franchise
Bio-Mat, LLC
Sarasota-Bradenton
September 2006

iv

You _____ You _____        US _____

22.   NOTICES AND PAYMENTS. ..........................................................................................65

## EXHIBITS

EXHIBIT A          GLOSSARY
EXHIBIT B          PROTECTED TERRITORY AND MARKETING AREA
EXHIBIT C          FORM OF PROMISSORY NOTE
EXHIBIT D          FORM OF UCC-1 FINANCIAL STATEMENT
EXHIBIT E          INITIAL ORDER

CAL. 1st Franchise
Flu-May, LLC
Sarasota-Bradenton
September 2006

## U.S. MEDICAL CARE HOLDINGS, L.L.C.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "Agreement") is effective as of September 21, 2006 (the "Agreement Date"). The parties to this Agreement are U.S. MEDICAL CARE HOLDINGS, L.L.C., a Florida limited liability company, with its principal business address at 3350 NW Boca Raton Boulevard, Suite B-38, Boca Raton, FL 33431 (referred to in this Agreement as "we," "us" or "our"), and FLO-MAR, LLC, a Florida limited liability company, whose principal business address is 370 Golfview Road, #701 North Palm Beach, FL 33408 (referred to in this Agreement as "you," "your" or "Franchise Owner").

1.    INTRODUCTION.  Various terms are defined in context throughout this agreement, and a glossary is attached as Exhibit "A" for convenience.

1.1.    The SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ System. We and SMLC have expended considerable time and effort developing a system of franchised weight reduction and weight management, nutritional and health businesses specializing in providing medical-based physician monitored and supervised weight reduction and weight management program, health and nutritional management services and other services we designate or approve periodically (the "Services") and the sale of weight management, nutritional and other products that we may periodically designate or approve, including SIEGAL™ Cookies, SIEGAL™ Shakes, SIEGAL™ Drops, SIEGAL™ Soups and DR. SIEGAL'S NOTHING™ (non-dairy creamer) ("Core Products") sauces, syrups, dips, barbecue sauces, dressings, dressing packets, candies and our educational products, vitamins, minerals and weight reduction supplements(the "Secondary Products"); and SMART FOR LIFE Scales for consumer use, SMART FOR LIFE Water Bottles, SMART FOR LIFE Pedometers, SMART FOR LIFE Tote Bags, SMART FOR LIFE Shirts, SMART FOR LIFE Hats and all other SMART FOR LIFE logo products for resale to the public (the "Tertiary Products") (collectively, the "Products") (the "SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™" or "Center(s)"). We offer Services to adults who have weight problems and do not target customers based on sex, age group or any other categories. We or our designees are the source of nearly all of the Core Products, Secondary Products and Tertiary Products that Centers offer. We use, promote and license in the operation of a Center certain trademarks, service marks and other commercial symbols, including the trade and service marks "SIEGAL WEIGHT MANAGEMENT®," "SIEGAL™ MEDICAL WEIGHT MANAGEMENT," "DR. SIEGAL'S™," "SIEGAL™ SHAKE," "SIEGAL™ DROPS," "SIEGAL™ DIET PROGRAM," "SIEGAL™ SYSTEM," "THE SIEGAL™ COOKIE," "SIEGAL™," "DR. SIEGAL'S NOTHING,™" "SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™," "SMART FOR LIFE," and other associated logos, designs, artwork and trade dress, trademarks, service marks, commercial symbols, and e-names, which have gained and continue to gain public acceptance and goodwill, and may create, use and license additional trademarks, service marks, e-names and commercial symbols in conjunction with the operation of Centers (collectively, the "Marks") (see Item 13). The Centers operate under the Marks and under distinctive business formats, methods, procedures, designs, layouts, signs, equipment, recipes, trade dress, standards and specifications, all of which we may improve, further develop or otherwise modify periodically (the "System"). We grant to persons who meet our qualifications and are willing to undertake the investment and effort, a Franchise to own and operate a Center offering only the Products and Services we authorize and approve from a single location and

You MR  You    us

utilizing the Marks, Copyrights and the System.  The  Center you will operate under this Agreement is referred to as your "Center."

    1.2.    <u>Acknowledgments</u>.  You acknowledge and agree that:

        (a)  you have read this Agreement and our Franchise Offering Circular;

        (b)  you understand and accept the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain our high standards of quality and service and the uniformity of those standards at each  Center and to protect and preserve the goodwill of the Marks;

        (c)  you have conducted an independent investigation of the business venture contemplated by this Agreement and recognize that, like any other business, the nature of the business conducted by a  Center may evolve and change over time;

        (d)  an investment in a  Center involves business risks;

        (e)  your business abilities and efforts are vital to the success of the venture and the success or failure of your  Center is predominately based on your skills in operating and managing it;

        (f)  any information you acquire from other  SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ franchisees relating to their sales, profits or cash flows does not constitute information obtained from us, nor do we make any representation as to the accuracy of any such information;

        (g)  in all of their dealings with you, our officers, directors, employees and agents act only in a representative, and not in an individual, capacity.  All business dealings between you and such persons as a result of this Agreement are solely between you and us;

        (h)  we have advised you to have this Agreement reviewed and explained to you by an attorney.

    1.3.    <u>Representations</u>.  Our approval of your request to purchase a franchise is made in reliance on all of your representations and warranties.  Any violation of these representations or warranties, or any Anti-Terrorism Laws by you or your owners, or your or your owners' agents or employees, or any "blocking" of your or their assets under the Anti-Terrorism Laws, will constitute grounds for immediate termination of this Agreement and any other agreements you have entered into with us or any of our affiliates.  As an inducement to our entry into this Agreement, you represent and warrant to us that:

        (a)  all statements you have made and all materials you have submitted to us in connection with your purchase of the franchise are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise;

2

You ___ You ___        US ___

(b) you will at all times faithfully, honestly and diligently perform your obligations, continuously exert your best efforts to promote and enhance the Center and not engage in any other business or activity that conflicts with your obligations to operate the Center in compliance with this Agreement.

(c) you will comply with and/or assist us to the fullest extent possible in our efforts to comply with Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war (the "Anti-Terrorism Laws"); and

(d) neither you nor any of your owners, employees, independent contractors, or agents, property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that neither you nor they are otherwise in violation of any of the Anti-Terrorism Laws.

1.4.    No Warranties.  We expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any warranty or guaranty, express or implied, as to the revenues, sales, profits or success of the business venture contemplated by this Agreement or the extent to which we will continue to develop and expand the network of the Centers.  You acknowledge and understand the following:

(a) any statement regarding the potential or probable revenues, sales or profits of the business venture, or of any services, benefits or commitments we are to make available to you, are made solely in the Franchise Offering Circular delivered to you prior to signing this Agreement;

(b) any statement regarding the potential or probable revenues, sales or profits of the business venture or statistical information regarding any existing  Center owned by us or our affiliates or that is not contained in our Franchise Offering Circular is unauthorized, unwarranted and unreliable and should be reported to us immediately;

(c) you have not received or relied on any representations about us or our franchising program or policies made by us, or our officers, directors, employees or agents, that are contrary to the statements made in our Franchise Offering Circular or to the terms of this Agreement.  If there are any exceptions to any of the foregoing, you must: (i) immediately notify our chief executive officer; and (ii) note such exceptions by attaching a statement of exceptions to this Agreement prior to signing it; and

(d) We make no representations or warranties that the sale, lease or license of a Center, your Center and/or franchise and the purchase, lease or license of such Center, your Center and/or franchise does not violate any federal or state law including, without limitation, federal and state laws prohibiting kickbacks, self referrals, brokering, fee splitting, corporate practice of medicine, disclosures of ownership interests, etc.  It is your responsibility and obligation to perform sufficient due diligence to ensure no aspect of the purchase, lease, licensing and/or sale of your Center and/or franchise and/or the Products or Services they or you offer would violate any federal or state law, rule or regulation.

