7.3.    **Additional Training.** We may require you, or your owners or Medical Director, to attend, at your expense, periodic supplemental, additional or refresher training courses or training conferences at such times and locations that we designate, and we may charge then-current fees for such courses (collectively, "**Additional Training**"). You agree to give us reasonable assistance in training other Center franchisees. We will reimburse you for your reasonable out-of-pocket expenses in providing such assistance.

7.4.    **General Guidance.** We will advise you from time to time regarding the operation of the Center based on reports you submit to us or inspections we make. In addition, we will furnish guidance to you with respect to:

(a) standards, specifications and operating procedures and methods utilized by Centers;

(b) purchasing required fixtures, furnishings, equipment, signs, products, materials and supplies;

(c) types of and procedures for Services and Products;

(d) use of suppliers, approved products, volume buying;

(e) advertising and marketing programs;

(f) training; and

(g) administrative, bookkeeping and accounting procedures.

Such guidance will, in our sole judgment, be furnished in our Manual, bulletins or other written materials and/or during telephone consultations, e-mails, web-based or other electronic means and/or consultations at our office or the Center. At your request, we will furnish additional guidance and assistance and, in such a case, may charge the per diem fees and charges we establish from time to time. But, if such assistance is deemed by us to be "Additional Training," you must pay to us our then-current Additional Training fees.

8.    **MARKS.**

8.1.    **Ownership and Goodwill of Marks and Copyrights.** As between you and us, we own or have been licensed all rights, title and interest in and to all information capable of being rendered into tangible form (i.e., copyrights) created in connection with or used in connection with the System or your Center (collectively, the "**Copyrights**"). The Copyrights include, for example, the Art, written materials, electronic data, Software, Manuals, brochures, music, photography, the content and compilation of websites, graphics, and the like. Your right to use the Marks and the Copyrights is derived solely from this Agreement and limited to your operation of the Center pursuant to and in compliance with this Agreement and all System Standards we prescribe from time to time during the Term. Your unauthorized use of the Marks and the Copyrights will be a breach of this Agreement and an infringement of our rights in and to the Marks and the Copyrights. You acknowledge and agree that your usage of the Marks and the Copyrights and any goodwill established by such use will be exclusively for our benefit and that this Agreement does not confer any goodwill or other interests in the Marks or the Copyrights upon you (other than the right to

26

Your _____ You _____        US _____

operate the Center in compliance with this Agreement). All provisions of this Agreement applicable to the Marks and the Copyrights apply to any additional proprietary trade and service marks, Copyrights and commercial symbols we authorize you to use.

8.2.   **Creation of Copyrights.** If you commission any Copyrights for any use in connection with the operation of your Center, you will be responsible for requiring the artist and any other person who may claim copyrights, moral rights, privacy rights, publicity rights or any other intellectual property rights in or to that Copyrights (including any aspect of the content or composition of it), to assign to us all rights, title and interest in and to the Copyrights. To the extent such assignment is not possible or obtainable, you must require that such persons failing to grant to us such assignment grant to us an unconditional, royalty free, world-wide, multi-site, multi user, irrevocable, freely assignable license to use, license, modify, reproduce, make commercial use of, and make derivative works from or of, the Copyrights and all attributes of and to it. You agree to, prior to commissioning, utilizing, purchasing or licensing any Copyright, require all persons who claim intellectual property, privacy, publicity or moral rights in or to that Copyrights (other than us) sign such assignments or licenses as we may designate from time to time. Between you and us, you agree that we will be deemed to own all aspects of the physical embodiment of the Copyrights. We may also hire artists, authors or others to commission the Copyrights and you will be required to pay to us our then current fees for commissioning shipment or installation of the Copyrights, which will be due, at our option, prior to commencement of the work by the artist, or prior to shipment, upon delivery or otherwise in accordance with applicable policies and procedures we may establish from time to time. Your payment to us of fees for commissioning the Copyrights will not be deemed your purchase of the Copyrights and only constitutes payment to us to help, in whole or in part, offset our cost to commission the Copyrights. You acknowledge and agree that title to all of the Copyrights is and will at all times remain with and be held solely by us, and you neither have nor will make any claim with respect to the ownership of the Copyrights. You will not (i) make any express or implied representations to any person that you own the Copyrights or have rights in or to it that are superior to our rights in and to it, (ii) grant or purport to grant any security interest or lien in or on any of the Copyrights to any other person, or (iii) permit or suffer to exist any lien on any of the Copyrights in favor of any other person. You must discharge at your expense any lien asserted against the Copyrights (other than liens imposed thereon by our acts or omissions) and to take such steps as may be necessary, from time to time, to preserve all of our rights in the Copyrights against third parties.

8.3.   **Limitations on Your Use of Marks and Copyrights.** You agree to use the Marks and Copyrights we designate and in the manner we designate as the sole identification of the Center, except that you agree to identify yourself as the independent owner in the manner we prescribe. You may not use the Marks or Copyrights in any press release, articles or other publications without our prior express written consent. You may not use modifying words, terms, designs or symbols (other than logos we license to you), or in any modified form, nor may you use any Mark or Copyright in connection with the performance or sale of any unauthorized services or products or in any other manner we have not expressly authorized in writing. No Mark or Copyright may be used in any advertising concerning the transfer, sale or other disposition of the Center or an ownership interest in you. You agree to display the Marks and Copyrights prominently in the manner we prescribe at the Center, on supplies or materials we designate and in connection with forms and advertising and marketing materials. You agree to give such notices of trade and service mark registrations as we specify and to obtain any fictitious or assumed name registrations required under applicable law.

CAL - 1st Franchise
Flo-Mar, LLC
Seminole-Henderson
September 2006

27

You _____   Us _____

8.4.    **Notification of Infringements and Claims.**  You agree to notify us immediately of any apparent infringement or challenge to your use of any Mark or Copyright, or of any claim by any person of any rights in or to any Mark or Copyright, and you agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim.  We have sole discretion to take such action as we deem appropriate and the right to control exclusively any litigation, U.S. Patent and Trademark Office or U.S. Copyright Office proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark or Copyright.  You agree to sign any and all instruments and documents, render such assistance and do such acts and things as, in the opinion of our attorneys, may be necessary or advisable to protect and maintain our interests in any litigation or Patent and Trademark Office, U.S. Copyright Office or other proceeding or otherwise to protect and maintain our interests in the Marks and Copyrights.

8.5.    **Discontinuance of Use of Marks.**  If it becomes advisable at any time in our sole judgment for us and/or you to modify or discontinue the use of any Mark or Copyright and/or use one or more additional or substitute trade or service marks, including the complete replacement of any Mark or Copyright and usage of other marks or copyrights (due to merger, acquisition or otherwise), you agree to comply with our directions within a reasonable time after receiving notice.  We will not reimburse you for any loss of revenue attributable to any modified or discontinued Mark or Copyright or for any expenditures you make to change Marks or Copyrights or to promote or use a modified or substitute trademark or service mark.

8.6.    **Indemnification.**  We will indemnify you against and reimburse you for all damages for which you are held liable to third parties in any proceeding arising out of your authorized use of any of our Marks or Copyrights, pursuant to and in compliance with this Agreement, resulting from claims by third parties that your use of any of the Marks or Copyrights infringes their trademark rights, and for all costs you reasonably incur in the defense of any such claim in which you are named as a party, so long as you have timely notified us of the claim and have otherwise complied with the terms of this Agreement.  We will not indemnify you against the consequences of your use of the Marks or Copyrights except in accordance with the requirements of this Agreement.  You must provide written notice to us of any such claim within 10 days of your receipt of such notice and you must tender the defense of the claim to us.  We will have the right to defend any such claim and if we do so, we will have no obligation to indemnify or reimburse you for any fees or disbursements of any attorney retained by you.  If we elect to defend the claim, we will have the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim.

9.    **CONFIDENTIAL INFORMATION.**

9.1.    **Types of Confidential Information.**  We possess (and will continue to develop and acquire) certain confidential information (the "Confidential Information") relating to the development and operation of Centers, which includes (without limitation):

(a)  the System and the know-how related to its use;

(b)  plans, specifications, size and physical or operational characteristics of Centers and the Centers;

28

CAL-1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

(c) site selection criteria and site development methods;

(d) methods in obtaining licensing and meeting regulatory requirements;

(e) sources and design of equipment, furniture, forms, materials and supplies Products and Services;

(f) marketing, advertising, Institutional Accounts, contests and promotional programs for Centers;

(g) staffing and delivery methods and techniques for personal services;

(h) the selection, testing and training of personnel for Centers;

(i) the recruitment, qualification and investigation methods to secure employment for employment candidates;

(j) any computer software we require, make available or recommend for Centers;

(k) methods, techniques, formats, specifications, procedures, information and systems related to and knowledge of and experience in the development, operation and franchising of Centers;

(l) knowledge of specifications for and suppliers of certain products, materials, supplies, furniture, furnishings and equipment;

(m) Service methods and techniques and Product recipes, formulas, ingredients and preparation methods;

(n) knowledge of operating results and financial performance of Centers other than those operated by you (or your affiliates); and

(o) e-commerce related data (e.g., customer data, click-stream data, cookies, user data, hits and the like);

(p) patents and copyrights secured by us or our affiliates; and

(q) customer records of all types.

9.2.  **Disclosure and Limitations on Use**.  We will disclose much of the Confidential Information to you and personnel of the Center by furnishing the Manuals to you and by providing training, guidance and assistance to you.  In addition, in the course of the operation of your Center, you or your personnel may develop ideas, recipes, copyrightable works, concepts, methods, techniques or improvements ("Improvements") relating to your Center, which you agree to disclose to us.  We will be deemed to own the Improvements and may use them and authorize you and others to use them in the operation of Centers. Improvements will then also constitute Confidential Information.

CAL 1st Franchise
Flo-Mor, LLC
Sarasota-Bradenton
September 2006

29

9.3.    **Confidentiality Obligations.**  You agree that your relationship with us does not vest in you any interest in the Confidential Information other than the right to use it in the development and operation of your Center, and that the use or duplication of the Confidential Information in any other business would constitute an unfair method of competition.  You acknowledge and agree that the Confidential Information is proprietary, includes trade secrets belonging to us and is disclosed to you or authorized for your use solely on the condition that you agree, and you therefore do agree, that you:

(a)  will not use the Confidential Information in any other business or capacity;

(b)  will maintain the absolute confidentiality of the Confidential Information during and after the Term;

(c)  will not make unauthorized copies of any portion of the Confidential Information disclosed via electronic medium, in written form or in other tangible form, including, for example, the Manuals; and

(d)  will adopt and implement all reasonable procedures we may prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including, restrictions on disclosure to your employees and the use of nondisclosure and noncompetition agreements we may prescribe for employees or others who have access to the Confidential Information.

9.4.    **Exceptions to Confidentiality.**  The restrictions on your disclosure and use of the Confidential Information will not apply to the following:

(a)  disclosure or use of information, processes, or techniques which are generally known and used in the  Centers (as long as the availability is not because of a disclosure by you), provided that you have first given us written notice of your intended disclosure and/or use;

(b)  disclosure of the Confidential Information in judicial or administrative proceedings when and only to the extent you are legally compelled to disclose it, provided that you have first given us the opportunity to obtain an appropriate protective order or other assurance satisfactory to us that the information required to be disclosed will be treated confidentially; and

(c)  disclosure or use by the Physicians, Physician Services Corporations and Professional Associations with whom you contract to assist you in providing products and services so long as they agree to be bound by the confidentiality provisions under this Agreement.

10.    **EXCLUSIVE RELATIONSHIP.**

You acknowledge and agree that we would be unable to protect Confidential Information against unauthorized use or disclosure or to encourage a free exchange of ideas and information among  Centers if franchised owners of  Centers were permitted to hold interests in or perform services for a Competitive Center (defined below).  You also acknowledge that we have granted the Franchise to you in consideration

30

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____                    US _____

of and reliance upon your agreement to deal exclusively with us. You agree that, during the Term, neither you nor any of your owners (nor any of your or your owners' spouses or children) will:

    (a) (other than through another Center under a Franchise Agreement with us) have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Center wherever located;

    (b) have any direct or indirect interest of 5% or greater as a disclosed or beneficial owner in a publicly held Competitive Center, wherever located;

    (c) perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Center, wherever located; or

    (d) recruit or hire any person who is our employee or the employee of any Center without obtaining the prior written permission of that person's employer.