3

CAL- 1ˢᵗ Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

1.5.    **Business Organization.**  If you are at any time a business organization ("Business Entity") (including but not limited to a corporation, professional association, limited liability company or partnership) you agree and represent that:

(a)  you have the authority to execute, deliver and perform your obligations under this Agreement and are duly organized or formed and validly existing in good standing under the laws of the state of your incorporation or formation;

(b)  your organizational or governing documents will recite that the issuance and transfer of any ownership interests in you are restricted by the terms of this Agreement, and all certificates and other documents representing ownership interests in you will bear a legend referring to the restrictions of this Agreement;

(c)  the Principal Owners Statement will completely and accurately describe all of your owners and their interests in you.  A copy of our current form of Principal Owners Statement is attached to the our Franchise Offering Circular;

(d)  you and your owners agree to revise the Principal Owners Statement as may be necessary to reflect any ownership changes and to furnish such other information about your organization or formation as we may request (no ownership changes may be made without our approval);

(e)    each of your owners during the Term will sign and deliver to us our standard form of Principal Owner's Guaranty undertaking to be bound jointly and severally by all provisions of this Agreement and any other agreements between you and us.  A copy of our current form of Principal Owners Guaranty is attached to our Franchise Offering Circular; and

(f)  at our request, you will furnish true and correct copies of all documents and contracts governing the rights, obligations and powers of your owners and agents (including but not limited to articles of incorporation or organization and partnership, operating or shareholder agreements).

1.6.    **Subfranchise Relationship.**  We are a subfranchisor of SM Licensing Corporation ("SMLC").  Although our rights to franchise the Centers derive from SMLC, your relationship will only be with us.  Accordingly, you acknowledge, understand and agree that we are solely responsible for performing all obligations to you under this Agreement, that we alone award you the franchise represented by this Agreement, and that SMLC will not be liable or obligated to you in any way, unless otherwise required by law.  We have prepared the Franchise Offering Circular given to you in connection with the establishment of our relationship with you and you will look only to us, and not SMLC, for direction, assistance and consents associated with your operation of the Center and performance under this Agreement.  You agree not to contact SMLC or any of its affiliates, including Dr. Sanford Siegal, directly regarding your Center or any of the Products or Services we authorize you to provide at your Center.  If you violate the terms of this Section, we may terminate this Agreement.

CAL - 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

4

Y/au        You

US

2.    **GRANT AND TERM**

2.1.    **Grant of Franchise.**  You have applied for a Franchise to own and operate a  Center operating only at the fixed location approved by us (the "Site"), and marketing to customers primarily in the geographic area we designate or approve as the "Marketing Area." The Site and Marketing Area are designated on the attached Exhibit "B." You will not actively advertise, market or promote the Center outside the Marketing Area. You must operate the Center only from the Site. Reference to the Site in this Agreement includes the Center.  Subject to the terms of and upon the conditions contained in this Agreement, we grant you a franchise (the "Franchise") to: (a) operate the Center located only at the Site (and no other locations); (b) to market the Products and Services solely to customers within the Marketing Area; (c) use the Marks and Copyrights in connection with operating the Center; (d) use the System in the operation of your Center; and (e) to offer through the Center only the Products and Services, and no others. The term of the Franchise and this Agreement (the "Term") is 10 years and begins on the Agreement Date and expires 10 years from the Agreement Date. The date your Center opens for business is referred to as the "Opening Date." This Agreement may be terminated before it expires.

2.2.    **Protected Area.**  We may designate a geographic area as your "Protected Area." If we do so, it will be described in Exhibit "B," and will consist of part of your Marketing Area. So long as you are in full compliance with this Agreement, we will not grant to others the right to operate a Center from any location, fixed or permanent, at the Site or within the Protected Area (if any).  However, any Center operated by any Center may service customers from anywhere inside or outside of your Protected Area or Marketing Area.  We may allow other Centers to be located in your Marketing Area but not your Protected Area.

2.3.    **Rights We Reserve.**  We (and our affiliates) retain the right in our sole judgment to ourselves or grant others the right:

(a) to solicit prospective Franchisees and grant other persons Franchises, or other rights to operate the Centers: through national or regional advertising, trade shows or conventions, or using or through the Internet, Intranet or other forms of e-commerce or through similar means;

(b) to grant licenses or franchises to others to operate the Centers, or to own and operate the Centers ourselves or through affiliates anywhere, except your Protected Area;

(c) sell, solicit, recruit and provide services for the Centers or any franchised business not defined as a  Center in this Agreement;

(d) to sell, and provide the Products Services authorized for sale by the Centers under the Marks or other trade names, trademarks, service marks and commercial symbols through similar or dissimilar channels which are not accessible by a  Center (like telephone, mail order, kiosk, co-branded sites, or through alternative channels of distribution like: mail orders, sites located within other retail businesses, stadiums, Intranet, Internet, web sites, wireless, email or other forms of e-commerce) for distribution within and outside of your Marketing Area or Protected Area and pursuant to such terms and conditions as we consider appropriate;

(e) to solicit prospective franchisees for, and own and operate  Centers; and

CA1- 1st Franchise
Flo-Man, LLC
Sarasota-Bradenton
September 2006

(f) reduce the size and area of your Marketing Area if some of it is awarded as a Protected Area to another Center;

2.4.    **Corporate or Institutional Accounts.**    We may develop an Institutional Accounts program for the benefit of the Centers, generally. An "Institutional Account" is a customer or a group of customers that operate under common ownership or control, through independent dealerships, affiliated entities, franchise systems, religious organizations, school systems, governmental units or some other association, for whom, or at whose locations or at multiple locations we have arranged for the Centers to provide the Products or Services, or special pricing structures. Regardless of any contrary provision of this Agreement, you and we agree as follows:

(a) **Territorial Rights.** You agree that we or our designee may solicit your or current or potential customers located in your Marketing Area or Protected Area, whether or not you currently provide any products or services to them, in order to develop them as Institutional Accounts or for products or services we offer through e-commerce. We or our designee may do so without violating any of your territorial rights as described in this Agreement;

(b) **Best Efforts.** You must use your commercially reasonable best efforts to perform services or sell the Services we designate to or at the locations of Institutional Accounts located in your Marketing Area (or at your Center if we so designate) on the terms and conditions we specify for the program for those Institutional Accounts. These terms may vary from Institutional Account to Institutional Account depending on the situations and circumstances. We may require that you coordinate your efforts with other Centers in order to provide interrelated services to Institutional Accounts;

(c) **Alternative Services.** You recognize that some Institutional Accounts, for whatever reason, may decide that they do not want to do business with you. If that happens, we will cooperate with you to the fullest extent we deem practicable to resolve the Institutional Account's concerns. However, if after we exercise what we believe to be efforts in the best interest of the System to rectify the problem, the Institutional Account continues to refuse to do business with you as a result of your failure to comply with our standards and specifications or lapses in your customer service: we may prohibit you from participating in all other, or such Institutional Account Programs as we may designate. You agree to indemnify us against all expenses we incur or monies we rebate to such Institutional Accounts if we are required to reimburse the Institutional Account or rebate to it any prepaid fees, or are required to make financial consideration to it for your failure to provide services to it;

(d) **Terms and Conditions.** You must honor the terms and conditions we specify and develop for Institutional Accounts, including the maximum pricing for products or services and any service schedules for any Institutional Account you service; and

(e) **Eligibility.** Due to the need to insure adherence to the System Standards in performing services for Institutional Accounts, you will not be eligible for assignment of Institutional Accounts unless you are in full compliance with this Agreement.

CAL.- 1st Franchise
Fla.-Mar, LLC
Sarasota-Bradenton
September 2006

6

By _____    You _____

US _____

3.  SITE, PROTECTED AREA AND MARKETING AREA SELECTION AND CENTER
    DEVELOPMENT.

    3.1.    Site Selection

        (a) Site.  Without our prior written consent, you may not operate the Center from any
location other than the Site.  You (with or without our assistance) must, locate a site that we (in
our sole judgment) have approved and signed a lease for it to be acceptable to us.  If you and we
have agreed on a Site as of the date you sign this Agreement, it will be designated on Exhibit "B"
at this time.  Otherwise, they will be designated on Exhibit "B" upon our approval of the Site.
The Site must meet our criteria for the location of an office for a Center (which may or may not
include demographic characteristics, traffic patterns, parking, character of neighborhood,
competition from and proximity to other businesses and other  Centers and other commercial
characteristics and the size, appearance and other physical characteristics of the proposed site,
and any other factors or characteristics we consider appropriate).  One Site selection visit is
included as part of your Franchise Fee and System Fee.  For your second and each subsequent
Site selection visit you request to obtain our approval, you must reimburse us our travel, hotel and
meal expenses for such visits.  Our criteria, and our evaluation of them, may vary periodically
and from location to location. If you and we are unable to agree on a location for the Site, or you
have not obtained a fully signed lease agreement for the Site, within 60 days of the Agreement
Date, we may terminate this Agreement.  Before entering into any lease for a Site (including the
building or improvements comprising the Center), you and the lessor must sign our then current
form of Conditional Assignment of Lease (the "Lease Assignment").  You must provide the
lessor our forms of Lease Assignment when you begin negotiations with the prospective lessor.
We will approve or disapprove a Site you propose within 30 days after we receive from you a
complete site report and any other materials we request.  If you have not heard from us within
such 30-day period, the Site is deemed disapproved.  No Site will be deemed approved by us until
we provide to you Exhibit B with that Site designated in it and Exhibit B is signed by both you
and us.