However, if the geographic scope of these foregoing competitive restrictions is not enforceable under applicable law, neither you nor your owners will engage in a Competitive Center (other than a Center under a Franchise Agreement with us) operating within 75 miles of: (i) the Protected Area; or (ii) the site of any other Center owned or operated by us, our affiliates or one of our franchisees. The term "Competitive Business" as used in this Agreement means any business or facility owning, operating or managing, or granting franchises or licenses to others to do so, any Center or any business operating from a mobile or fixed location (or via any form of e-commerce) that offers: physician assisted, or non-physician assisted, medical based physician monitored or supervised weight reduction or weight management, health or nutritional services or weight loss or weight loss management products, foods, cookies, shakes, supplies, drops, creamers, or the like which are the same as or similar to those Services or Products employed or offered or sold by Centers or which in any way utilize the Confidential Information the copyrights, Art, the System or the Marks (other than a Center operated under a Franchise Agreement with us) or any other health, nutritional or dietary products or vitamins. You acknowledge and agree that:  (1) we and our affiliates have expended and will expend substantial time and expense in training our and their employees; and (2) we and our affiliates (as applicable), will suffer substantial injury, with respect to which it is extremely difficult and impracticable to calculate actual damages, if you or any of your owners or any member of the immediate family member or of you or any of your owners, breaches this agreement with respect to solicitation of employees. Accordingly, in an effort to liquidate in advance the sum that would represent such damages caused by your or their solicitation of employees of ours, our affiliates or our franchisees, you agree that you will pay to us or our affiliates or franchisees an amount equal to the Annualized Compensation paid by us or such affiliate or franchisee to any employee of ours, our affiliate or our franchisees who leaves such employment directly or indirectly as a result of your breach of this agreement.  "Annualized Compensation" means the aggregate compensation (including wages/salary, bonus and other employer's cost of all taxes and benefits) payable to an employee (i) during the 12 month period immediately preceding the date of such employee's employment with us, our affiliate or our franchisees, if such employee was employed by us or them during the entire 12 month period, or (ii) during the period of such employee's employment with us, our affiliates or our franchisees multiplied by a fraction, the numerator of which is 365 and the denominator of which is the number of days that such employee was employed by us, our affiliate or our franchisee, if such employee was not employed by us, our affiliate or our franchise for a period of 12 consecutive months. You acknowledge and agree that this amount, which

31

Your _____  You _____                US _____

will be due and payable within 30 days of your receipt of our invoice, is a fair and reasonable amount to be recovered as liquidated damages and will not constitute a penalty or forfeiture.

11.    **OPERATION AND SYSTEM STANDARDS.**

11.1.    **Operations Manual.** We will loan you during the Term, one copy of our manuals (the "Manuals"), consisting of such materials (including, as applicable, audiotapes, videotapes, magnetic media, computer software and written materials) that we generally furnish to franchisees from time to time for use in operating a Center. The Manuals may be provided to you in electronic form and by any means of e-commerce we designate. The Manuals will contain mandatory and suggested specifications, standards, operating procedures and rules ("System Standards") that we prescribe from time to time for the operation of a Center and information relating to your other obligations under this Agreement and related agreements. You agree to follow the standards, specifications and operating procedures we establish periodically for the SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ System that are described in the Manuals. You also must comply with all updates and amendments to the SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ System as described in newsletters or notices we distribute, including via computer systems. You must maintain the Manuals as confidential and maintain the information in the Manuals as secret and confidential. The Manuals may be modified, updated and revised from time to time to reflect changes in System Standards. You agree to keep your copy of the Manuals (in hard copy or electronic form) current and in a secure location and by secure means at the Office or in the Center. In the event of a dispute relating to its contents, the master copy of the Manuals we maintain at our principal office (or if via e-commerce, on our Computer System) will be controlling. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Manuals. If your copy of the Manuals is lost, destroyed or significantly damaged, you agree to obtain a replacement copy at our then applicable charge.

11.2.    **Compliance with System Standards.** You acknowledge and agree that your advertising, operation and maintenance of the Center in accordance with System Standards are essential to preserve our goodwill including the goodwill of the System, Marks, Copyrights and all Centers. Therefore, at all times during the Term, you agree to operate and maintain your Center in accordance with each and every System Standard, as we periodically modify and supplement them during the Term. System Standards may regulate any one or more of the following with respect to the Centers:

(a) design, layout, décor, appearance and lighting; periodic maintenance, cleaning and sanitation; periodic remodeling; replacement of obsolete or worn-out leasehold improvements, fixtures, furnishings, equipment and signs; periodic painting; and use of interior and exterior signs, emblems, lettering and logos, and illumination;

(b) types, models and brands of required fixtures, furnishings, equipment, signs, software, materials and supplies;

(c) required or authorized Services and Products and product or service categories;

(d) designated or Approved Suppliers (which may include us) of Operating Assets, Center Materials and other fixtures, furnishings, Copyrights, equipment, signs, software, products, ingredients, materials, Services and supplies;

32

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

(e) terms and conditions of the sale and delivery of, and terms and methods of payment for, products, materials, supplies and services, including direct labor, that you obtain from us, unaffiliated suppliers or others;

(f) sales, marketing, advertising, Institutional Accounts, contests, and promotional programs and materials and media used in such programs;

(g) use and display of the Marks or Copyrights;

(h) staffing levels for the Center and matters relating to managing the Center's communication to us of the identities of the Center's personnel; and qualifications, training, dress and appearance of employees;

(i) days and hours of operation of the Center;

(j) participation in Call Center Services, market research and testing and product and service development programs;

(k) acceptance of or participation in credit cards, gift certificates, coupons, other payment systems and check verification services or contests, give-aways, and the like;

(l) bookkeeping, accounting, data processing and record keeping systems, including software, and forms; methods, formats, content and frequency of reports to us of sales, revenue, financial performance and condition; and furnishing tax returns and other operating and financial information to us;

(m) types, amounts, terms and conditions of insurance coverage required to be carried for the Center and standards for underwriters of policies providing required insurance coverage; our protection and rights under such policies as an additional named insured; required or impermissible insurance contract provisions; assignment of policy rights to us; periodic verification of insurance coverage that must be furnished to us; our right to obtain insurance coverage for the Center at your expense if you fail to obtain required coverage; our right to defend claims; and similar matters relating to insured and uninsured claims;

(n) the maximum prices you may charge and advertise for certain Services or Products;

(o) complying with applicable laws; obtaining required licenses and permits; adhering to good business practices; observing high standards of honesty, integrity, fair dealing and ethical business conduct in all dealings with customers, suppliers and us; and notifying us if any action, suit or proceeding is commenced against you or the Center;

(p) regulation of such other aspects of the operation and maintenance of the Center that we determine from time to time to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Centers;

You ___   US ___

(q) your acquisition and you and your personnel's use of the Computer System and software we designate;

(r) you and your personnel's compliance with and agreement to all of our e-mail, spam, copyright notice and takedown, privacy, intranet and internet, website, hyperlink, wireless, hi-fi, Bluetooth, internet telephony, and other communications policies we may designate from time to time, regardless of the technology or media; and

(s) you and your employees receipt of e-mails and other communications from us (e.g., we may require you and your personnel to agree to accepting unsolicited e-mails from us or our designees).

You agree that System Standards prescribed from time to time in the Manual, or otherwise communicated to you in writing or other tangible form, constitute provisions of this Agreement as if fully set forth. All references to this Agreement include all System Standards as may be periodically modified.

11.3.    **Modification of System Standards.** We may periodically modify System Standards, which may accommodate regional or local variations as we determine, and any such modifications may obligate you to invest additional capital in the Center ("Capital Modifications") and/or incur higher operating costs; provided, however, that such modifications will not alter your fundamental status and rights under this Agreement. We agree to give you 30 days to comply with Capital Modifications we require, but if a Capital Modification requires an expenditure of more than $7,000 we agree to give you 3 months from the date such request is made to comply with such Capital Modification. We will not require you to spend more than $25,000 in Capital Modifications during the term of the Franchise Agreement. You are obligated to comply with all modifications to System Standards within the time period we specify. Capital Modifications are in addition to the costs you will incur to repair, replace or refurbish your Center, inventory, supplies, equipment and fixtures from time to time. Capital Modifications do no include any expenditures you must, or choose to make solely in order to comply with applicable laws, or governmental rules or regulations (e.g. ADA compliance).

11.4.    **Interior and Exterior Upkeep.** You must at all times maintain the Center's interior and exterior and the surrounding area in the highest degree of cleanliness, orderliness and sanitation and comply with the requirements regarding the Center established in the Manuals and by federal, state and local laws.

11.5.    **Hours of Operation.** You must operate the Center during the hours and on the days prescribed by us in the Manuals or otherwise approved in advance in writing by us.

11.6.    **Accounting, Computers and Records.** You must provide your own internet service provider, with access via IDSL or other technology we designate and you must utilize redundant "back-up" systems meeting our System Standards. You must use in developing and operating the Center the MIS System, computer equipment and operating and accounting software (collectively, the "Computer System") that we may specify. We may require you to obtain specified computer hardware or software and may modify specifications for any components of the Computer System from time to time. Our modifications and specifications for components of the Computer System may require you to incur costs to

34

purchase, lease or license new or modified computer hardware or software to obtain service and support for the Computer System during the term. You agree to incur such costs in connection with obtaining (in addition to those provided with the Initial Order, if any) the computer hardware and software comprising the Computer System (or additions or modifications) as long as the Computer System we specify for use is the same Computer System that we, or our affiliates, then currently use in Center that we, or they, own and operate. Within 30 days after you receive notice from us, you must obtain the components of the Computer System that we designate and require. The Computer System must be capable of connecting your Center's Computer System with our computer system so that we can daily review the results of your Center's operations. We also have the right to charge you a systems fee (the "Computer System Fee") for modifications of and enhancements made to any proprietary software that we license to you and other maintenance and support services that we, or our affiliates, furnish to you related to the Computer System, including access to and use of the SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ intranet system and use of our Software. You must: (a) supply us with any and all codes, passwords, and information necessary to have access to your Computer System and not change any of them without first notifying us; and (b) not load or utilize any software on the Computer System that we have not specified or approved for use. You agree to comply with the terms of any "terms of use," "privacy policies," or "user rules" we may designate in our sole discretion relating to the Computer System and any website we designate.

11.7.    **Trade Accounts and Taxes.** You must: (a) maintain your trade accounts in a current status and seek to resolve any disputes with trade suppliers promptly; and (b) timely pay all taxes incurred in connection with your Center's operations. Your failure to do so is a material breach of this Agreement. If you fail to maintain your trade accounts in a current status, timely pay such taxes or any other amounts owing to any third parties or perform any non-monetary obligations to third parties, we may, but are not required to, pay any and all such amounts and perform such obligations on your behalf. If we elect to do so, then you must reimburse us for such amounts. You agree to repay us immediately upon receipt of our invoice. We may also set-off the amount of any such reimbursement obligations against all amounts which we may owe you.

11.8.    **Proprietary Materials.** We may require that you must purchase from us, or approved manufacturers, or suppliers, certain Center Materials or Operating Assets consisting of all articles used in operating the Center and bearing any of the Marks. These items may include employee clothing, uniforms, stationary, forms, Products and advertising materials (collectively, the "Proprietary Materials"), at then prevailing prices, plus freight, taxes and delivery costs. We have no obligation to evaluate or consider alternative supplies of Proprietary Materials.

11.9.    **Approved Products.** You must not sell Services, Products or other items or services at the Center or otherwise through the Center that we have not previously approved for sale. We may negotiate group or volume purchasing arrangements with Approved Suppliers and you must participate in the arrangements. We will be entitled to all rebates, bonuses and promotional benefits associated with those programs. You must not, without our prior written consent, sell, dispense, give away or otherwise provide products or other items except by means of retail sales to customers at the Center, or a program of charitable giving approved by us. You must immediately implement changes to the Services, Products or other items requested by us. You must maintain an inventory of Products in the types and quantities we may designate and capacity to perform the Services sufficient to meet the daily demands of the Center.

11.10.  **Management.**  Unless we agree otherwise, you, or one of your owners, must assume responsibility for the Center's day-to-day management and operation and supervise the Center's personnel. The Center must at all times be under your, or your owner's, direct supervision and control, but recognizing that you will employ agents (trained management personnel) on-site who will act at your direction. Unless we approve otherwise, one of your principal owners must have and retain at least 50% ownership of the Center.

11.11.  **Personnel.**  You must hire, train and supervise your Center's personnel in accordance with the specifications set forth in the Manuals. All personnel must meet every requirement imposed by applicable federal, state and local law and those required by us as a condition to their employment. All persons you employ that have access to any of the Confidential Information must sign a Confidentiality and Noncompetition Agreement in a form satisfactory to us. You are responsible to have such Confidentiality and Noncompetition Agreement signed and sent to us before you are granted any access to Confidential Information. You are liable to us for any unauthorized disclosure of such information by any of your Owners, directors, employees, representatives or agents.