        (b) Relocation of the Site  If the lease expires or terminates without expiration or
termination being your fault, if the Site is destroyed, condemned or otherwise rendered unusable
as a Center for a  Center in accordance with this Agreement, or if in our sole judgment, there is a
change in character of the location of the Site sufficiently detrimental to its business potential to
warrant the Center's relocation, we will permit you to relocate the Center to another Site location
within the trade area provided that you comply with all of our System Standards for a Site
relocation and such relocation Site meets are then current Site criteria for relocation Sites. If we
consent to the Center's relocation, we have the right to charge you for the expenses we incur in
connection with the relocation and finding a relocation Site.  Any relocation of the Site will be at
your sole expense.  If you seek to obtain our approval of the replacement Site and lease in
accordance with our then current Site approval process, you must: pay to us a relocation fee in the
amount of $7,000; and reopen the Center at the replacement Site as soon as practicable, but in no
event more than 90 days after the closing of the original Site.  You are not permitted to relocate the
Center except pursuant to this Section.  In addition, if the Center is closed for a period of more than
7 days pending relocation pursuant to this section of the Center or for any other reason, you must

7

You          You          US

pay to us an amount equal to: (1) the aggregate of all Royalties paid by you during the 12 month period immediately preceding the Center's closure divided by 365, if the Center has been operating continuously throughout such 12 month period; or (2) the aggregate of all Royalties paid by you during the 12 month period that the Center was operating continuously, if less than 12 months, divided by the number of days in such period. You must make such payments to us during such period on a weekly basis.

3.2.    <u>Acknowledgements Regarding Area of Operations</u>. You acknowledge and agree that:

(a) our recommendation or approval of the Protected Area (if any), the Marketing Area or the Site and any information regarding the Site, the Protected Area (if any) and the Marketing Area communicated to you, does not constitute a representation or warranty of any kind, express or implied, as to the suitability of the Protected Area (if any), the Marketing Area or the Site for a Center or for any other purpose;

(b) our recommendation or approval of the Protected Area (if any), the Marketing Area or the Site, or any lease indicates only that we believe that the Protected Area (if any), the Marketing Area and Site falls within the acceptable criteria for Sites, premises and areas that we have established as of the time of our recommendation or approval of the Protected Area (if any), the Marketing Area and the Site

(c) application of criteria that have appeared effective with respect to other areas, sites and premises may not accurately reflect the potential for all areas, sites and premises, and, after our approval of an area, site or premises, demographic and/or other factors included in or excluded from our criteria could change or alter the potential of an area, site and premises; and

(d) the uncertainty and instability of such criteria are beyond our control, and we will not be responsible for the failure of an area, site and premises we have recommended or approved to meet expectations as to potential revenue or operational criteria.

3.3.    <u>Leases</u>.

(a) Lease of Site.  At your option, you may lease the Site or some or all of your components of the Center.

(b) Lease Approval.  You must obtain our approval of the lease(s) (if any) or any component of the Center (e.g., furniture, exercise equipment, computers and other weight reduction or weight management equipment) (each a "Lease") before you sign it, or any renewal of it. You must also deliver a copy of each signed Lease to us within 15 days after its execution along with the applicable Lease Assignment. You must not sign any Lease or renewal of a Lease unless you have also obtained the Lease Assignment signed by the lessor. Our review and approval of the Lease is solely to ensure that the Lease contains terms that we accept or require for our benefit and the franchise system; it is not a substitute for careful review and analysis by you and your advisors. Our approval of the Lease does not constitute warranty or any assurance that the Lease contains terms and conditions for your benefit. You agree and acknowledge that

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You____ You____

8

US.____

you are solely responsible for negotiating the Lease and ensuring that its terms and conditions meet your interests and objectives.

(c) Mandatory Lease Terms. We may require that any Lease or any renewal contain certain provisions that:

(i)     expressly permits the lessor to provide us with all revenue and other information it may have related to the operation of your Center as we may request;

(i)     requires the lessor to contemporaneously provide us with copies of any written notice of default under the Lease sent to you and which grants to us, at our option, the right (but not the obligation) to cure any default under the lease (should you fail to do so) within 15 days after the expiration of the period in which you may cure the default;

(ii)    in the event of your default of the lease or the Franchise Agreement, and upon written notice from us (the "Assignment Notice") the Lease will, at our option, be assigned to us, we will become the lessee, we will be liable for all obligations under the Lease accruing once we take possession, and the landlord will recognize us as the lessee as of the date of the Assignment Notice.

(iii)   authorizes your right to display the Marks in accordance with the specifications required by the Manuals, subject only to the provisions of applicable law;

(iv)    requires that any lender or other person will not disturb your possession of the Center (or any aspect of it) so long as the lease term continues and you are not in default (along with such documents as are necessary to ensure that such lenders and other persons are bound);

(v)     expressly states that any default under the lease which is not cured within any applicable cure period also constitutes grounds for termination of this Agreement;

(vi)    a Lease term which is at least equal to the Term, either through an initial term of that length or rights, at your option, to renew the lease for the Term; and

(vii)   the Lease cannot be modified or canceled without our prior written approval.

(d) Indemnification.    You agree to indemnify and hold us and our affiliates, stockholders, directors, officers and representatives harmless from and against any and all losses, liabilities, claims, proceedings, demands, damages, judgments, injuries, attorneys' fees, costs and

CAJ. - 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

expenses, that they incur resulting from any claim brought against any of them or any action which any of them are named as a party or which any of them may suffer, sustain or incur by reason of, or arising out of, your breach of any of the terms of the Lease, including the failure to pay rent or any other terms and conditions of the Lease.

(e) Default. If you breach or default under the Lease, or if we pay the Lessor any money as a result of your breach of the Lease, then you will be in breach of this Agreement, and we will be entitled to possession of the Site and any Collateral described in this Section, and to all of your rights, title and interest in the Lease, without limitation on any other remedies available to us under this Agreement, at law or in equity, or under any other agreements between you and us. This Agreement constitutes a lien on your interest in the Lease until satisfaction in full of all amounts you owe us. In addition, our rights to assume all obligations under the Lease are totally optional on our part, to be exercised in our sole judgment.

(f) No Subordination. You will not permit the Lease to become subordinate to any lien without first obtaining our written consent, other than the lien created by this Agreement, the Lessor's lien under the Lease, liens securing bank financing for your operations on the Center and the agreements and other instruments referenced in this Agreement. You will not terminate, modify or amend any of the provisions or terms of the Lease without our prior written consent. Any attempt at termination, modification or amendment of any of the terms without such written consent is null and void.

3.4.    Ownership and Financing.  Instead of leasing the Site or other Collateral, you may propose to purchase and own part, any or all of a Site or other Collateral directly, or through affiliates. The insurance required by this Agreement and our System Standards must be in force and effect when you begin operation of the Center.  If at any time prior to acquisition, or subsequently, you or your affiliates propose to obtain any financing with respect to any Operating Assets or other Collateral in which any of such items are pledged as Collateral securing your performance, the form of any purchase contract with the seller of a business or such Operating Assets and any related documents, and the form of any loan agreement with or mortgage in favor of any lender and any related documents, must be approved by us before you sign them.  Our consent to them may be conditioned upon the inclusion of various terms and conditions, including the following:

(a) a provision which requires any lender or mortgagee concurrently to provide us with a copy of any written notice of deficiency or default under the terms of the loan or mortgage sent to you or your affiliates or the purchaser;

(b) a provision granting us, at our option, the right (but not the obligation) to cure any deficiency or default under the loan or mortgage (should you fail to do so) within 15 days after the expiration of a period in which you may cure such default or deficiency;

(c) a provision which expressly states that any default under the loan or mortgage, if not cured within the applicable time period, constitutes grounds for termination of this Agreement and any default under this Agreement, if not cured; and

CAL- J™ Franchise
Mo-Mar, LLC
Sarasota-Bradenton
September 2008

10

(d) your agreement not to re-title the Site, Collateral or any other Operating Assets without our prior written consent.