11.12.  **Insurance Required.**  During the term of this Agreement, you must maintain in force, at your expense and under policies of insurance issued by carriers approved by us, the following types of insurance coverage:

(a)  professional liability whether included in your comprehensive insurance described in 11.12(b) or otherwise insurance for your Center, and for each of your Professionals or other employees, contractors or agents who we designate (collectively, your "Professional Personnel"), in amounts of no less than $1,500,000 per incident, with an insurance carrier approved by us, and will name us and SMLC as an additional insured; in the event of termination of your Franchise, you are responsible for obtaining or requiring your Professional Personnel to obtain "tail coverage" for your Center and for each of your Professional Personnel for any professional liability claims which may be made for at least 5 years after termination of your franchise. Such "tail coverage" will be with an insurance carrier approved by us, and will name us and SMLC as an additional insured. You must require that any Physicians, Professional Service Corporations, Professional Associates and the like with whom you conduct any form of business for customers of your Center name SMLC and you as an additional insured to their insurance policies;

(b)  comprehensive, public and product liability insurance against claims for bodily and personal injury, death and property damage caused by or occurring in conjunction with the operation of your Center;

(c)  general casualty and property insurance including fire and extended coverage, vandalism and malicious mischief insurance with a full replacement value of your inventory and contents of your Center, covering such risks as are covered in the Standard Extended Coverage Endorsement;

(d)  comprehensive motor vehicle insurance (including personal injury protection and uninsured motorist protection) for any motor vehicles operated by your Center;

36

CAL. 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

(e) workers' compensation in the amounts required by applicable law for your Center; and

(f) such other insurance as is required under any financing document (if any) for the Center or any lease for the premises of the Center; and

(g) such other insurance as we specify from time to time due to identification of risks and available coverages.

11.13.  Insurance Coverage Requirements.  You must maintain the insurance coverages in the minimum amounts we prescribe from time to time in the Manuals.  We may periodically increase or decrease the amounts of coverage required under these insurance policies and require different or additional kinds of insurance at any time to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes and circumstances.

11.14.  Insurance Policy Terms.  All insurance policies must:

(a) contain no provision which in any way limits or reduces coverage for us in the event of any claim by us or any of our affiliates, directors, officers or agents;

(b) extend to provide indemnity for all obligations assumed by you under this Agreement and all items for which you are required to indemnify us under the provisions of this Agreement or otherwise;

(c) name us and SMLC as an additional insured and not contain an "insured vs. insured" exclusion;

(d) contain a waiver of the insurance company's right of subrogation against us and SMLC;

(e) provide that the coverage afforded applies separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured;

(f) provide that the insurance company will provide us with at least 30 days' prior written notice of termination, expiration, cancellation or material modification of any policy;

(g) provide that you cannot reduce the policy limits, restrict coverage, cancel or otherwise alter or amend the policies without our prior written consent; and

(h) contain such other terms and conditions as we require from time to time.

11.15.  Evidence of Coverage.  Before the expiration of the term of each insurance policy, you must furnish us with a copy of each new, renewal or replacement policy you have obtained to extend your coverage, along with evidence of the premium payment.  If you do not maintain the required insurance coverage, or do not furnish us with satisfactory evidence of insurance coverage and premium payments, we may obtain, at our option and in addition to our other rights and remedies under this Agreement, any

CAL- 1ˢᵗ Franchise
Mo-Mar, LLC
Sarasota/Bradenton
September 2006

37

Yo[signature] Yo[signature]          US[signature]

required insurance coverage on your behalf. If we do so, you must fully cooperate with us in our effort to obtain the insurance policies and must promptly sign all forms required to obtain or maintain the insurance. You must also allow any inspections of your Center required to obtain or maintain the insurance. Finally, you must pay us, on demand, any costs and premiums we incur in obtaining insurance on your behalf. Neither your obligation to maintain insurance coverage nor our maintenance of insurance on your behalf, will reduce or absolve you of any obligations of indemnification described in this Agreement.

11.16.  **Affiliation Development.**  You agree to cooperate fully with us and to appear at all times, publicly and privately, in support of our development of relationships with, participation in or support of Institutional Accounts or other commercial, training, trade, marketing, educational, social or religious organizations which we designate (collectively, the "Organizational Associates"). You agree to participate in and support any events we designate for Institutional Accounts or other programs offered by Centers in connection with the activities of Organizational Associates and follow our rules and procedures for them.

## 12.   ADVERTISING AND PROMOTION.

12.1.   **Establishment of Advertising Fund.**  We may establish an Advertising Fund (the "Advertising Fund") for such advertising, marketing and public relations programs and materials on a system-wide basis that we deem necessary or appropriate in our sole judgment. Following the 1 year anniversary of the Agreement date, you agree to, upon notice from us, pay to us or our designee Advertising Fund Contributions in such amounts that we prescribe from time to time, not to exceed 3% of your Gross Sales per Accounting Period (except as described below), payable in the same manner as the Royalty.   If we determine that applicable laws or regulations will not permit the payment of an Advertising Fund Contribution that varies based on Gross Sales, then we may require you to pay an Advertising Fund Contribution of $200 per week. We reserve the right to defer or reduce Advertising Fund Contributions of a Center franchisee and, upon 30 days' prior written notice to you, to reduce or suspend Advertising Fund to and operations of the Advertising Fund for one or more periods of any length and to terminate (and, if terminated, to reinstate) the Advertising Fund. If the Advertising Fund is terminated, all unspent monies, less any outstanding accounts payable and other obligations, on the date of termination will be distributed to our franchisees in proportion to their respective Advertising Fund Contributions to the Advertising Fund during the preceding 12 Accounting Periods.  Our affiliates who operate  Centers will pay fees to the Advertising Fund on the same basis as franchise owners for any Center they own and operate. Even though you pay Advertising Fund Contributions to us, we or our designee, by operation of the Advertising Fund, are not your agents and do not owe fiduciary duties or other duties to you arising out of our or our designee's operation of the Advertising Fund.

12.2.   **Use of the Funds.**  We will direct all programs financed by the Advertising Fund, with sole discretion over all activities, including without limitation, the creative concepts, materials and endorsements, and the geographic, market and media placement and allocation. You agree that the Advertising Fund may be used to pay the costs of, without limitations, preparing and producing video, audio and written advertising materials; administering regional and multi-regional advertising programs, including, without limitation, purchasing direct mail and other media advertising and employing advertising, promotion and marketing agencies; marketing and advertising training programs and materials; and supporting public relations, market research and other advertising, promotion and marketing activities. The Advertising Fund

38

CAI – 1st Franchise
Flo-Mart, LLC
Sarasota-Bradenton
September 2006

We ___  You ___        US ___

periodically will furnish you with samples of advertising, marketing and promotional formats and materials at no cost. Multiple copies of such materials will be furnished to you at our direct cost of producing them, plus any related shipping, handling and storage charges.

12.3.    **Accounting for the Fund.** The Advertising Fund will be accounted for separately from our other funds and will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead, including rent and utilities, as we may incur in activities related to the development and administration of the Advertising Fund and its programs, including, without limitation, conducting market research, product and service offering development, preparing advertising, promotion and marketing materials and collecting and accounting for contributions to the Advertising Fund. All interest earned on monies contributed to the Advertising Fund will be used to pay advertising costs before other assets of the Advertising Fund are expended. We may spend, on behalf of the Advertising Fund, in any fiscal year an amount greater or less than the aggregate contribution of all Centers to the Advertising Fund in that year. The Advertising Fund may borrow from us or others to cover deficits or invest any surplus for future use. If we lend money to the Advertising Fund, we may charge interest at an annual rate 1% greater than the rates we pay our lenders. We will prepare an annual statement of monies collected and costs incurred by the Advertising Fund and furnish the statement to you upon written request. We have the right to cause the Advertising Fund to be incorporated or operated through a separate entity at such time as we deem appropriate, and such successor entity will have all of the rights and duties specified in this Agreement.

12.4.    **Advertising Fund Limitations.** You acknowledge that the Advertising Fund is intended to maximize recognition of the Marks and patronage of Centers. Although we will endeavor to utilize the Advertising Fund to, among its activities, develop advertising and marketing materials and programs and to place advertising that will benefit all Centers, we undertake no obligation to ensure that expenditures by the Advertising Fund in or affecting any geographic area are proportionate or equivalent to the contributions to the Advertising Fund by Centers operating in that geographic area or that any Center will benefit directly or in proportion to its contribution to the Advertising Fund from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this section, we assume no direct or indirect liability or obligation to, you with respect to maintaining, directing, administering or collecting amounts due to the Advertising Fund.

12.5.    **Local Advertising and Promotion.** You agree that any advertising, promotion and marketing you conduct will be completely clear and factual and not misleading and conform to the highest standards of ethical marketing and the promotion policies which we prescribe from time to time. Samples of all advertising, promotional, and marketing materials which we have not prepared or previously approved must be submitted to us for approval before you use them. If you do not receive written approval within 15 days after our receipt of such materials, we will be deemed to have disapproved the materials. You may not use any advertising or promotional materials that we have not approved. You must spend as we may designate from time to time on approved forms of local advertising and promotion, not less than such amounts per month we may designate which is: (a) up to $7,500 for pre opening advertising following the advertising plan we may designate ("Grand Opening Advertising"); and (b) not less than $3,000 per months for the first 3 months following your Opening Date, and starting the 4th month following the Opening Date an amount up to 6% of your Gross Sales per month (your "Minimum Local Advertising Expenditures"). The amount we require you to spend need not be

uniform among franchisees and may be determined by us based on our analysis of the marketing reach we deem necessary for your local advertising market.

12.6.   **Co-op Participation and Contributions.**   If a group of Center Franchise Owners is established in a geographic area in which your Center is located to do joint advertising, marketing and promotion (the "Co-op"), you must join and actively participate in it. You also must contribute to the Co-op such amounts as are determined from time to time by us, not less than 2% of your Gross Sales. Your contribution to such Co-op will not exceed 2% of Gross Sales unless such higher sum is determined in accordance with the rules, regulations and procedures of the Co-op. Your local advertising requirement will be reduced by the amount that you contribute to any Co-op. We will set the amount of those contributions. The Co-op will adopt its own rules, regulations and procedures, which you must follow. However, the rules, regulations and procedures of the Co-op must be approved by us. All advertising utilized by the Co-op must not be used unless and until we have reviewed and approved it. The Co-op will use our mandated accountings system and also pay us the Computer System Fee. We also have the right to participate in any meetings of the Co-op and its members. Your failure to timely contribute the amounts required by the Co-op constitutes a material breach of the provisions of this Agreement and we may offset against any amounts we otherwise owe to you the amount of your Co-op contributions and pay such contributions for you.

12.7.   **Websites.**   We have the right to control or designate the manner of your use of all telephone numbers, URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin ("e-names"). We also have the right to designate, approve, control or limit all aspects of your use of the Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-names, e-mail, home pages, bulletin boards, chatrooms, linking, framing, on-line purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware (collectively), "e-commerce"). You must follow all of our policies and procedures for the use and regulation of e-commerce, including all of our policies and procedures for customer referrals via e-commerce. We may require that you provide graphical, photographic, written or other forms of artistic or literary content to us for use in e-commerce activities associated with the Marks or the System which we may designate. We may restrict your use of e-commerce to a centralized website, portal or network or other form of e-commerce that we designate or operate. We may restrict your advertising activities to the use of only the e-names we designate. We may require that you provide information to us via e-commerce. You (and you must obtain agreements from your personnel to) agree to be bound by any e-mail, SPAM, unsolicited e-mail, terms of use, privacy and copyright notice and takedown policies and the like that we establish from time to time. We may require you to, at your expense, coordinate your e-commerce activities with us, your personnel and other Centers, suppliers and affiliates. We may require you and your personnel to participate in any internet or intranet networks (the "MIS System") we establish or designate and obtain the services of and pay the then current fees for ISP and ASP services and the like. You agree that you will not (and you will obtain agreement from your personnel not to) "opt-out" or otherwise or ask to no longer receive e-mails form us or other participants in the System. You recognize and agree that we own all rights, title and interest in and to any and all websites and any e-names we commission or utilize, or require or permit you to utilize, in connection with the System which bear our Marks or any derivative of our Marks. You also recognize and agree that we own all rights, title and interest in and to any and all data or other information collected via e-commerce related to the System or the Marks, including any

40

You _____  You _____

US _____

customer data, click-stream data, cookies, user data, hits and the like. Such data or other information also constitutes our Confidential Information.