4.    PHYSICIANS AND OTHER PROFESSIONALS.

4.1.    Physicians. We, upon notice to you may require that you establish relationships with or otherwise refer clients only to independent or affiliated physicians whom we designate or approve, in accordance with applicable law, through which such physicians (the "Physicians") may provide medical services related to the Services. You must comply with all of our policies and procedures for interacting with the Physicians, physician independence or autonomy, and for making referrals of their Services to customers. You must establish billing policies that we designate or approve. For example, you must comply with all of our policies and procedures for establishing payment relationships with such Physicians. Notwithstanding the foregoing, you are responsible for ensuring that your business and its payment practices and relationships with the Physicians comply with all applicable laws, rules, and regulations.

4.2.    RN's, PA's, Technicians and Medical Assistants. You must hire (or subject to our System Standards contract with) such numbers of qualified medical office managers, dieticians, nutritionists, ARNP's, RN's, LPN's, Physicians' Assistants, medical technicians, medical assistants and similar types of personnel as we may designate from time to time (the "Professionals"). You must ensure that such Professionals are properly licensed in the states in which you operate, and you are responsible for compensating such Professionals in accordance with applicable law. In the event that applicable law prohibits you from receiving monies directly for the Services provided by such Professionals, you must, in accordance with our System Standards, establish relationships with such Professionals such that the customers compensate them directly or which otherwise comply with applicable law.

4.3.    Compliance with Healthcare-Related Laws. Without limiting your other obligations under this Agreement to comply with all applicable law, you are required to ensure that your relationships with the Physicians and the Professionals, and the manner in which your Center provides the Services and Products comply with all applicable laws, rules, regulations, ordinances and standards of professional conduct. As indicated above, we may require you to restructure your compensation arrangements with us, the Physicians or the Professionals in order to comply with applicable law. You are responsible for ensuring that the Professionals and the Physicians, as well as any other healthcare-related professionals who are employed by or work with you in any manner, are properly licensed, certified, trained, educated and experienced to perform the tasks assigned to them or to which they are likely to engage in connection with their relationship with you, your clients or the Center. You agree that, to the extent we designate, or is otherwise prohibited by applicable law, you will not bill nor accept any form of insurance, including Medicare, Medicaid or private insurance, for or in connection with the Services rendered or Products sold or any other activity or service in connection with your customers. However, in limited circumstances, we, subject to our System Standards, may permit you to service customers whose Services or Products are paid for or reimbursed by self-insured companies or third party payors we designate or approve. You understand and agree that this limitation may restrict the customers to which you market or provide Services or Products (such as prohibiting you from offering or selling to Medicaid and Medicare, or insurance reimbursed customers), and you are willingly accept such limitation in order such that you may focus the activities of your Center, and limit them to, to the extent we may designate, "cash—same day deposit payment for services or products sold basis." .By "cash—same day deposit payment for

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You____ You____

US____

services or products sold basis," we mean that you may charge your customers fees paid by credit card, with cash, debit card, checks or the like, which are paid directly by the customer and not by any public or private insurance carrier or fund.

4.4.    **Medical Practice.**

(a) You understand that: (i) we do not intend to be in the business of providing physician or professional medical services; (ii) activities ancillary to the conduct of your Center involve the Practice of Medicine; and (iii) as a franchise owner and operator of a Center, this Agreement envisions that either the individuals, Physicians or Professionals with whom you, your customers or we contract, advise, counsel, supervise or employ may, to the extent permitted by applicable law, order tests, diagnose diseases or medical conditions, prescribe or conduct treatment of individuals, perform operations, prescribe drugs for various human diseases, pain, injuries, deformities or other physical or mental conditions or engage in other activities commonly referred to as the "Practice of Medicine," or other professions requiring licensure, certification or training under applicable laws (collectively, the "Practice of a Profession"). However, we do not and will not intentionally engage in the Practice of a Profession at or in connection with your Center.

(b) Licensure: You acknowledge and agree that the Practice of a Profession and certain other medically related activities may be performed only by lawfully licensed or certified professionals, or in certain circumstances permitted by law under the direct supervision and control of a lawfully trained, licensed or certified professional. Accordingly, interpretation of data, testing and screening, manipulation or touching of the body, and other services which require licensure, training or certification under applicable law, must only be performed by qualified trained and licensed professionals. For example, in some states operation of the Center(s) may be considered to be the Practice of Medicine, and you, your Professionals and Physicians may require a medical, or some other form of license to enter into, or perform services under this Agreement. For example, in all states, the individuals who engage in the Practice of Medicine must be licensed physicians or otherwise be permitted by law to engage in the Practice of Medicine. We do not make, and have not made, any representations of any kind whatsoever that this Agreement does, or does not, violate: any laws governing the Practice of Medicine or any other Practice of a Profession, or the various legal doctrines commonly referred to as the "corporate practice of medicine"; HIPAA; any federal or state law, rule or regulation governing Medicare or Medicaid, including state and federal laws regulating the relationships between providers and suppliers of health care products and services on one hand and physicians and other providers and suppliers of health care products and services on the other hand; the Fraud and Abuse provisions of the Medicare and Medicaid Statutes; state and federal laws governing self referral by physicians; fee splitting, patient brokerage prohibitions; anti-kickback prohibitions; or any other law, rule or regulation related to the field of medicine or public health. You are responsible for ensuring that your Center complies with all laws, rules and regulations applicable to the operation of your Center. You should check the various state and federal laws and regulations governing the Practice of a Profession and the structure of entities involved with those fields. If we determine that applicable laws, rules or regulations require, or in our judgment it is prudent to do so, we may require you to sign and deliver to us our then current form of NCP Addendum to our Franchise Agreement, which will modify and supersede conflicting terms of

12

CAL-1st Franchise
Rio-Mar, LLC
Sarasota-Bradenton
September 2006

Your _____  You _____          US _____

this Agreement (the "NCP Addendum"). Our current form of NCP Addendum is attached as an exhibit to our Offering Circular. Upon our request, you must provide to us such materials and information as we may designate to demonstrate that you are in full compliance with applicable laws.

(c) **No Interference:** We may not and will not interfere with, supervise or assume any responsibility for you or your Professionals', Physicians' or other employees', contractors' or agents' exercise of their medical professional judgment with respect to treatment of customers. This provision controls and modifies any other contrary provision of this Agreement that would in any manner affect or purport to limit the independent exercise of medical professional judgment by you, your Professionals, Physicians or employees, contractors or agents or that would require us to engage in any activity that would constitute the Practice of Medicine or any other form of a Practice of a Profession. All medical decisions, acts or omissions made by, or in connection with, any person in any way associated with your Center in the course of the Practice of Medicine or any other Practice of a Profession will be the decisions of the individual professionals involved and will not be affected by or attributed to us.

(d) **Responsibility for Treatment:** You acknowledge and agree that we will in no way whatsoever be responsible for and you will indemnify us against any decisions, acts or omissions related to the medical treatment of, Practice of Medicine or any other Practice of a Profession in relation to, or violation of the privacy interests of any person in any way whatsoever associated with your Center. You agree to take all necessary measures to inform all individuals associated with and potential customers of your Center that we have no control over or responsibility for any person's or persons' Practice of Medicine or any other Practice of a Profession.