12.8.  **Promotion of the Franchise System.**  We may require you to place any and all materials promoting the Franchise System that we from time to time provide to you. We may require you to place all such materials in the manner in which we designate. You will at all times during the term of this Agreement maintain as many business telephone lines as we designate, from time to time, for use solely in connection with your Center. We may require you to utilize the Call Center Services, and we or our affiliates may be designated by us as the only Approved Supplier of Call Center Services. We may require you to be responsible for our or our designees' then current Call Center Services fees, due at the time we designate, and you must comply with, and you agree to all policies and procedures we designate, from time to time regarding customer referrals and call routing via such Call Center Services. Without limiting the foregoing, we may require you to engage such Call Center Service providers or personnel, or other personnel and/or answering service and/or purchase and install as many answering machines or telemarketing dialing machines, as may be necessary to provide telephone answering coverage and telemarketing services on behalf of your Center during normal business hours (and on weekends in the manner we designate), but not less than the hours 9:00 a.m. to 5:00 p.m, Mondays through Fridays (excepting holidays). You must not use any type of Call Center Services telephone answering service, answering machine, or telemarketing equipment without our prior approval. We may require you to maintain a mailing address at the Center at all times during the Term.

13.    **RECORDS, REPORTS AND FINANCIAL STATEMENTS.**

13.1.  **Accounting System.**  You must obtain your accounting services and any required hardware or software related to them that we designate. You must at all times maintain the records reasonably specified in the Manuals, including, without limitation, sales, inventory and expense information. You must report gross sales and other business information to us using the format, reporting system and accounting system (the "Accounting System") that we require from time to time. We may require that the Accounting System reside on our Computer System and we will provide you access to the Accounting System through the Internet; the Accounting System reside at a location designated by us, and you must establish access to the Accounting System via the Internet at your cost. You must deliver to us the financial and operating reports in the form, manner, content and time we specify from time to time, including via access to the Accounting System. We may require you to update all information in the Accounting System at least daily, including but not limited to revenues, expenditures and other pertinent data. We may periodically change the Accounting System and the suppliers of accounting services. You will make available for our review and inspection during normal business hours all original books and records that we want to ascertain and verify financial statements or reports. You will maintain all of your books and records in accordance with generally accepted accounting principles. You will maintain and preserve such records during the entire Term and for 7 years following expiration or termination of this Agreement. Such records include deposit reports and receipts, cash receipts journal, general ledgers, cash disbursement journals, weekly payroll registers, monthly bank statements, supplier invoices (paid and unpaid), accounts payable journals, balance sheets, profit and loss statements, inventory records, records of wholesale accounts and such other records as we may require. We may use the information obtained as we deem appropriate, except that information you designate as confidential will not be disclosed to third parties in a manner that identifies you as the subject or source except: (i) with your permission, (ii) as may be required by law, (iii) in connection with audits or collections under this Agreement; or shared within the Center franchise

CAL- 1ª Franchise
Flo-Mar, l.l.C
Sarasota-Bradenton
September 2006

You _____  You _____                    US _____

4)

system (you understand that we disseminate operational and financial data throughout the system and to prospects). We may require you to use approved computer hardware and software in order to maintain the Accounting System and other communication processes.

13.2.    Reports. You agree to furnish to us on such forms that we prescribe from time to time:

(a) on the Report Day (which may be as frequent as daily), a report on your Center's Gross Sales during the preceding Accounting Period (which may be as frequent as daily);

(b) within 20 days after the end of each Accounting Period, a profit and loss statement for the Center for the immediately preceding Accounting Period and year-to-date and a balance sheet as of the end of such Accounting Period; and

(c) within 60 days after the end of the Center's fiscal year, annual profit and loss and source and use of funds statements and a balance sheet for Center as of the end of such fiscal year.

13.3.    Access to Information. You agree to verify and sign each report and financial statement in the manner we prescribe. We have the right to disclose data derived from such reports. We also have the right to require you to have reviewed or audited financial statements prepared on an annual basis if you have been late in making payments or sending us reports or we determine that you have understated Gross Sales by over 2% twice or more during any 18-month period. You will provide us copies of any reviewed or audited financial statements (if any) promptly after you receive them. Moreover, we have the right as often as we deem appropriate (including on a daily basis) to access all computer registers and other computer systems that you are required to maintain in connection with the operation of the Center and to retrieve all information relating to the Center's operations. At our request, you will promptly send us true and correct copies of all federal and state income, sales, excise and other tax returns.

14.    INSPECTIONS AND AUDITS.

14.1.    Our Right to Inspect the Center. To determine whether you and the Center are complying with this Agreement and all System Standards, we and our designated agents have the right at any time during your regular business hours, and without prior notice to you, to:

(a) inspect the Center and any other aspect of or facility used by the Center (if any);

(b) observe, photograph and videotape the operations of the Center and any other aspect of or facility used by the Center for such consecutive or intermittent periods as we deem necessary;

(c) remove samples of any products, materials or supplies for testing and analysis;

(d) interview personnel and customers of the Center and engage in "secret shopper" type programs; and

CAL, 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

42

You    You

US

(e) inspect and copy any books, records, tax returns and documents relating to your operation of the Center.

You agree to cooperate with us fully in connection with any such inspections, observations, photographing, videotaping, product removal and interviews. You agree to present to your customers such evaluation forms that we periodically prescribe and to participate and/or request your customers to participate in any surveys performed by us or on our behalf. You must immediately correct or repair any unsatisfactory conditions we specify.

14.2.   **Our Right to Audit.** We have the right at any time during your business hours, and without prior notice to you, to inspect and audit, or cause to be inspected and audited, your (if you are a Business Entity) and the Center, bookkeeping and accounting records, sales and income tax records and returns and other records. You agree to cooperate fully with our representatives and independent accountants we hire to conduct any such inspection or audit. You must immediately pay us any shortfall in the amounts you owe us (regardless of the degree), including late fees and interest. You agree to reimburse us for the cost of such inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board and compensation of our employees if:

(a) our inspection or audit is made necessary by your failure to furnish reports, supporting records or other information we require, or to furnish such items on a timely basis; and/or

(b) our audit or inspection reveals that you understated Gross Sales by over 2%.

The foregoing remedies are in addition to our other remedies and rights under this Agreement and applicable law.

15.   **TRANSFER.**

15.1.   **By Us.** This Agreement is fully transferable by us and will inure to the benefit of any transferee or other legal successor to our interests.

15.2.   **By You.** You understand and acknowledge that the rights and duties created by this Agreement are personal to you (or, if you are a Business Entity, to your owners) and that we have granted the Franchise to you in reliance upon our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability and financial capacity. Accordingly, neither this Agreement (nor any interest in it) nor any ownership or other interest in you or the Center or other aspect of the Center may be transferred without our prior written approval. Any transfer without such approval constitutes a breach of this Agreement and is void and of no effect. As used in this Agreement, the term "transfer" includes your (or your owners') voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition of any interest in: (a) this Agreement; (b) you; or (c) the Center or other aspect of the Center.

An assignment, sale, gift or other disposition includes the following events:

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          Us _____

(i)     transfer of ownership of 10% or more of any capital stock or a partnership interest or any other interest that affects control over the Business Entity;

(ii)    merger or consolidation or, issuance of additional securities or interests representing an ownership interest in you;

(iii)   any issuance or sale of your stock or any security convertible to your stock;

(iv)    transfer of an interest in you, this Agreement, the Center or any other aspect of the Center in a divorce, insolvency or corporate or partnership dissolution proceeding or otherwise by operation of law;

(v)     transfer of an interest in you, this Agreement, the Center or any other aspect of the Center, in the event of your death or the death of one of your owners, by will, declaration of or transfer in trust or under the laws of intestate succession; or

(vi)    pledge of this Agreement (to someone other than us) or of an ownership interest in you as security, foreclosure upon the Center or any other aspect of the Center, your transfer, surrender or loss of possession, control or management of the Center or Center.

15.3.   Conditions for Approval of Transfer. If you (and your owners) are in full compliance with this Agreement, then subject to the other provisions of this Section, we will approve a transfer that meets all the applicable requirements of this Section. The proposed transferee and its direct and indirect owners must be individuals of good character and otherwise meet our then applicable standards for Center franchisees. A transfer of ownership, possession or control of the Center or the Center may be made only in conjunction with a transfer of this Agreement. If the transfer is of this Agreement or a controlling interest in you, or is one of a series of transfers which in the aggregate constitute the transfer of this Agreement or a controlling interest in you, all of the following conditions must be met prior to or concurrently with the effective date of the transfer:

(a) the transferee has sufficient business experience, aptitude and financial resources to operate the Center and the Center;

(b) you have paid all Royalties, Advertising Fund Contributions, Co-op Fund contributions, amounts due us under any promissory notes, amounts owed for purchases from us and all other amounts owed to us or to third-party creditors and have submitted all required reports and statements;

(c) the transferee (or its owners) have agreed to complete our standard training program, at their expense;

CAL- I"' Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____  Koo _____                    44                    US _____

(d) the transferee has agreed to be bound by all of the terms and conditions of this Agreement;

(e) the transferee has entered into our then-current form of Franchise Agreement;

(f) the transferee agrees to upgrade the Center to conform to our then-current standards and specifications;

(g) you or the transferee pay us a transfer fee equal to 1/5 of our then-current initial franchise fee to defray expenses we incur in connection with the transfer, including the costs of training the transferee (or its owners) and other personnel. If the proposed transfer is among your owners, the transfer fee will be equal to $1,500;

(h) you (and your transferring owners) have signed a general release, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents;

(i) we have approved the material terms and conditions of such transfer and determined that the price and terms of payment will not adversely affect the transferee's operation of the Center;

(j) if you or your owners finance any part of the sale price of the transferred interest, you and/or your owners have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests that you or your owners have reserved in the Center are subordinate to the transferee's obligation to pay Royalties, Advertising Fund Contributions, Co-op fund contributions and other amounts due to us and otherwise to comply with this Agreement;

(k) you and your transferring owners (and your and your owners' spouses and children) have signed a non-competition covenant in favor of us and the transferee agreeing to be bound, commencing on the effective date of the transfer, by the restrictions contained in this Agreement; and

(l) you and your transferring owners have agreed that you and they will not directly or indirectly at any time or in any manner (except with respect to other Centers you own and operate) identify yourself or themselves or any business as a current or former Center, or as one of our licensees or franchisees, use any Mark, any colorable imitation of a Mark, or other indicia of a Center in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with us.

15.4.    <u>Transfer to a Business Entity.</u>  If you are in full compliance with this Agreement, you may transfer this Agreement to a Business Entity that conducts no business other than the Center and, if applicable, other Centers so long as you own, control and have the right to vote 51% or more of its issued and outstanding ownership interests (like stock or partnership interests) and you guarantee its performance under this Agreement. All other owners are subject to our approval. The organizational or governing documents of the Business Entity must recite that the issuance and transfer of any ownership interests in the

45

CAL-I* Franchise
Flo-Mter, LLC
Sarasota-Bradenton
September 2006

You _____ You _____

US _____

Business Entity are restricted by the terms of this Agreement, are subject to our approval, and all certificates or other documents representing ownership interests in the Business Entity must bear a legend referring to the restrictions of this Agreement. As a condition of our approval of the issuance or transfer of ownership interests to any person other than you, we may require (in addition to the other requirements we have the right to impose) that the proposed owner sign an agreement, in a form provided or approved by us, agreeing to be bound jointly and severally by, to comply with, and to guarantee the performance of, all of the your obligations under this Agreement.

15.5.    **Transfer Upon Death or Disability**.   Upon your death or disability or, if you are a Business Entity, the death or disability of the owner of a controlling interest in you, we may require you (or such owner's executor, administrator, conservator, guardian or other personal representative) to transfer your interest in this Agreement (or such owner's interest in you) to a third party.  Such disposition (including, without limitation, transfer by bequest or inheritance) must be completed within the time we designate, not less than 1 month but not more than 3 months from the date of death or disability.  Such disposition will be subject to all of the terms and conditions applicable to transfers contained in this Section.  A failure to transfer your interest in this Agreement or the ownership interest in you within this period of time constitutes a breach of this Agreement. For purposes of this Agreement, the term "disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent you or an owner of a controlling interest in you from managing and operating the Center.

15.6.    **Operation Upon Death or Disability**.  If, upon your death or disability or the death or disability of the owner of a controlling interest in you, the Center is not being managed by a trained manager, your or such owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed 15 days from the date of death or disability, appoint a manager to operate the Center.  Such manager will be required to complete training at your expense. Pending the appointment of a manager as provided above or if, in our judgment, the Center is not being managed properly any time after your death or disability or after the death or disability of the owner of a controlling interest in you, we have the right, but not the obligation, to appoint a manager for the Center.  All funds from the operation of the Center during the management by our appointed manager will be kept in a separate account, and all expenses of the Center, including compensation, other costs and travel and living expenses of our manager, will be charged to this account.  We also have the right to charge a reasonable management fee (in addition to the Royalty, Advertising Fund Contributions and Co-op Fund contributions payable under this Agreement) during the period that our appointed manager manages the Center. Operation of the Center during any such period will be on your behalf, provided that we only have a duty to utilize our best efforts and will not be liable to you or your owners for any debts, losses or obligations incurred by the Center or to any of your creditors for any products, materials, supplies or services the Center purchases during any period it is managed by our appointed manager.