## 5.    CENTER DEVELOPMENT, DÉCOR AND OPERATING ASSETS.

5.1.    **Development of the Center.** You are responsible for developing your Center, and in doing so must purchase or lease Center Materials, Proprietary Products and Operating Assets from us or our designee or suppliers we designate or approve (each an "Approved Supplier"). We may restrict the Products and Services you offer to only those we designate or approve, and we may be the only Approved Supplier of some or all of the Products and Services, or their components, which you offer. You must maintain a sufficient inventory of the Products and be able to provide the Services to meet our System Standards. If we do so, we may require you to execute our form of Center Purchase Agreement or Center Lease Agreement approved by us. (A sample of the Center Purchase Agreement or a Center Lease Agreement may be attached, as applicable, as an exhibit.) To assist you with your development obligations, in return for the Initial Order Fee, you must purchase the Initial Order from us or our designee. The "Initial Order" will consist of only those items or services listed in Exhibit "E." We will, to the extent we deem necessary or appropriate, furnish such approval or designated suppliers with mandatory and suggested specifications and layouts for a Center, including requirements for dimensions, design, color scheme, image, interior layout, décor, and Operating Assets, Center Materials and Products, which include, for example inventory, fixtures, equipment, signs, and furnishings. Our or our designees' services in inspecting, testing and installing certain items in the Initial Order, if at all, prior to the opening of your Center are included in the Initial Order Fee only if specified in the Initial Order. We receive compensation from the Approved Suppliers for your purchases from them, and charge mark-ups on the Products, Operating Assets and Center Materials we sell to you, which also compensates us for the services

13

You ___    You ___        US ___

we provide to you in connection with our assistance to you. At our option, you may purchase certain other equipment we designate or approve from us, our designee(s) (or our affiliate(s)) to be installed in your Center to conduct Services. We may also receive compensation from the Preferred Vendors who provide various form of leasing or financing to the Centers. You agree that:

(a) the Center will not be used for any purpose other than the operation of your Center in compliance with this Agreement and that you will offer, sell, lease, barter or provide only the Products and Services (and no others);

(b) you will place or display at, in or on the Center such signs, emblems, lettering and logos as are approved in writing by us and no other signs, emblems, lettering or logos;

(c) while we or our designee will (at our option) sell or lease to you certain items or services comprising the Initial Order, you remain responsible for the buildout, manufacture and development of, and must equip and outfit, remodel or renovate the Center in accordance with our specifications as may be modified from time to time;

(d) you will maintain the condition and appearance (including interior, exterior and mechanical parts) of the Center in accordance with our standards and will effect such cleaning, repair and maintenance of the Center as we require from time to time;

(e) you will maintain the Center in good repair and regularly service and maintain it so it remains clean and in good working order; and

(f) you will not lease, loan, provide or sell or otherwise transfer any aspect of the Center to anyone (other than to us) without first obtaining our permission to do so and removing all of the Marks and Equipment from the Center (subject to our security interest and right of first refusal).

5.2.    Security Interest/Assignment.

(a) Grant: By signing this Agreement you:

(i)      grant to us, a first priority security interest in the following assets: furniture, fixtures, equipment, supplies, accounts, receivables, inventory, operating assets, records, inventory, food products, and all tangible and intangible assets constituting the Center and the Site, including the Lease and all accessions and replacements (collectively, the "Collateral"). The security interest you grant to us in the Collateral secures your payment and performance of all of your obligations, claims, debts, duties, liabilities conditions and terms, expenses and future advances to you or your affiliates and those amounts which may be incurred by us in connection with the administration or collection of any of your obligations under or in connection with the Agreement.

14

    (ii)    agree to sign and deliver to us a UCC-1 Financing Statement, in form and content provided by us describing the Collateral as defined in this Agreement;

    (iii)    you agree to sign and deliver to us all other documents and take all other steps, acts and measures that may be necessary to ensure that we are able to fully perfect a first priority security interest in the Collateral;

    (iv)    You consent to any notices given by us or our affiliates to other creditors designed to perfect our security interest and to grant us first priority. You agree to authorize us to file, in jurisdictions where this authorization will be given effect, a UCC-1 Financing Statement signed only by us describing the Collateral in the same manner as described in this Agreement. You agree to sign and deliver to us for filing additional Financing Statements and any other documents necessary or desired by us for us to establish or maintain a valid security interest in the Collateral (free and clear of all other liens and claims whatsoever), including deposit with us of any certificate of title issuable with respect to the Collateral and notation on that title of this security interest.

    (v)    (if you lease any of the Collateral), you agree to sign and deliver to us our standard form of Conditional Assignment and Assumption of Lease Agreement; and

    (vi)    sign and deliver to us our form of Conditional Assignment of Telephone Numbers and Listings.

    (b) Exercise of Remedies  In any case of your default under the terms of the Lease or under this Agreement or under any promissory note or other agreement with us, we are entitled to exercise any one or more of the following remedies in our sole discretion:

    (i)    to take possession of the Site or other Collateral or any part thereof, personally, or by our agents or attorneys;

    (ii)    to, in our discretion, without notice and with or without process of law, enter upon and take and maintain possession of all or any part of the Center, together with all furniture, fixtures, inventory, books, records, papers and accounts of the Franchisee;

    (iii)    to exclude you, your agents or employees from the Site or other Collateral;

    (iv)    as attorney-in-fact for you, or in our own name, and under the powers herein granted, to hold, operate, manage and control the Center and conduct the business, if any, thereof, either personally or by its agents, with full power to use such measures, legally rectifiable, as in its

15

CAL- 1st Franchise
Bto-Mar, LLC
Sarasota-Bradenton
September 2006

discretion may be deemed proper or necessary to cure such default, including actions of forcible entry or detainer and actions in distress of rent, granting full power and authority to us to exercise each and every of the rights, privileges and powers herein granted at any and all times hereafter;

(v)     to cancel or terminate any unauthorized agreements or subleases entered into by you, for any cause or ground which would entitle us to cancel the same;

(vi)    to disaffirm any unauthorized agreement, sublease or subordinated lien, to make all necessary or proper repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements to the Site that may seem judicious, in our sole judgment;

(vii)   at our option, with or without prior notice to you, enter or obtain access to and control of the Site and remove applicable weight management equipment, at your expense;

(viii)  to insure and reinsure the same for all risks incidental to our possession, operation and management thereof; and/or

(ix)    notwithstanding any provision of this Agreement, to declare all of your rights, but not obligations under the Agreement, to be immediately terminated as of the date of your default under the lease.

(c) Power of Attorney.   You irrevocably appoint us as your true and lawful attorney-in-fact in your name and stead and hereby authorizes us, upon any default under the Lease or under this Agreement, with or without taking possession of the Site or any other Collateral under the lease, to rent, lease, manage and operate the Site or any other Collateral under the lease to any person, firm or corporation, upon such terms and conditions as, in our discretion, we may determine, and with the same rights and powers and immunities, exoneration of liability and rights of recourse and indemnity as we would have upon taking possession of the Site or any other Collateral under the lease pursuant to the provisions set forth in the Lease. The power of attorney conferred upon us pursuant to this Agreement is a power coupled with an interest and cannot be revoked, modified or altered without the written consent of the Franchisor.

5.3.    Plans.  You are obligated at your expense to develop and equip the Center in accordance with all of our required Development Plans, space plans, and specifications to suit the use, shape and dimensions of the Center ("Development Plans") and to ensure that such Development Plans and specifications comply with applicable ordinances, codes and permit requirements and with lease requirements and restrictions, and the mandatory specifications and layout provided by us. We may make changes to the Development Plans that we specify from time to time during the development of the Center. You and your respective vendors and service providers must not begin development, remodeling or otherwise construct the Center until we have approved the Development Plans.  Our changes to the Development Plans during the build-out or development of your Center may result in increased costs to

16

CAL-1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You ___  You ___                                    Us ___

you, and you agree to be responsible for such increased costs. You and your respective vendors and services providers must make no changes to the approved Development Plans unless such changes are presented to and approved by us. Despite our providing the Development Plans to your respective vendors or services providers, any changes and approval that we might provide for them, and your purchase of the Center and its assets from an affiliate of ours or our franchisee, where we have approved such transfer (if applicable), as between you and us, and our affiliates or other franchisees, you are solely responsible for complying with all laws, ordinances, rules and regulations relating directly or indirectly to the manufacture and development of the Center, including the Americans With Disabilities Act and any other laws, rules or regulations regarding public accommodations for persons with disabilities. For example, we may require you to hire your own architect to review and approve the Development Plans. You are solely responsible, as between us (and our affiliates or other franchisees) and you, for any and all claims, liabilities, costs and images relating to non-compliance or alleged non-compliance with any such laws, rules, ordinances or regulations, and you must remedy, at your expense, any such non-compliance or alleged non-compliance. We will not approve any Approved Supplier (e.g., architects, builders, designers, etc.) unless they, at our option, agree to assign to us the plans, drawings or designs, used by you in connection with their manufacture or modification of the Center, or at our option, their agreement to license to us such plans, drawings or designs for use in connection with the Centers.