15.7.    **Effect of Consent to Transfer**.  Our consent to a transfer of this Agreement and the Center or any interest in you does not constitute a representation as to the fairness of the terms of any contract between you and the transferee, a guarantee of the prospects of success of the Center or transferee or a waiver of any claims we may have against you (or your owners) or of our right to demand the transferee's exact compliance with any of the terms or conditions of this Agreement.

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

46

15.8.    Our Right of First Refusal. If you (or any of your owners) at any time determine to sell, assign or transfer for consideration an interest in this Agreement and the Center or an ownership interest in you, you (or such owner) agree to obtain a bona fide, executed written offer and earnest money deposit (in the amount of 5% or more of the offering price) from a responsible and fully disclosed offeror (including lists of the owners of record and all beneficial owners of any corporate or limited liability company offeror and all general and limited partners of any partnership offeror and, in the case of a publicly-held corporation or limited partnership, copies of the most current annual and quarterly reports and Form 10K) and within 5 days of receipt submit to us a true and complete copy of such offer, which includes details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be denominated in a dollar amount. The offer must apply only to an interest in you or in this Agreement and the Center and may not include an offer to purchase any of your (or your owners') other property or rights. However, if the offeror proposes to buy any other property or rights from you (or your owners) under a separate, contemporaneous offer, such separate, contemporaneous offer must be disclosed to us, and the price and terms of purchase offered to you (or your owners) for the interest in you or in this Agreement and the Center must reflect the bona fide price offered and not reflect any value for any other property or rights.

We have the right, exercisable by written notice delivered to you or your selling owner(s) within 30 days from the date of the delivery to us of both an exact copy of such offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in such offer, provided that:

(a) we may substitute cash for any form of payment proposed in such offer (with a discounted amount if an interest rate will be charged on any deferred payments);

(b) our credit will be deemed equal to the credit of any proposed purchaser;

(c) we will have not less than 30 days after giving notice of our election to purchase to prepare for closing; and

(d) we are entitled to receive, and you and your owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the capital stock of an incorporated business, as applicable, including, without limitation, representations and warranties as to:

(e) ownership and condition of and title to stock or other forms of ownership interest and/or assets;

(f) liens and encumbrances relating to the stock or other ownership interest and/or assets; and

(g) validity of contracts and the liabilities, contingent or otherwise, of the corporation whose stock is being purchased.

If we exercise our right of first refusal, you and your selling owner(s) agree that, for a period of 2 years commencing on the date of the closing, you and they will be bound by the noncompetition

CAL-1" Franchise
Fin-Man, LLC
Sarasota-Bradenton
September 2006

You _____ You _____

47

US _____

covenant contained this Agreement. You and your selling owner(s) further agree that you and they will, during this same time period, abide by the restrictions of this Agreement.

If we do not exercise our right of first refusal, you or your owners may complete the sale to such purchaser pursuant to and on the exact terms of such offer, subject to our approval of the transfer, provided that, if the sale to such purchaser is not completed within 120 days after delivery of such offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), we will have an additional right of first refusal during the 30 day period following either the expiration of such 120 day period or notice to us of the material change(s) in the terms of the sale, either on the terms originally offered or the modified terms, at our option.

16.    **SUCCESSOR TERMS.**

16.1.    Acquisition. Upon expiration of this Agreement, subject to the conditions of this Section, you will have the right to acquire a successor franchise to operate the Center for 3 additional 5-year periods on the terms and conditions of the franchise agreement we are then using in granting franchises for Centers, if you (and each of your owners) have substantially complied with this Agreement during its Term, and either:

(a) you maintain possession of and agree to remodel and/or expand the Center, add or replace improvements, equipment and signs and otherwise modify the Center as we require to bring it into compliance with specifications and standards then applicable for Centers; or

(b) if you are unable to maintain possession of the Center, you secure substitute premises we approve, develop such premises in compliance with specifications and standards then applicable for Center until operations are transferred to the substitute premises.

16.2.    Grant. You must give us written notice of your election to acquire a successor franchise during the last year of the Term, but no later than 180 days before expiration. We will respond ("Response Notice"), within 90 days after we receive your notice, of our decision, either:

(a) to grant you a successor franchise;

(b) to grant you a successor franchise on the condition that deficiencies of the Center, or in your operation of the Center, are corrected; or

(c) not to grant you a successor franchise based on our determination that you and your owners have not substantially complied with this Agreement during its Term.

If applicable, our Response Notice will:

(a)    describe the remodeling and/or expansion of the Center and other improvements or modifications required to bring the Center into compliance with then applicable specifications and standards for Center; and

CAL- 1st Franchise
Fig-Mar, LLC
Sarasota-Bradenton
September 2006

48

(b)      state the actions you must take to correct operating deficiencies and the time period in which such deficiencies must be corrected.

If we elect not to grant a successor franchise, the Response Notice will describe the reasons for our decision. Your right to acquire a successor franchise is subject to your continued compliance with all of the terms and conditions of this Agreement through the date of its expiration, in addition to your compliance with the obligations described in the Response Notice.

In our discretion, we may extend the Term for such period of time as we deem necessary in order to provide you with either reasonable time to correct deficiencies or 90 days notice of our refusal to grant a successor franchise.

16.3.    Agreements/Releases.  If you satisfy all of the other conditions to the grant of a successor franchise, you and your owners agree to sign the form of franchise agreement and any ancillary agreements we are then customarily using in connection with the grant of successor franchises for Centers.  You and your owners further agree to sign general releases, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors and assigns.  Failure by you or your owners to sign such agreements and releases and deliver them to us for acceptance and signature within 60 days after their delivery to you will be deemed an election not to acquire a successor franchise.

16.4.    Training and Refresher Programs.  Our grant of a successor franchise is also conditioned on the satisfactory completion by you (or a your owners) of any new training and refresher programs as we may reasonably require.

16.5.    Fees and Expenses.  Our grant of a successor franchise is contingent on your payment to us of a successor franchise fee of $5,000.  We must receive the fee from you at the time of your election, but not later than 180 days prior to the expiration date of this Agreement.  In addition, we have the right to charge you for services we render to you and expenses we incur in conjunction with the grant of the successor franchise.  Payment of those charges is due upon your receipt of our invoice.

16.6.    Subsequent Successor Franchises.  The fees and other conditions for any later granting of subsequent successor franchises will be governed by the successor franchise agreement (as described above).

## 17.    TERMINATION OF AGREEMENT.

17.1.    Termination of Service Rights.  If we are entitled to terminate this Agreement in accordance with any of its provisions, we will have the option to terminate or suspend any one or more of equal rights under this Agreement instead of terminating this Agreement, including:

(a)      your right to participate in any programs or services provided by us offered by us from time to time;

(b)      your right to participate in any services that we provide in connection with any website or marketing services, the Advertising Fund or the like; and any exclusivity for the trade area granted to you under this Agreement.

CAL 1st Franchise
Flo-Mor, LLC
Sarasota-Bradenton
September 2006

You ___  You ___          49          US ___

If we terminate or suspend any of your rights under this Agreement in accordance with this section, we will provide you five days prior written notice of such suspension or termination. If any such rights, options or arrangements are terminated or suspended in accordance with this section, such termination or suspension will be without prejudice to and will not be a waiver or release of any of our rights to terminate this Agreement otherwise in accordance with its terms, or to terminate any other rights, options or arrangements under this Agreement or any other agreement between you and us at any time thereafter, for the same default or as a result of any additional defaults of the terms of this Agreement or other agreements between you and us.

17.2.  **On Notice.**  We have the right to terminate this Agreement, effective upon delivery of written notice of termination to you, if:

(a) you (or any of your owners) have made any material misrepresentation or omission in connection with your purchase of the Franchise;

(b) you fail to begin operating the Center within 6 months of the Agreement Date;

(c) you, or your owners, fail to successfully complete initial or any other training to our satisfaction;

(d) you abandon or fail to actively operate the Center for 5 or more consecutive business days, unless the Center has been closed for a purpose we have approved or because of casualty or government order or is requiring mechanical repair or remodeling approved by us;

(e) you surrender or transfer control of the operation of the Center without our prior written consent;

(f) you (or any of your owners) are or have been convicted by a trial court of, or plead or have pleaded no contest, or guilty, to, a felony or other serious crime or offense;

(g) you (or any of your owners) engage in any dishonest or unethical conduct which may adversely affect the reputation of the Center or other Centers or the goodwill associated with the Marks;

(h) you understate Gross Sales by 2% or more, or our audits or investigations show that you understated Gross Sales by 2% or more 2 or more times during any 18-month period;

(i) you (or any of your owners) make an unauthorized assignment of this Agreement or of an ownership interest in you, the Center or the Center;

(j) in the event of your death or disability or the death or disability of the owner of a controlling interest in you, this Agreement or such owner's interest in you is not assigned as required under this Agreement;

(k) you lose the right to possession of the Center or the Site;

50

You ____ You ____           us ____

(l) you (or any of your owners) make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Manual in violation of this Agreement;

(m) you violate any federal, HIPAA, State, medical, privacy, health, safety or sanitation law, ordinance or regulation and do not cure the violation within 24 hours to both our satisfaction and that of the governmental authority;

(n) you fail to pay any amounts due to us or any Approved Supplier and do not correct such failure within 15 days after written notice of such failure is delivered to you;

(o) you fail to pay when due any federal or state income, service, sales or other taxes due on the operations of the Center, unless you are in good faith contesting your liability for such taxes;

(p) you (or any of your owners) contact SMLC, its affiliates, or Dr. Sanford Siegal directly;

(q) you (or any of your owners) fail to comply with any other provision of this Agreement or any System Standard and do not correct such failure within 30 days after written notice of such failure to comply is delivered to you;

(r) you (or any of your owners) fail on 3 or more separate occasions within any period of 12 consecutive Accounting Periods or on 5 occasions during the Term to submit when due reports or other data, information or supporting records; or to pay when due any amounts due to us or otherwise to comply with this Agreement, whether or not such failures to comply were corrected after written notice of such failure was delivered to you; or

(s) you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee or liquidator of all or the substantial part of your property; the Center or Center is attached, seized, subjected to a writ or distress warrant or levied upon, unless such attachment, seizure, writ, warrant or levy is vacated within 30 days; or any order appointing a receiver, trustee or liquidator of you or the Center or Center is not vacated within 30 days following the entry of such order.

17.3.    **After Notice.**  We may also terminate this Agreement after we notify you of our intention to do so because of the occurrence of any of the following events and your failure to cure it within 30 days of our notice:

(a) you or a trained manager and the requisite Professionals are not present at the Center during all open hours;

(b) you fail to keep the Center open during the required hours;

(c) you purchase or lease any product or service from an unapproved supplier;

(d)  you fail to participate in a Co-op;

(e)  you fail to pay taxes and assessments when due;

(f)  you fail to obtain and maintain permits and licenses required by applicable law;

(g)  if you are a Business Entity, failure to maintain active status in your state of organization;

(h)  you fail to timely make required reports;

(i)  you fail to maintain sufficient liquid funds and bank authorizations to pay amounts to us via electronic transfer;

(j)  you violate any other provision of this Agreement;

(k)  you fail to maintain any standards or procedures contained in the Operations Manual;

(l)  your continued violation of any law, ordinance, rule or regulation of a governmental agency; or

(m) you fail to obtain any approvals or consents required by this Agreement.

18.  **RIGHTS AND OBLIGATIONS UPON TERMINATION.**

18.1.  **Payment of Amounts Owed To Us.**  You agree to pay us within 15 days after the effective date of termination or expiration of this Agreement, or on such later date that the amounts due to us are determined, such Royalties, Advertising Fund Contributions, amounts owed for purchases from us, interest due on any of the foregoing and all other amounts owed to us which are then unpaid.