5.4. <u>Pre-Opening Obligations</u>. Without limiting your foregoing obligations, you agree, at your own expense, to do the following with respect to your purchase or lease of the Center:

(a) yourself or through an Approved Supplier, complete the Development of the Center within 6 months (180 days) of the earlier of the Agreement Date or the effective date of the Application and Deposit Agreement between you and us;

(b) secure and provide us proof of your securing all financing or leasing required to acquire and operate the Center and the Center;

(c) obtain all construction, development, vehicle, transportation, professional, medical, occupational, building, utility, sign, health, sanitation, business and other permits and licenses required to construct and operate the Center;

(d) through one or more designated or Approved Supplier, manufacture, equip, modify, assemble or construct all required post-build out improvements to the Center and decorate, staff and equip the Center in compliance with plans and specifications we have approved (the "Development");

(e) through an Approved Supplier, purchase or lease and utilize or install all other Operating Assets, Center Materials and Products required for the Center;

(f) purchase an opening inventory of authorized and approved products, materials, supplies (e.g., the Services and Products); and

(g) purchase from us (or our designees or Approved Suppliers) the paintings, pictures, photographs, murals, drawings, sculptures and other forms of art we designate, for display in or on your Center and install them in accordance with our specifications at your expense.

17

CAI - 1" Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

5.5.    **Updates.** We or our designee may modify or update the design or Development Plans for the Centers from time to time and make them available to you or Approved Suppliers. The price for updated versions of any Center Materials or Operating Assets referenced in those modified or updated Development Plans may be different than otherwise described in this Agreement or as included the Initial Order or initial cost estimates we provide. However, we or our designee have no obligation to provide you with any improvements, enhancements, add-on features or functionality or new technology or next-generation instrumentation.

5.6.    **Shipping and Installation.** You are responsible for paying all handling, shipping, transportation and insurance costs for delivery of the Operating Assets, Center Materials or other items you buy from us or any Approved Supplier to the location we specify. You must pay all freight arrangements and charges, including loading and unloading, although we or such Approved Supplier will schedule the transportation and shipping. However, shipment fees for the Initial Order are included in the Initial Order Fee.

5.7.    **No Resale.** You must not resell, lease to anyone, loan, barter or permit anyone else to use the Center or the Operating Assets in any manner we do not expressly approve. You have no right to sublicense, lease, barter, loan, sell or otherwise dispose of any interest in the Center, Center, Center Materials or Operating Assets, except as otherwise described in this Agreement. You must not engage in any wholesale business or sublicensing of any of the Products you buy from us or Approved Supplies.

5.8.    **Shipment and Allocation.** To place an order for Operating Assets, Center Materials or Products from us or our designee, you must notify us in writing or otherwise in the precise manner designated in our Manuals for placement of orders, which we may change after or amend from time to time. No orders will be effective unless we have communicated acceptance to you in writing, received payment in full of the initial franchise fee and the then current applicable fee for such order and have commenced shipment to you. We make no representations to you regarding the time of shipments of equipment to you from the time we or any supplier accepts your order. You recognize that timing can vary based on a multitude of factors, many of which are beyond our control, since we may obtain Operating Assets or Center Materials for them or from our own manufacturing or supply sources; and subject to this Agreement. You also understand and acknowledge that we and the Approved Supplies have other uses for the Operating Assets or Center Materials or their components or other equipment and we or they may allocate orders or uses of them among these competing sources as we or they see fit.

5.9.    **Inspection and Acceptance.** You must inspect the Center Materials or Operating Assets immediately when you receive them and promptly notify us in writing of any defects in accordance with our inspection and acceptance policies we may designate from time to time. They will be deemed accepted by you if we or the applicable supplier have not received any claim of defect from you within 5 business days. For all items we or our designees ship, unless otherwise indicated in the Manuals, orders are shipped F.O.B., so that the risk of loss, casualty or damage to whatever was ordered passes to you as soon as we or our designee deliver it to the carrier for shipment or to you at our headquarters or other origination point of shipment.

5.10.    **Due Care.** At all times, you must treat and operate your Center, and treat and utilize, Center Materials, Operating Assets and Products with due care and in strict accordance with any Manual

CAL 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

18

You [signature]    You [signature]                                US [signature]

and other instructions we (or our affiliate) provide you. You must comply with all of our System Standards for the preparation, provision, sale and delivery of the Products and Services. You must promptly report any damage or malfunction to us. You must not sell or otherwise provide any Product or Service to Customers if it fails to meet our System Standards.

5.11.   **Unit Preparation.** You must maintain, a safe Center and safely maintain, offer, use and provide Operating Assets, Center Materials, Services and Products in strict accordance with the Manuels we provide you (or other information we provide you).

5.12.   **Risk of Loss.** You assume all risk of loss, theft, damage, requisition of use and destruction to your Products, Center Materials or Operating Assets from any cause whatsoever. You must insure them in accordance with the insurance provisions of this Agreement.

5.13.   **Maintenance.** You must comply with and perform all maintenance procedures we (or our affiliate) specify periodically in any Manual or other instructions. You must duly care for each Center and use reasonable business efforts to otherwise repair, maintain and cause them to perform in accordance with agreed written test specifications.

5.14.   **Third Party Rights.** You recognize that certain components and proprietary technology utilized by the Center may be furnished pursuant to this Agreement pursuant to a sublicense or license we have obtained from a third-party owner, developer or manufacturer. You agree to take such actions and sign such documents as we reasonably may request on behalf of such third party in connection with such sublicense.

5.15.   **Décor.** You agree that all décor of your Center must be previously approved by us and must comply with our standards as described in the Manuals or other communications, which may be periodically revised. We own all copyrights in and to all forms of art displayed in the Center including morals, paintings, pictures, drawings, sculptures, and photographs that we direct you to display (including any artwork commissioned for the Center) (the "Art"), as well as all intellectual property rights in and to the Art. You will not allow any of the Art to become a fixture to the Center and you will not display or use the Art in any Competitive Center of any kind. Your failure to maintain the Center's décor in compliance with our System and the standards described in the Manuals or otherwise constitutes a material breach of this Agreement.

5.16.   **Operating Assets and Center Materials.** You must acquire all products, supplies, materials and products for use in connection with your Center, including all inventory or other Products, stationery; business cards; signage; services; marketing materials; insurance; financial services; video services; advertising services; credit card services; merchant account systems; the regional, local, national or international call center centralized reservation (appointment setting), telemarketing or call routing services we designate from time to time (the "Call Center Services"); hardware or equipment; and telephone systems (collectively, the "Center Materials") and all medical or other equipment or supplies used for performing or selling the Services or Products, and all lights, filing systems and records systems, fixtures, furnishings, training materials, other equipment signs, Art and computer hardware and software we designate or approve (the "Operating Assets") from us (or our affiliates) or suppliers we have previously approved. We will only approve Approved Suppliers whose Center Materials and Operating Assets meet

the quality standards that we establish from time to time. Currently, we are the only approved Supplier of the Products. You will only place or display at the Site (interior and exterior) such signs, emblems, lettering, logos and display materials that we periodically approve.

    5.17.   **Changes to Approved Suppliers.** If you want to propose a new supplier of Center Materials or Operating Assets (including any type of Product or Services) provided to or by you, you must submit to us sufficient written information about the proposed new supplier to enable us to approve or reject either the supplier or the particular items. If we have not responded within 30 days of our receipt of the information, then the application will be deemed rejected by us. We may consider in providing such approval not just the quality standards for such item or services, but their delivery capabilities, financing terms and ability to service our franchise system as a whole. We may terminate or withhold approval of any Center Materials, Operating Assets, or any supplier of them, that does not meet our quality standards by giving you written notice. If we do so, you must immediately stop purchasing from such supplier or offering or using such Center Materials or Operating Assets in or otherwise in connection with your Center, until we notify you that such supplier or such Center Materials or Operating Assets meet our quality standards. At our request, you must submit to us sufficient information about a proposed supplier and samples of the proposed Center Materials or Operating Assets for our examination so that we can determine whether they meet our quality standards. We also must have the right to require our representatives to be permitted to inspect the proposed supplier's facilities at your expense. We may charge a fee for evaluating alternative suppliers of $500 per day for personnel time plus laboratory fees, professional fees and travel and living expenses as well as any other fees we pay to third parties in furtherance of the evaluation. Because we wish to control the quality and source of the Products, we have no obligation to approve any other Approved Supplier of them.