18.2.  **Marks.**  Upon the termination or expiration of this Agreement:

(a)  you may not directly or indirectly at any time or in any manner (except with respect to other Center you own and operate) identify yourself or any business as a current or former Centers, or as one of our licensees or franchisees, use any Mark, any colorable imitation of a Mark or other indicia of a Center in any manner or for any purpose or utilize for any purpose any trade name, trade or service mark or other commercial symbol that indicates or suggests a connection or association with us;

(b)  you agree to take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

(c)  if we do not have or do not exercise an option to purchase the Center, you agree to deliver to us within 30 days after, as applicable, the effective date of expiration of this Agreement or the Notification Date all signs, sign-faces, sign-cabinets, marketing materials, forms and other

CAI - 1ˢᵗ Franchise
Flo-Max, LLC
Sarasota-Bradenton
September 2006

52

US

materials containing any Mark or otherwise identifying or relating to a Center and allow us, without liability to you or third parties, to remove all such items from the Center and Office;

(d) if we do not have or do not exercise an option to purchase the Center, you agree that, after, as applicable, the effective date of expiration of this Agreement or the Notification Date, you will promptly and at your own expense make such alterations we specify to distinguish the Center clearly from its former appearance and from other Centers so as to prevent confusion by the public;

(e) if we do not have or do not exercise an option to purchase the Center, you agree that, after, as applicable, the effective date of expiration of this Agreement or the Notification Date, you will notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone, telecopy or other numbers and any regular, classified or other telephone directory listings associated with any Mark, authorize the transfer of such numbers and directory listings to us or at our direction and/or instruct the telephone company to forward all calls made to your telephone numbers to numbers we specify; and

(f) you agree to furnish us, within 30 days after, as applicable, the effective date of expiration of this Agreement or the Notification Date, with evidence satisfactory to us of your compliance with the foregoing obligations.

18.3.  **Confidential Information.**  You agree that, upon termination or expiration of this Agreement, you will immediately cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Manual and any other confidential materials that we have loaned to you.

18.4.  **Competitive Restrictions.**  Upon our termination of this Agreement in accordance with its terms and conditions, or expiration of this Agreement (if we offer, but you elect not to acquire, a successor franchise),

(a) you and your owners agree that, for a period of 2 years commencing on the effective date of termination or expiration or the date on which a person restricted by this Section begins to comply with this Section, whichever is later, neither you nor any of your owners will have any direct or indirect interest (e.g., through a spouse or child) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity in any Competitive Center operating:

(i)  within the Protected Area or Marketing Area;

(ii)  within 75 miles of the Protected Area or Marketing Area; or

(iii)  within 75 miles of any other Center (franchised or otherwise) in operation (periodic or continual) or which is under construction and granted the right to operate in such area on the later of the effective date of the termination or expiration or the date on which a person restricted by this Section complies with this Section.

CAL. 1ˢᵗ Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

53

Vol. _____   You _____

US _____

If any person restricted by this Section refuses voluntarily to comply with the foregoing obligations, the 2-year period will commence with the entry of an order of an arbitrator, or court if necessary, enforcing this provision. You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting such skills. Consequently, enforcement of the covenants made in this Section will not deprive you of your personal goodwill or ability to earn a living.

18.5.    Our Right to Purchase.

(a) Exercise of Option. Upon our termination of this Agreement in accordance with its terms and conditions or your termination of this Agreement without cause, or if you have entered into a Development Agreement with us and you are not in full compliance with your Development Agreement, we have the option, exercisable by giving written notice to you within 60 days from the date of such termination, to purchase your Center from you, including the ownership or leasehold rights to the Center. (The date on which we notify you whether or not we are exercising our option is referred to in this Agreement as the "Notification Date"). We have the unrestricted right to assign this option to purchase your Center. We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise.

(b)    Leasehold Rights. You agree at our election:

(i)    to assign your leasehold interest in the Site to us; or

(ii)    to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the prime lease.

(c) Purchase Price. The purchase price for your Center under this Section will be the fair market value of the Center, determined in a manner consistent with reasonable depreciation of the Center's equipment, signs, inventory, materials and supplies, provided that the Center will be valued as an independent business and its value will not include any value for:

(i)    the Franchise or any rights granted by this Agreement;

(ii)    the Marks or copyrights; or

(iii)    participation in the network of Centers.

The Center's fair market value will include your Center's goodwill you developed in the market of the Center that exists independent of the goodwill of the Marks, Copyrights and the System. The length of the remaining term of the lease for the Site will also be considered in determining the Center's fair market value.

We may exclude from the assets purchased cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the

54

CAL - 1st Franchise
Fia-Mar, LLC
Sarasota-Bradenton
September 2006

Center's operation or that we have not approved as meeting standards for Centers, and the purchase price will reflect such exclusions.

      (d)     Appraisal. If we and you are unable to agree on the Center's fair market value, its fair market value will be determined by mutual agreement among 3 independent appraisers who collectively will conduct 1 appraisal each. We will appoint one appraiser, you will appoint one appraiser and the two party-appointed appraisers will appoint the third appraiser. You and we agree to select our respective appraisers within 15 days after we notify you that we are exercising our option to purchase the Center, and the two appraisers so chosen are obligated to appoint the third appraiser within 15 days after the date on which the last of the two party-appointed appraisers was appointed. You and we will bear the cost of our own appraisers and share equally the fees and expenses of the third appraiser chosen by the two party-appointed appraisers. The appraisers are obligated to complete their appraisal within 30 days after the third appraiser's appointment.

      (e) Payment of Purchase Price. The purchase price under this Section will be paid in 2 installments. The first installment of the purchase price consisting of an amount equal to the Franchise Fee you have paid to us (the "First Installment") will be paid by us within 30 days of our notifying you of our election to purchase your Center. The second installment of the purchase price (the "Second Installment") will equal the total purchase price less the First Installment. The Second Installment will be paid at a time of our choosing, not later than 90 days after the later of closing or the determination of the purchase price. We have the right to set off against the purchase price, and thereby reduce the purchase price by, any and all amounts you or your owners owe to us or any amounts of rent you owe the landlord of the Site, or supplies or your creditors that we pay on your behalf in order to obtain lawful possession of the Site, any of your assets or to cover amounts you owe suppliers we do business with.

      (f) Closing. At the closing, which will occur at our option, on or within 15 days after our payment of the First Installment, you agree to deliver instruments transferring to us:

          (i)     good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and other transfer taxes paid by you; and

          (ii)    all licenses and permits of the Center which may be assigned or transferred; and

          (iii)   the leasehold interest and improvements in the Center.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues (other than the payment of the Second Installment), the closing of the sale will be accomplished through an escrow. You and your owners further agree to execute general releases, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors and assigns.

CAL- 1ˢᵗ Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ /_____ You _____

55

18.6.    **Continuing Obligations**.    All of our and your (and your owners' and affiliates') obligations which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.    Examples include indemnification, payment, de-identification and dispute resolution provisions.

18.7.    **Buyout Option**.

(a)  **Triggering Event**:  We, or our designee, may purchase all of the rights and interests you or your owners have in you, the Center and under this Agreement, at our option, if we experience a Triggering Event (the "Buyout").  A "Triggering Event" means:  (i) the sale of all or substantially all of our assets to an unaffiliated third party; (ii) the sale or exchange of more than 50% of our total issued and outstanding equity securities to an unaffiliated third party; (iii) a merger or consolidation of us with or into an unaffiliated third party in which neither we nor our affiliates obtain or maintain a controlling voting interest; (iv) any public offering, pursuant to a registration statement under the Securities Act of 1933 or successor statute, of any of our capital stock or the effectiveness of a registration statement for the initial public offering of our equity securities (an "IPO"); (v) the sale, conveyance, exchange or assignment by our shareholders in one transaction or series of related transactions, of 50% or more of our outstanding capital stock to persons who, prior to such sale, did not own more than 25% of our outstanding stock.

(b)  **Our Rights on Triggering Event**.  If we experience a Triggering Event or enter into a binding agreement to do so, we will have the right, at our option and election, to cause the Buyout.  To exercise our option to cause the Buyout, we will notify you within 30 days of either the date of the agreement for a Triggering Event or the effective date of the IPO, to require you and your owners to sell, convey, exchange or assign all of his, her or its interest in you, the Center and this Agreement and the assets comprising them (collectively, "Your Interest"), to our transferee, in exchange for the same type of consideration, and upon the same terms, to be received by us in the Triggering Event.  No partial assignment, conveyance or exchange of Your Interest will be permitted unless otherwise expressly agreed to in writing by us.  The term "Your Interest" does not mean you or your owners' ownership of securities in the Business Entity.

(c)  **Purchase Price Form**:  If we exercise the Buyout for any Triggering Event other than an IPO, the purchase price will be paid to you or your owners, as applicable, in the same form or type of consideration, and upon the same terms, as we or our shareholders receive in the Triggering Event transaction.  If the Triggering Event is an IPO, at our option the purchase price will be paid to you or your owners either in cash or stock valued at the price underwritten and/or offered to the public in the IPO.

(d)  **Purchase Price Amount**:  The amount of the purchase price for Your Interest will be the amount equal to a multiple of Your EBIT.  Your multiple will be equal to two-thirds (2/3) of the multiple offered to us for our interest in connection with the Triggering Event.  "Your EBIT" means net income from your Center before interest and income taxes.  "Our EBIT" means our net income before interest and income taxes.  Your EBIT and Our EBIT will be determined by generally accepted accounting principles, based on the same trailing 12 month period preceding the purchase or sale agreement, underwriting agreement or other agreement regarding the

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

56

Your _____  Your _____

US _____

Triggering Event. However, for this calculation, your income will exclude extraordinary items. If your Center has been open less than 12 months, at your request, we may suspend the Buyout until you have 12 months continuing operating history.

(e) **Examples of Purchase Price Calculations:** The following example demonstrates the calculation of the purchase price to be paid for Your Interest under a Buyout, assuming the sale is for 100% of Your Interest:

    (i)    Triggering Event - sale of all of our stock.

    (ii)    Purchase Price for all of our stock - $100,000,000.

    (iii)    Our EBIT for the previous 12 months: $5,000,000.

    (iv)    Purchase Price / Our EBIT = our multiple: $100mil. / $5mil.= 20.

    (v)    2/3 of our multiple (20)= your multiple: 2/3 x 20=13.34.

    (vi)    Your EBIT for the previous 12 months: $500,000.

    (vii)    Your multiple (13.32) x Your EBIT ($500k)= your payment.

    (viii)    13.32 x $500,000 = $6,670,000 = Your Interest.

(f) **Election to Convert Shares:** If we undertake an IPO, we will have the right, at our option and election, to require you and your owners, and you and your owners will be obligated, to convert Your Interest into the type of our capital stock (or any successor to us) which is the subject of such IPO ("IPO Conversion"). Your Interest will be converted into an equivalent value of our capital stock (or our successor's stock), on the following basis:

    (i)    Your Interest will be valued at a multiple of Your EBIT, such multiple to be equal to two-thirds (2/3) of the multiple that the valuation of 100% of our common stock on a pre-offering basis (as determined with reference to the proposed public offering price) bears to Our EBIT (Your EBIT shall be calculated on the same basis and for the same periods as are Our EBIT); and

    (ii)    the value of our capital stock, or our successor in interest, will be the proposed public offering price for such offering.

(g) **Example:** The following example demonstrates the calculation of the conversion of Your Interest into our capital stock pursuant to an IPO Conversion:

    (i)    Public offering of 1,000,000 shares of our common stock, such 100 shares, when issued, to represent 100% of our fully diluted outstanding common stock.

CAL- 1ˢᵗ Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

Yo[signature] Ver [signature]    57    US [signature]

(ii)    Proposed public offering price - $100 per share.

(iii)   Equivalent value of 100% of our common stock = $100,000,000.

(iv)    Our EBIT for previous 12 months - $5,000,000.

(v)     Purchase Price / Our EBIT = our multiple; $100mil. / $5mil.=20.

(vi)    2/3 of our multiple = your multiple: 2/3 x 20 = 13.32.

(vii)   Your EBIT for the prior 12 months: $500,000.

(viii)  Your multiple x Your EBIT = your calculated valuation for Your Interest.

(ix)    13.32 x $500,000 =$6,670,000.

(x)     Number of shares of our common stock to be received by you: Stock equivalent of $6,670,000 based on the public offering price.

(xi)    Number of shares of common stock to be received by you based on public offer price of $100 per share: 66,700 shares.

Your owners will determine how Your Interest will be divided among them. Upon such IPO Conversion, Your Interest shall be canceled, transferred or assigned in the manner we designate and we will succeed to all of your properties and assets (including, without limitation, all Centers) and we will be the sole owner thereof. THE EXAMPLES OF THE BUYOUT CALCULATION PROVIDED ABOVE ARE <u>NOT</u> REPRESENTATIONS OF ANY KIND THAT YOU WILL OR ARE LIKELY TO OBTAIN ANY PARTICULAR INCOME OR REVENUES. THE "YOUR EBIT" FIGURES ARE PURELY HYPOTHETICAL AND ARE EXAMPLES ONLY TO ILLUSTRATE THE BUYOUT CALCULATION METHOD. DO NOT RELY ON THEM AS A REPRESENTATION OF YOUR ACTUAL OR POTENTIAL INCOME.