    5.18.   **Preferred Vendor Programs.** In addition to our approval of Approved Suppliers, we may develop certain programs and terms under which we, our affiliates, certain franchisees or others receive certain negotiated benefits or terms from Approved Suppliers ("Preferred Vendor Programs"). You must follow all of our policies and procedures for participation in or termination of Preferred Vendor Programs ("program rules"). We can refuse or terminate your participation in Preferred Vendor Programs without terminating this Agreement. And, our program rules may include all requirements that you agreed to, and you must agree to, only place or display at the Center (interior and exterior) such signs, emblems, lettering, logos and display materials that we periodically approve in connection with Preferred Vendor Programs. We may, in connection with our Preferred Vendor Programs, designate one or more Approved Suppliers as an exclusive or the exclusive supplier or suppliers of types, models or brands of Center Materials or Operating Assets or other business services that we approve for Centers as meeting our specifications and standards in such preferred vendors or other preferred vendors may be required by us to pay to us, the Advertising Fund or through our affiliates, in a manner we designate, monies or provide other benefits as condition of our designation of them as preferred vendors or permission for them to serve as an Approved Supplier (collectively "Preferred Vendors"). We may require, and certain Approved Suppliers we designate as Preferred Vendors may require, that you agree to enter into certain agreements with them (subject to our approval) in connection with our designation of them as Preferred Vendors or your participation in the preferred vendor program ("Preferred Vendor Agreements"). We may require that we be a party to such Preferred Vendor Agreements with Preferred Vendors. You acknowledge and agree that: (a) monies or other remuneration that we receive in connection with Preferred Vendor Programs or other benefits we receive from Preferred Vendors or Approved Suppliers is

CAI, I" Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

20

You_____ Ya_____

us_____

fair and appropriate compensation to us in connection with our active efforts to evaluate them as Preferred Vendors or Approved Suppliers, our ongoing efforts to monitor and evaluate whether they continue to meet our requirements for participation as Preferred Vendors or Approved Suppliers and our administration of Preferred Vendor Programs; and (b) such monies or remuneration are fully earned by us. We and our affiliates may retain all revenue and other remuneration we receive from Approved Suppliers or Preferred Vendors without restriction (unless the supplier or vendor requires otherwise). We, in our sole judgment, may concentrate purchases with one or more Approved Suppliers or Preferred Vendors to obtain lower prices, advertising support and/or services for the benefit of us, our affiliates and Centers, or for any other reason that we deem appropriate, and establish supply facilities or servicing capabilities owned by us or our affiliates which we may designate as an Approved Supplier or Preferred Vendor. In such instances, we may limit the number of suppliers, Approved Suppliers or Preferred Vendors with whom you may deal, designate sources that you must use, and refuse any request by you for another approved supplier or preferred vendor of any applicable product or service.

5.19.   **Music and Other Audio and Visual Entertainment**. You acknowledge and agree that the provision of music or audio and visual entertainment to patrons of your Center is, or may become an integral part of the System. Accordingly, you agree to play only the type(s) of music and display only the types of visual entertainment, at the decibel levels, using such equipment and in the manners that we may periodically prescribe or approve. You must acquire and install any audio or visual equipment that we designate or require for use by your Center and you must subscribe to music and video services as we may periodically specify, whether as an Approved Supplier or preferred vendor, to enable you to broadcast videos, music and other content as specified by us from time to time. We may prohibit you from displaying, exhibiting, broadcasting or providing any media we choose, regardless of content, including or prohibiting use of political, religious or social content in such media.

5.20.   **Forms and Invoices**. You will use only such test report forms, warranty forms, invoices and other forms as are approved by us. You will obtain such forms from us or from suppliers approved by us to produce such forms utilizing the Marks. All invoices will be sequentially numbered. Copies of all invoices issued by you will be submitted to us on a monthly basis at our option.

5.21.   **Uniform, Dress and Insignia**. When soliciting customers or when performing Services or providing Products for customers, you and any of your employees or other personnel will wear such uniform or standard items of dress and/or insignia as may be prescribed by us from time to time. All such items of dress and insignia will be maintained by you and your employees in a clean and attractive manner.

5.22.   **Hiring and Training of Employees by You**. You will hire all employees and other forms of personnel of your Center, and will be exclusively responsible for the terms of their employment and compensation. You will not employ, contract with or permit any person to perform services for your Center who has not been satisfactorily trained by you, signed a nondisclosure and/or noncompetition agreement in the form prescribed or approved by us, or is appropriately licensed under applicable state laws. You will hire a physician who will be responsible for the supervision of the Center and such other responsibilities as we may designate in the Manuals from time to time ("Medical Director"). We, in our sole judgment, may request that your Medical Director have at least a 1% equity interest in the Center in the form of stock option or similar rights in the manner we periodically specify. We may request that, at

CAI - 1st Franchise
Bio-Mat, LLC
Sarasota-Bradenton
September 2006

21

You ___  You ___                                                    US ___

your expense, you increase the Medical Director's equity interest in you if necessary to comply with applicable law. We may offer you the opportunity to, or require you to sign one of our NCP Addendum which is Exhibit "D-1" to our Franchise Offering Circular.

5.23.    Center Opening.  You agree not to open the Center or any other aspect of the Center for business until:

(a) we approve the Center as developed and you have acquired an opening inventory sufficient to met our System Standards;

(b) pre-opening training has been completed to our satisfaction and you provide us with evidence you and your management personnel have completed training at authorized facilities;

(c) the Franchise Fee and all other amounts then due to us, your landlord, governmental authorities and our suppliers have been paid;

(d) you have obtained all required building, utility, sign, health, sanitation, business permits, certificates and licenses required to operate the Center;

(e) we have been furnished with copies of all insurance policies required by this Agreement, or such other evidence of insurance coverage and payment of premiums as we request or accept; and

(f) we have received signed counterparts of all required documents pertaining to your acquisition or lease of the Center (including any required agreements between you and us).

(g) we have provided you with written authorization to open the Center for business.

You agree to open the Center for business within 6 months following the Agreement Date (unless we agree otherwise).

6.    FEES.

6.1.    Franchise Fee.  You agree to pay us a nonrecurring and nonrefundable franchise fee (the "Franchise Fee") in the amount of $40,000.00 less Deposit (if any and if the Deposit Agreement states the Deposit is to be applied to the Franchise Fee).  The Franchise Fee must be paid to us on the Agreement Date.  The Franchise Fee is nonrefundable and is fully earned by us when paid.

6.2.    Financing Franchise Fee.  On a limited basis, if you meet our qualifications, we may agree to finance a portion of the Franchise Fee.  Currently, we require a down payment of $N/A.  If we do finance the Franchise Fee, you will be required to sign a Promissory Note.  A copy of our current form of Promissory Note is attached as Exhibit C.

6.3.    Royalty.  In return for our providing you the right to use the System during the term, you agree to pay us a royalty ("Royalty") in the amount of 10% of your Center's Gross Sales during each Accounting Period.  On the day we designate (the "Report Day") of each Accounting Period, you must

22

CAL-1" Franchise
Flo-Max,LLC
Sarasota-Bradenton
September 2006

You ____  You ____    US ____

report the amount of your Gross Sales for the preceding Accounting Period. "Accounting Period" is that period we designate in the Manual (currently a 7-day accounting period for Royalty and Marketing calculations that runs from Monday through Sunday and a 4, 4, 5-week accounting period for financial statement purposes). However, Accounting Periods may be daily, weekly or monthly. So, for example, at our option, we may monitor and collect the Royalty on a daily, weekly or monthly basis. You must pay us the Royalty so that we receive it on or before the 3rd business day following the Report Day or such other day as we may designate (the "Payment Day") (currently Wednesday) for the immediately preceding Accounting Period. If we determine that applicable laws or regulations will not permit the payment of a Royalty to us that varies based on your Center's Gross Sales, or raises sufficient risk of being held unlawful, then we may require you to pay a Royalty to us equal to the greater of $500 per week or the average amount we receive from all other franchised Centers in the immediately preceding accounting period. We will notify you of the amount due and you must pay it to us by the Payment Day.