(h) Procedural Aspects: At our option, we will pay the purchase price in 2 installments. If so, we will pay an amount equal to the First Installment in cash at a time within 15 days of our notice to you. The balance will be paid at closing. We must notify you of our intention to exercise our purchase option not later than 60 days following our entering into the definitive purchase and sale agreement or the underwriting agreement relating to the Triggering Event. Unless the Triggering Event is not completed or closed, in which case our notice and election to exercise the Buyout will not be effective, the closing for such acquisition will take place at the completion or closing of the Triggering Event or, at our option, within 180 days thereafter. You will have all of your rights and benefits, and all of your obligations, under this Agreement until we (or our designee) have consummated the acquisition pursuant to the Buyout. The acquisition will be in the form of an assignment and relinquishment of your rights under this Agreement and we will not assume any of your obligations or liabilities whatsoever other than those we expressly agree to in writing or at the time of such acquisition. Moreover, we may require that your rights

58

CAL- 1st Franchise
Flo-Mor, LLC
Sarasota-Bradenton
September 2006

must be transferred to us free and clear of all liens, pledges, security interests and encumbrances. We may require that we will be entitled to all customary representations and warranties in that regard, in such form and content as we reasonably require. You will cooperate with us in preparing for the sale of such rights, any transition in ownership, and to accurately calculate the purchase price. Through such acquisition we will take possession of all of your assets, including but not limited to cash, accounts receivable and capital assets. We will also assume liability for your Site lease, capital leases and any liabilities deemed by us to be a valid business liability of your Center. You must comply with any post acquisition restrictions, if any, on transfers of stock you receive.

(i) Option to Include Franchises: If we exercise the Buyout, we may also, at the time we notify you of our election, elect to include as part of the acquisition: any or all franchise(s) owned or controlled by you or your affiliates, all of your or their rights and obligations under any related or Area Development Agreement or Franchise Agreements; all related property leases and all assets used in connection with the operation of the  Centers covered by the Franchise Agreements and any Area Development Agreements you have with us.,

(j) Priority. The provisions of the Buyout will take precedence over all other provisions of this Agreement, notwithstanding any conflicting provisions. We will have the right to specific performance of a Buyout. You acknowledge and agree that we will not have an adequate remedy at law if you violate this Section 18, and we will be entitled to injunctive and equitable relief to enforce all our rights under it.

## 19.   RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.

19.1.   Independent Contractors. You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us, that we and you are and will be independent contractors and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner or employee of the other for any purpose. In addition, nothing in this Agreement creates a fiduciary relationship between you and SMLC, and you and SMLC are neither general or special agents, joint venturers, partners or employees of the other for any reason whatsoever. You agree to conspicuously identify yourself in all dealings with customers, suppliers, public officials,  Center personnel and others as the owner of the Center under a franchise we have granted and to place such notices of independent ownership on such forms, business cards, stationery and advertising and other materials as we may require from time to time.

19.2.   No Liability for Acts of Other Party. You agree not to employ any of the Marks in signing any contract or applying for any license or permit, or in a manner that may result in our liability for any of your indebtedness or obligations, and that you will not use the Marks in any way we have not expressly authorized. Neither we nor you will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name or on behalf of the other, represent that our respective relationship is other than franchisor and franchisee or be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized in writing. Neither we nor SMLC will be obligated for any damages to any person or property directly or indirectly arising out of the Center's operation or the business you conduct pursuant to this Agreement.

CAL- 1st Franchise
Plu-Mar, LLC
Sarasota-Bradenton
September 2006

59

You ___   You ___                              US ___

19.3.   **Taxes.** Neither we nor SMLC will have any liability for any sales, use, alcohol surcharge, service, occupation, excise, gross receipts, income, payroll, property or other taxes, whether levied upon you or the Center, in connection with the business you conduct, (except any taxes we are required by law to collect from you with respect to purchases from us). Payment of all such taxes are your responsibility.

19.4.   **Indemnification.** You agree to indemnify, defend and hold harmless SMLC, us, our affiliates and our and their respective shareholders, directors, officers, employees, agents, successors and assignees (the "Indemnified Parties") against and to reimburse any one or more of the Indemnified Parties for all claims, obligations and damages described in this Section, any and all taxes described in this Agreement and any and all claims and liabilities directly or indirectly arising out of the Center's operation (even if our negligence is alleged) or your breach of this Agreement. For purposes of this indemnification, "claims" includes all obligations, damages (actual, consequential or otherwise) and costs reasonably incurred in the defense of any claim against any of the Indemnified Parties, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses. We have the right to defend any such claim against us. This indemnity will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. Under no circumstances will we or any other Indemnified Party be required to seek recovery from any insurer or other third party, or otherwise to mitigate our, their or your losses and expenses, in order to maintain and recover fully a claim against you. You agree that a failure to pursue such recovery or mitigate a loss will in no way reduce or alter the amounts we or another Indemnified Party may recover from you.

20.   **ENFORCEMENT.**

20.1.   **Severability; Substitution of Valid Provisions.** Except as otherwise stated in this Agreement, each term of this Agreement, and any portion of any term, are severable. The remainder of this Agreement will continue in full force and effect. To the extent that any provision restricting your competitive activities is deemed unenforceable, you and we agree that such provisions will be enforced to the fullest extent permissible under governing law. This Agreement will be deemed automatically modified to comply with such governing law if any applicable law requires: (a) a greater prior notice of the termination of or refusal to renew this Agreement; or (b) the taking of some other action not described in this Agreement; or (c) if any of our System Standards are invalid or unenforceable. We may modify such invalid or unenforceable provision to the extent required to be valid and enforceable. In such event, you will be bound by the modified provisions.

20.2.   **Waivers.** We will not be deemed to have waived our right to demand exact compliance with any of the Terms, even if at any time: (a) we do not exercise a right or power available to us under this Agreement; or (b) we do not insist on your strict compliance with the terms of this Agreement; or (c) if there develops a custom or practice which is at variance with the terms of this Agreement; or (d) if we accept payments which are otherwise due to us under this Agreement. Similarly, our waiver of any particular breach or series of breaches under this Agreement or of any similar term in any other agreement between you and us or between us and any other franchise owner, will not affect our rights with respect to any later breach by you or anyone else.

20.3.   **Limitation of Liability.** Neither of the parties will be liable for loss or damage or deemed to be in breach of this Agreement if failure to perform obligations results from:

60

CAL 1" Franchise
Sto-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          US _____

(a) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof;

(b) acts of God, war, terror or similar like;

(c) acts or omissions of a similar event or cause.

However, such delays or events do not excuse payments of amounts owed at any time.

20.4.   **Approval and Consents.**   Whenever this Agreement requires our advance approval, agreement or consent, you agree to make a timely written request for it. Our approval or consent will not be valid unless it is in writing. Except where expressly stated otherwise in this Agreement, we have the absolute right to refuse any request by you or to withhold our approval of any action or omission by you. If we provide to you any waiver, approval, consent, or suggestion, or if we neglect or delay our response or deny any request for any of those, we will not be deemed to have made any warranties or guarantees which you may rely on, and will not assume any liability or obligation to you.

20.5.   **Waiver of Punitive Damages.**   EXCEPT FOR YOUR OBLIGATIONS TO INDEMNIFY US AND CLAIMS FOR UNAUTHORIZED USE OF THE MARKS OR CONFIDENTIAL INFORMATION, YOU AND WE EACH WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY RIGHT TO, OR CLAIM FOR, ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER. YOU AND WE ALSO AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN YOU AND US, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

20.6.   **Limitations of Claims.**   ANY AND ALL CLAIMS ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP AMONG YOU AND US MUST BE MADE BY WRITTEN NOTICE TO THE OTHER PARTY WITHIN 1 YEAR FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO SUCH CLAIM (REGARDLESS OF WHEN IT BECOMES KNOWN); EXCEPT FOR CLAIMS ARISING FROM:  (A) UNDER-REPORTING OF GROSS SALES;  (B) UNDER-PAYMENT OF AMOUNTS OWED TO US OR OUR AFFILIATES; (C) CLAIMS FOR INDEMNIFICATION; AND/OR (D) UNAUTHORIZED USE OF THE MARKS. HOWEVER, THIS PROVISION DOES NOT LIMIT THE RIGHT TO TERMINATE THIS AGREEMENT IN ANY WAY.

20.7.   **Governing Law.**   EXCEPT TO THE EXTENT THIS AGREEMENT OR ANY PARTICULAR DISPUTE IS GOVERNED BY THE U.S. TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. §1051 AND THE SECTIONS FOLLOWING IT) OR OTHER FEDERAL LAW, THIS AGREEMENT AND THE FRANCHISE ARE GOVERNED BY THE LAW OF THE STATE IN WHICH OUR PRINCIPAL BUSINESS OFFICE IS LOCATED, EXCLUDING ANY LAW REGULATING THE SALE OF FRANCHISES OR GOVERNING THE RELATIONSHIP BETWEEN A FRANCHISOR AND FRANCHISE OWNER, UNLESS THE JURISDICTIONAL REQUIREMENTS OF SUCH LAWS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS SECTION. ALL MATTERS RELATING TO ARBITRATION ARE GOVERNED BY THE FEDERAL ARBITRATION ACT. References to any law or regulation also refer to any successor

61

CAI. 1st Franchise
Fin.Mar.,LLC
Sarasota-Bradenton
September 2006

Your _____ You _____

US _____

laws or regulations and any implementing regulations for any statute, as in effect at the relevant time. References to a governmental agency also refer to any successor regulatory body that succeeds to the function of such agency.

20.8.    Jurisdiction.  YOU AND WE CONSENT AND IRREVOCABLY SUBMIT TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION LOCATED IN PALM BEACH COUNTY, FLORIDA, AND WAIVE ANY OBJECTION TO THE JURISDICTION AND VENUE OF SUCH COURTS. THE EXCLUSIVE CHOICE OF JURISDICTION DOES NOT PRECLUDE THE BRINGING OF ANY ACTION BY THE PARTIES OR THE ENFORCEMENT BY THE PARTIES IN ANY JUDGMENT OBTAINED IN ANY SUCH JURISDICTION, IN ANY OTHER APPROPRIATE JURISDICTION OR THE RIGHT OF THE PARTIES TO CONFIRM OR ENFORCE ANY ARBITRATION AWARD IN ANY APPROPRIATE JURISDICTION.

20.9.    Waiver of Jury Trial.  YOU AND WE EACH IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER YOU OR US.

20.10.    Cumulative Remedies.  The rights and remedies provided in this Agreement are cumulative and neither you nor we will be prohibited from exercising any other right or remedy provided under this Agreement or permitted by law or equity.

20.11.    Costs and Attorneys Fees.  If a claim for amounts owed by you to us or any of our affiliates is asserted in any legal or arbitration proceeding or if either you or we are required to enforce this Agreement in a judicial or arbitration proceeding, the party prevailing in such proceeding will be entitled to reimbursement of its costs and expenses, including reasonable accounting and attorneys fees. Attorneys fees will include, without limitation, reasonable legal fees charged by attorneys, paralegal fees, and costs and disbursements, whether incurred prior to, or in preparation for, or contemplation of the filing of written demand or claim, action, hearing, or proceeding to enforce the obligations of the parties under this Agreement and including appeals.

20.12.    Binding Effect.  This Agreement is binding on and will inure to the benefit of our successors and assigns. Except as otherwise provided in this Agreement, this Agreement will also be binding on your successors and assigns, and your heirs, executors and administrators.

20.13.    Entire Agreement.  This Agreement, including the introduction, addenda and exhibits to it, constitutes the entire agreement between you and us. There are no other oral or written understandings or agreements between you and us concerning the subject matter of this Agreement. Except as expressly provided otherwise in this Agreement, this Agreement may be modified only by written agreement signed by both you and us.

20.14.    No Liability to Others; No Other Beneficiaries.  We will not, because of this Agreement or by virtue of any approvals, advice or services provided to you, be liable to any person or legal entity who is not a party to this Agreement. SMLC is a third-party beneficiary of this Agreement. Except as specifically described in this Agreement, no other party has any rights because of this Agreement.

CAI- 1st Franchise
Fla-Mar, LLC
Sarasota-Bradenton
September 2006

You                    You                    62                    US

20.15.  **Construction.**  The headings of the sections are for convenience only.  If two or more persons are at any time franchise owners hereunder, whether or not as partners or joint venturers, their obligations and liabilities to us are joint and several.  This Agreement may be signed in multiple copies, each of which will be an original.  "A or B" means "A" or "B" or both.

20.16.  **Certain Definitions.**  The term "family member" refers to parents, spouses, offspring and siblings, and the parents and siblings of spouses.  The term "affiliate" means any Business Entity directly or indirectly owned or controlled by a person, under common control with a person or controlled by a person.  The terms "franchisee, franchise owner, you and your" are applicable to one or more persons, a Business Entity, as the case may be.  The singular use of any pronoun also includes the plural and the masculine and neuter usages include the other and the feminine.  The term "person" includes individuals or Business Entities.  The term "section" refers to a section or subsection of this Agreement.  The word "control" means the power to direct or cause the direction of management and policies.  The word "owner" means any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in another person (or a transferee of this Agreement or an interest in you), including any person who has a direct or indirect interest in you or this Agreement and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets.