6.4.    **Initial Order.** On the Agreement Date, you must pay to us **$TBD per Exhibit E** for the initial Order (initial inventory of Products) designated in Exhibit "E." It is fully earned and non-refundable.

6.5.    **Advertising Fund Contribution.** Beginning on the 1st anniversary of the Agreement Date, upon notice from us, you must pay to us an advertising fund contribution (the "Advertising Fund Contribution") in the amount we designate up to 3% of your Gross Sales during each Accounting Period. If we determine that applicable laws or regulations will not permit the payment of an Advertising Fund Contribution to us that varies based on Gross Sales or raises sufficient risk of being held unlawful, then we may require you to pay Advertising Fund Contributions to us an amount equal to $200 per week due and payable on the Payment Day. The Advertising Fund Contribution is your compensation to us for our operation of the Advertising Fund.

6.6.    **Computer System Fee.** You must pay to us $100 per month, during the Payment Day we designate, as compensation to us for our licensing the Software to you and providing the Software Services (the "Computer System Fee").

6.7.    **Administrative Fee.** If you fail to pay any required costs, such as insurance, advertising expenses, etc. and we pay these costs for you, we may, at our option, charge you an Administrative Fee equal to 15% of the amount we paid on your behalf.

6.8.    **Electronic Funds Transfer.** We may require you to pay any amounts due us, including the Royalties, Computer System Fee and Advertising Fund Contribution, to us by electronic funds transfer on the due date. You must comply with the procedures we specify in our Manuals and perform such acts and sign and deliver such documents as may be necessary to accomplish payment by this method. On the Report Day designated in the Manual (currently Wednesday), you must report to us by telephone or electronic means or on written form, as we direct, the Center's true and correct Gross Sales for the immediately preceding week. We may require you to give us authorization, in a form that we designate, to initiate debit entries or credit correction entries to the Center's bank operating account (the "Account") for payments of Royalties and other amounts due under this Agreement, including any applicable interest charges. If so, you must make the funds available in the Account for withdrawal by electronic transfer no later than the Payment Day. The amount actually transferred from the Account to pay Royalties will be

23

CAL 1st Franchise
Flushing, LLC
Sarasota-Bradenton
September 2006

based on the Center's Gross Sales reported to us on the Report Day. If you have not reported the Center's Gross Sales to us for any reporting period, we may transfer from the Account an amount calculated in accordance with our reasonable estimate of the Center's Gross Sales during any such reporting period. If we determine at any time that you have under-reported Gross Sales or underpaid Royalties or other amounts due to us, we will be authorized to immediately initiate a transfer from the Account in the appropriate amount in accordance with the foregoing procedures, including applicable interest and late charges. Any overpayment will be credited to the Account through a credit, effective as of the first Report Day after you and we determine that such credit is due.

6.9.    **Definition of "Gross Sales".** As used in this Agreement, the term "Gross Sales" means the total actual gross charges for all products or services sold to customers of the Center for cash or credit, whether these sales are made at or from the Center, or any other location. However, any amounts that you collect and transmit to state or local authorities as sales, use or other similar taxes are excluded from the definition of Gross Sales.

6.10.    **Interest on Late Payments.** All amounts which you owe us, including but not limited to Royalties, Advertising Fund Contributions and Co-op Contributions, will bear interest after their due date at the annual rate of eighteen 18% or the highest contract rate of interest permitted by law, whichever is less. You acknowledge that we do not agree to accept any payments after they are due nor commit to extend credit to, or otherwise finance your operation of, the Center. Your failure to pay all amounts when due constitutes grounds for termination of this Agreement.

6.11.    **Late Payment Fee.** All Royalties, Advertising Fund Contributions, amounts due for purchases by you from us, and any interest accrued thereon, and any other amounts which you owe us, or our affiliates, are subject to a late payment fee of $25 for payment or report received by us 5 days after its due date. The late payment fee is due immediately on any delinquent payments and for dishonored checks. The provision in this Agreement concerning late payment fees does not mean that we accept or condone late payments, nor does it indicate that we are willing to extend credit to, or otherwise finance, the operation of your Center. In the event that you are delinquent in providing payment or reports during any 2 or more Accounting Periods, we may require that you to pay all amounts due us by electronic transfer or cashier's check.

6.12.    **Application of Payments.** Notwithstanding any designation you might make, we have sole discretion to apply any of your payments to any of your past due indebtedness to us. You acknowledge and agree that we have the right to set off any amounts you or your owners owe us against any amounts we might owe you or your owners.

6.13.    **Payment Offsets.** We may setoff from any amounts that we may owe you any amount that you owe to us, or our affiliates, for any reason whatsoever, including without limitation, Royalties, Advertising Fund Contributions, late payment penalties and late payment interest, amounts owed to us or our affiliates for purchases or services or for any other reason. Thus, payments that we make to you may be reduced, in our discretion, by amounts that you owe to us or our affiliates from time to time. In particular, we may retain (or direct to our affiliates) any amounts that we have received for your account as a credit and payment against any amounts that you may owe to us, or our affiliates, at any time. We may do so without notice to you at any time. However, you do not have the right to offset payments owed to us for amounts purportedly due to you from us.

UAL- 1ª Franchise
Fin-Mar, LLC
Sarasota-Bradenton
September 2006

24

You ____ You ____                                    US ____

6.14.  **CPI Adjustment.**  All fixed dollar amounts used in the Franchise Agreement and this Addendum will be adjusted as of January 1 of each year in proportion to the changes in the Index. The Index refers to the Consumer Price Index (U.S. Average, all items) maintained by U.S. Department of Labor (or such equivalent index as may be adopted in the future) between January 1, 1995 and January of the then-current year. Each adjustment will be made effective on January 1 based on the January Index, but the 1st adjustment will not be made until the 2nd January following the Agreement Date (i.e., for an Agreement Date of July 1, 2006, the 1st adjustment would be effective as of January 1, 2008). Our failure to adjust any fixed dollar amounts due to changes in the Index at any time does not constitute our waiver of the right to do so at any other time, including for past periods. However, we will not impose such adjustments retroactively.

7.    **TRAINING AND ASSISTANCE.**

7.1.    **Owner Training.**  Not later than 21 days before the Center is scheduled to open, we will furnish Owner Training on the operation of a Center to you and 1 other person (or, if you are a Business Entity, up to 2 of your owners) ("Owner Training"). The Owner Training lasts approximately 1 week and will be furnished at our designated training facility and/or at an operating Center, as we specify. You, or your owners, are required to complete the Owner Training to our satisfaction. We, in our sole judgment, may change, modify, amend or designate the content and process of Owner Training. Successful completion of the Owner Training program by you, or your owners, is a condition to the opening of the Center to the public. You also are required to participate in all other activities required to operate the Center and other aspects of the Center. Although we will furnish Owner Training to you, or your owners, at no additional fee or other charge, you will be responsible for all travel and living expenses which such persons incur in connection with Owner Training and any other training we require or recommend. You agree to replace an employee if we determine that he or she is not qualified to serve at the Center. If we determine that you, or your owners, are unable to complete Owner Training to our satisfaction, we have the right to terminate this Agreement. If you fail to satisfactorily complete the Owner Training, we may, in our sole judgment, terminate the Agreement.

7.2.    **Professional Training.**  Not later than 21 days before the Center is scheduled to open, we will furnish an Initial Training program lasting up to 5 – 6 days for a total of up to 2 persons, including your Medical Director, and up to 1 Professional (or other employees or independent contractors we approve) working for or in connection with your Center, at no additional charge (the "Professional Training"). The Professional Training may be furnished at our designated training facility and/or Center, as we may specify. Each of your Professionals are required to complete the Professional Training to our satisfaction. We, in our sole judgment, may require other employees or independent contractors employed by or working in connection with you, to attend, and to our total satisfaction, complete, such Professional Training. We, in our sole judgment, may change, modify, amend or designate the content of the Professional Training. You must pay to us a fee in the amount of $500 per person per day for the 3rd and each subsequent person who attends the Professional Training. You are responsible for all travel, living and compensation expenses associated with such persons who attend the Professional Training. If we determine that any of your Professionals are unable to complete the Professional Training to our satisfaction and you continue to employ such person, we have the right to terminate this Agreement.

25

CAL. 1st Franchise
Flo-Max, LLC
Sarasota-Bradenton
September 2006

You _____ You _____                    US _____