20.17.  **Timing is of the Essence.**  It will be a material breach of this Agreement to fail to perform any obligation within the time required or permitted by this Agreement.  In computing time periods from one date to a later date, the words "from" and "commencing on" (and the like) mean "from and including"; and the words "to," "until" and "ending on" (and the like) mean "to but excluding."  Indications of time of day mean Boca Raton, Florida time.

21.  **DISPUTE RESOLUTION.**

21.1.  **Mediation.**  During the Term, certain disputes may arise between you and us that may be resolvable through mediation.  To facilitate such resolution, you and we agree that each party must, before commencing any arbitration proceeding, submit the dispute for non-binding arbitration at a mutually agreeable location (if you and we cannot agree on a location, the mediation will be conducted at our headquarters) to 1 mediator, appointed under the American Arbitration Association's Commercial Mediation Rules.  The mediator will conduct a mediation in accordance with such rules.  You and we agree that any statements made by either you or us in any such mediation proceeding will not be admissible in any subsequent arbitration or other legal proceeding.  Each party will bear its own costs and expenses of conducting the mediation and share equally the costs of any third parties who are required to participate.  Nevertheless, both you and we have the right in a proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction.  However, the parties must immediately and contemporaneously submit the dispute for non-binding mediation.  If any dispute between the parties cannot be resolved through mediation within 60 days following the appointment of a mediator, the parties must submit the dispute to arbitration subject to the following terms and conditions.

21.2.  **Agreement to Arbitrate.**  Except for claims (as defined below) related to or based on the marks (which at our sole option may be submitted to any court of competent jurisdiction) and except as otherwise expressly provided by section 20.7 of this Agreement, any litigation, claim, dispute, suit, action, controversy, proceeding or otherwise ("Dispute") between or involving you and us (and/or involving you

63

and/or any claim against or involving any of our or our affiliates' shareholders, directors, partners, officers, employees, agents, attorneys, accountants, affiliates, guarantors or otherwise), which are not resolved within 45 days of notice from either you or we to the other, will be submitted to arbitration to the office of the American Arbitration Association closest to our headquarters in Boca Raton, Florida. The arbitration will be conducted by the American Arbitration Association pursuant to its commercial arbitration rules. All matters relating to arbitration will be governed by the federal arbitration act (9 U.S.C. §§1 et seq.) And not by any state arbitration law. The parties to any arbitration will execute an appropriate confidentiality agreement, excepting only such disclosures and filings as are required by law.

21.3.   Place and Procedure. The arbitration proceedings will be conducted at our headquarters in Boca Raton, Florida. Any dispute and any arbitration will be conducted and resolved on an individual basis only and not a class-wide, multiple plaintiff or similar basis. Any such arbitration proceeding will not be consolidated with any other arbitration proceeding involving any other person, except for disputes involving affiliates of the parties to such arbitration. The parties agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the federal rules of civil procedure) within the same proceeding as the dispute to which it relates. Any such dispute which is not submitted or filed in such proceeding will be barred.

21.4.   Awards and Decisions. The proceedings will be heard by 1 arbitrator. The arbitrator will have the right to award any relief which he deems proper in the circumstances, including, for example, money damages (with interest on unpaid amounts from their due date(s)), specific performance, temporary and/or permanent injunctive relief, and reimbursement of attorneys' fees and related costs to the prevailing party. The arbitrator will not have the authority to award exemplary or punitive damages except as otherwise permitted by this agreement, nor the right to declare any mark generic or otherwise invalid. You and we agree to be bound by the provisions of any limitations or the time on which claims must be brought under applicable law or under this agreement, whichever expires earlier. The award and decision of the arbitrator will be conclusive and binding and judgment on the award may be entered in any court of competent jurisdiction. The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award. Without limiting the foregoing, the parties will be entitled in any such arbitration proceeding to the entry of an order by a court of competent jurisdiction pursuant to an opinion of the arbitrator for specific performance of any of the requirements of this agreement. Judgment upon an arbitration award may be entered in any court having jurisdiction and will be binding, final and non-appealable.

21.5.   Specific Performance. Nothing in this agreement will prevent either you or we from obtaining temporary restraining orders and temporary or preliminary injunctive relief in a court of competent jurisdiction. However, you and we must contemporaneously submit the dispute for arbitration on the merits.

21.6.   Third Parties. The arbitration provisions of this agreement are intended to benefit and bind certain third party non-signatories, and all of yours and our principal owners and affiliates.

64

CAL- 1st Franchise
Flo-Mac, LLC
Sarasota-Bradenton
September 2006

You _____   You _____

US_____

21.7.    **Survival.**    This provision continues in full force and effect subsequent to and notwithstanding the expiration or termination of this agreement for any reason.

22.    **NOTICES AND PAYMENTS.**

All notices and reports permitted or required under this Agreement or by the Manuals must be in writing and will be deemed delivered:

(a) at the time delivered by hand;

(b) 1 business day after transmission by facsimile, telecopy, e-mail, or other electronic system;

(c) 2 business days after being placed in the hands of a commercial airborne courier service for next business day delivery; or

(d) 3 business days after placement in the United States mail by registered or certified mail, return receipt requested, postage prepaid.

Delivery by facsimile, e-mailed and electronic means constitutes a writing. All such notices must be addressed to the parties as follows:

If to Us:            U.S. MEDICAL CARE HOLDINGS, L.L.C.
                     3350 NW Boca Raton Boulevard, Suite B-38
                     Boca Raton, Florida 33431
                     Attention: Franchise Compliance and Administration
                     Copy to:  notices@togetthin.com

If to You:           FLO-MAR, LLC
                     370 Golfview Road, #701
                     North Palm Beach, FL 33408
                     Attn: Marian Zable
                     zablem@bellsouth.net

Either you or we may change the address for delivery of all notices and reports and any such notice will be effective within 10 business days of any change in address. Any required payment or report not actually received by us during regular business hours on the date due (or postmarked by postal authorities at least 2 days prior to such date, or in which the receipt from the commercial courier service is not dated prior to 2 days prior to such date) will be deemed delinquent.

Intending to be bound, you and we sign and deliver this Agreement in 2 counterparts on the Agreement Date.

CALe 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2008

You ___  Von ___       65

US ___

"US":

U.S. MEDICAL CARE HOLDINGS. L.L.C.
A Florida limited liability company

By:
Name: Sasson Moulavi, MD
Title: Manager

"YOU":

FLO-MAR, LLC
A Florida limited liability company

By:
Name: Marian Zable,                Member
By:
Name: Floyd Cohen, MD.             Member

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

66

You          You

US

EXHIBIT "A"
TO THE
U.S. MEDICAL CARE HOLDINGS, L.L.C.
FRANCHISE AGREEMENT
DATED September ___2___, 2006
WITH

FLO-MAR, LLC
(Name of Franchise Owner)

## GLOSSARY

This Glossary is intended as a general guideline to assist you in reading the Franchise Agreement. You must review the Franchise Agreement to get an exact definition of a term.

| Term | Definition |
|------|------------|
| **Account**<br>Section 6.8 | Your Center's bank operating account from which you may be required to authorize us to initiate debit entries or credit correction entries to for payments of Royalties and other amounts due under this Agreement, including any applicable interest charges. |
| **Accounting Period**<br>Section 6.3 | That period we designate in the Manual (currently a 7-day accounting period for Royalty and Marketing Calculations that runs from Monday through Sunday and a 4, 4, 5-week accounting period for financial statement purposes. But it may be daily.). |
| **Accounting System**<br>Section 13.1 | The format, reporting system and accounting system that we require from time to time. |
| **Additional Training**<br>Section 7.3 | The periodic, supplemental, additional or refresher training we designate for you, your owners or Medical Director. |
| **Advertising Fund Contributions**<br>Section 6.5 | If the Advertising Fund is established, then beginning on your 1st anniversary, the contributions you are required to pay to the Advertising Fund in an amount not to exceed 3% of your Gross Sales. If we determine that applicable laws or regulations will not permit the payment of an Advertising Fund Contribution that varies based on Gross Sales, then we may require you to pay an Advertising Fund Contribution of $200 per week |
| **Advertising Fund**<br>Section 12.1 | A fund used to develop advertising, marketing and public relations programs and materials that we deem necessary or appropriate for the goodwill and public image of Centers on a system-wide basis. |
| **Affiliate**<br>Section 20.16 | Any Business Entity directly or indirectly owned or controlled by a person, under common control with a person controlled by a person. |
| **Agreement Date**<br>Introductory Paragraph | Date of this Agreement. |
| **Agreement**<br>Introductory Paragraph | The Franchise Agreement between U.S. MEDICAL CARE HOLDINGS, L.L.C. and you. |

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____          US _____

| <u>Term</u> | <u>Definition</u> |
|---|---|
| Annualized Compensation Section 10 | The aggregate compensation (including wages/salary, bonus and other employers' costs of all taxes and benefits) payable to an employee (i) during the 12-month period immediately preceding the date of such employee's employment with us, our affiliate or our franchisees (if employed during an entire 12-month period); or (ii) during the period of such employee's employment with us prorated on the basis of a 365 day year. |
| Anti-Terrorism Laws Section 1.3 | Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. |
| Approved Supplier(s) Section 5.1 | Those suppliers we designate or approve. |
| Art Section 5.15 | The paintings, pictures, photographs, murals, drawings, sculptures and other forms of art we designate, commission, loan or lease, or require you to commission, borrow, lease or possess for display at or in your Center. |
| Assignment Notice Section 3.4 | The written notice from us in the event of your default of the lease or the Franchise Agreement that the lease will be assigned to us. |
| Business Entity Section 1.5 | A business organization like a corporation, professional association, limited liability company or partnership. |
| Buyout Section 18.7(a) | The right we have to purchase all of the rights and interest you or your owners have in you, the Center and under this Agreement, at our option, if we experience a Triggering Event. |
| Call Center Services Section 12.8 | The regional, local, national or international call center centralized reservation (appointment setting), telemarketing or call routing services we designate from time to time. |
| Capital Modifications Section 11.3 | Additional capital that you may be obligated to invest in the Center because of System Standards modifications that we may make from time to time. |
| Cash – Same day deposit payment for Services or Products sold basis Section 4.3 | Fees paid by credit card, with cash, debit card, checks or the like, which are paid directly by the customer and not by any public or private insurance carrier or fund. |
| Center Materials Section 5.16 | All products, supplies, materials and equipment for use in connection with your Center; including all inventory or other Products, stationary, business cards, signage, services, marketing materials, insurance, financial services, video services, advertising services, credit card services, merchant account systems, Call Center Services, hardware or equipment, and telephone systems. |

CAL, 5⁴ Franchise
Fla-Mar, LLC
Sarasota-Bradenton
September 2006

2

You _____ You _____       US _____

| Term | Definition |
|---|---|
| Center(s)<br>Section 1.1 | The franchised weight reduction and weight management, nutritional and health business(es) specializing in providing medical-based physician monitored and supervised weight reduction and weight management program, the Services and the sale of the Products. |
| Claims<br>Section 19.4 | All obligations, damages (actual, consequential or otherwise) and costs reasonably incurred in the defense of any claim against any of the Indemnified Parties, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other expenses of litigation, arbitration or alternative dispute resolution and travel and living expenses. |
| Collateral<br>Section 5.2 | The assets, including furniture, fixtures, equipment, supplies, accounts, receivables, inventory, operating assets, records, inventory, food products, and all tangible and intangible assets constituting the Center and the Site, including the Lease and all accessions and replacements in which you must grant to us a first priority security interest. |
| Competitive Center<br>Section 10 | Any business or facility owning, operating or managing, or granting franchises or licenses to others to do so, any Center or any business operating from a mobile or fixed location (or via any form of e-commerce) that offers; physician assisted, or non-physician assisted, medical based physician monitored or supervised weight reduction or weight management services or weight loss or weight loss management products, foods, cookies, shakes, supplies, drops, creamers, or the like which are the same as or similar to those employed or offered or sold by Centers or which in any way utilize the Confidential Information the Copyrights, Art, the System or the Marks (other than a Center operated under a Franchise Agreement with us) or any other health, nutritional or dietary products or vitamins. |
| Computer System Fee<br>Section 6.6 | The $100 per month fee you must pay for use for use of the Computer System. |
| Computer System<br>Section 11.6 | The MIS System, software, hardware, reporting and accounting equipment and systems we specify that you must utilize to report gross sales and other business information to us including internet and intranet networks we establish. |

CAL- 1st Franchise
Pto-Mar, LLC
Sarasota-Bradenton
September 2006

You _____ You _____   3     us _____