| Term | Definition |
|---|---|
| **Confidential Information** Section 9.1 | Certain confidential information that we have developed relating to the development and operation of Centers, which includes (a) the System and the know-how related to its use; (b) plans, specifications, size and physical characteristics of the Center(s); (c) site selection criteria, land use and zoning techniques and criteria; (d) methods in obtaining licensing and meeting regulatory requirements; (e) sources and design of equipment, furniture, forms, materials and supplies; (f) marketing, advertising, contest, and promotional programs for Centers; (g) staffing and delivery methods and techniques for personal services; (h) the selection, testing and training of personnel for Centers; (i) the recruitment, qualification and investigation methods to secure employment for employment candidates; (i) any computer software we make available or recommend for Centers; (j) methods, techniques, formats, specifications, procedures, information and systems related to and knowledge of and experience in the development, operation and franchising of Centers; (k) knowledge of specifications for and suppliers of certain products, materials, supplies, furniture, furnishings and equipment; (l) methods and servicing techniques; and (m) knowledge of operating results and financial performance of Centers other than those operated by you (or your affiliates); (o) e-commerce related data. |
| **Control** Section 20.16 | The power to direct or cause the direction of management and policies. |
| **Co-Op** Section 12.6 | An association of Center owners that may be established in the geographic area in which your Center is located. |
| **Copyrights** Section 8.1 | All information capable of being rendered into tangible form created by you or others in connection with or used in connection with the System or your Center, including, for example, Art, written materials, electronic data, software, Manuals, brochures, music, live performances, photography, the content compilation of website's graphics and the like. |
| **Core Products** Section 1.1 | SIEGAL™ Cookies, SIEGAL™ Shakes, SIEGAL™ Soups, SIEGAL™ Drops and DR. SIEGAL'S NOTHING™ (non-dairy creamer). |
| **Development Plans** Section 5.3 | Those preliminary layouts, Development Plans, space plans and specifications which you are obligated, at your expense, to have your Approved Supplies follow during the development of the Center. |
| **Development** Section 5.4 | The process by which you will, and are obligated to, manufacture, equip, modify, assemble or construct all required post-build out improvements to the Center and decorate, staff and equip the Center in compliance with plans and specifications we have approved. |
| **Disability** Section 15.5 | A mental or physical disability, impairment or condition that is reasonably expected to prevent you or actually does prevent you or an owner of a controlling interest in you from managing and operating the Center. |

4

CAL- 1ª Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

| Term | Definition |
|------|------------|
| **Dispute**<br>Section 21.2 | Any litigation, claim, dispute, suit, action, controversy, proceeding or otherwise between or involving you and us (and/or involving you and/or any claim against or involving any of our or our affiliates' shareholders, directors, partners, officers, employees, agents, attorneys, accountants, affiliates, guarantors or otherwise). |
| **e-commerce**<br>Section 12.7 | Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-names, e-mail, home pages, bulletin boards, chatrooms, linking, framing, on-line purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware. |
| **e-names**<br>Section 12.7 | URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin. |
| **Family Member**<br>Section 20.16 | Parents, spouses, offspring and siblings, and the parents and siblings of spouses. |
| **First Installment**<br>Section 18.5(e) | The first installment of the purchase price consisting of an amount equal to the Franchise Fee you have paid to us that will be paid by us within 30 days of our notifying you of our election to purchase your Center. |
| **Franchise Fee**<br>Section 6.2 | The nonrecurring and nonrefundable franchise fee that you must pay us on the Agreement Date. |
| **Franchise Owner**<br>Introduction | You; one or more persons, a Business Entity, as the case may be. |
| **Franchise**<br>Section 2.1 | The franchise we grant to you to operate an Center. |
| **Franchisee**<br>Section 20.16 | You; one or more persons, a Business Entity, as the case may be. |
| **Grand Opening Advertising**<br>Section 12.5 | The up to $7,500 pre-opening advertising following the designated advertising plan that you are required to spend. |
| **Gross Sales**<br>Section 6.8 | The total actual gross charges for all products and services sold to customers of the Center for cash or credit, whether these sales are made at or from the Center, or any other location. However, any amounts that you collect and transmit to state or local authorities as sales, use or other similar taxes are excluded from the definition of Gross Sales. |
| **Improvements**<br>Section 9.2 | Ideas, recipes, concepts, copyrightable works, methods, techniques or improvements relating to your Center that you or your personnel may develop in the course of the operation of your Center. |

CAL- 1ˢᵗ Franchise
Pro-Man, LLC
Sarasota-Bradenton
September 2006

5

You _____  You _____          US _____

| Term | Definition |
|------|------------|
| **Indemnified Parties**<br>Section 19.4 | Us, our affiliates and our respective shareholders, directors, officers, employees, agents, successors and assignees that you must agree to indemnify, defend and hold harmless against and to reimburse any one or more of for all claims, obligations and damages and any and all taxes and any and all claims and liabilities directly or indirectly arising out of your Center's operation (even if our negligence is alleged) or your breach of this Agreement. |
| **Initial Order**<br>Section 5.1 | The items and services we sell or lease to you in return for the Initial Order Fee. See Exhibit "E." |
| **Institutional Account**<br>Section 2.4 | A customer or a group of customers that operate under common ownership or control, through independent dealerships, affiliated entities, franchise systems, religious organizations, school systems, governmental units or some other association, for whom, or at whose locations, or at multiple locations, we have arranged for Centers to provide the Products or Services, or special pricing structures. |
| **IPO Conversion**<br>Section 18.7(f) | If we undertake an IPO, the right we have, at our option and election, to require you and your owners to convert Your Interest into the type of our capital stock (or any successor to us) which is the subject of such IPO. |
| **IPO**<br>Section 18.7(a) | Any public offering, pursuant to a registration statement under the Securities Act of 1933 or successor statute, of any of our capital stock or the effectiveness of a registration statement for the initial public offering of our equity securities. |
| **Lease Assignment**<br>Section 3.2 | Our then-current form of Lease Assignment of Lease Agreement that you and any lessor must sign before entering into a lease for any Site or the Center. |
| **Lease**<br>Section 3.4 | The lease for any Site or Center (or any components of it). |
| **Manuals**<br>Section 11.1 | Our Manuals consisting of such materials (including, as applicable, audiotapes, videotapes, magnetic media, computer software and written materials) that we generally furnish to franchisees from time to time for use in operating a Center. |
| **Marketing Area**<br>Section 2.1 | The geographic area we designate or approve in which you must focus your marketing efforts. You must market to customers located in your Marketing Area. |

| Term | Definition |
|---|---|
| Marks<br>Section 1.1 | Certain trademarks, service marks and other commercial symbols, including the trade and service marks "SIEGAL™ MEDICAL WEIGHT MANAGEMENT", "DR. SIEGAL'S™," "SIEGAL WEIGHT MANAGEMENT®," "SIEGAL™ SHAKE," "SIEGAL™ DROPS," "SIEGAL™ DIET PROGRAM," "SIEGAL™ SYSTEM," "THE SIEGAL™ COOKIE," "SIEGAL™," "DR. SIEGAL'S NOTHING,"™ "SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™," "SMART FOR LIFE," and other associated logos, designs, artwork and trade dress, trademarks, service marks, commercial symbols, and e-names, which have gained and continue to gain public acceptance and goodwill, and may create, use and license additional trademarks, service marks, e-names and commercial symbols in conjunction with the operation of Centers |
| Medical Director<br>Section 5.22 | The physician you hire who will be responsible for the supervision of the Center and such other responsibilities as we may designate in the Manuals from time to time. |
| Minimum Local Advertising Expenditures<br>Section 12.5 | Such amounts we designate which you must spend on local advertising and promotion. |
| MIS System<br>Section 12.7 | Internet or intranet networks we establish or designate. |
| Notification Date<br>Section 18.5(a) | The date on which we notify you whether or not we are exercising our option upon termination of this Agreement to purchase the Center from you, including the ownership or leasehold rights to the Site (if any) and the Center. |
| Opening Date<br>Section 2.1 | The date your Center opens for business. |
| Operating Assets<br>Section 5.16 | The medical and other equipment or supplies used for performing the Services, or Products and all lights, filing systems and records systems, fixtures, furnishings, training materials, other equipment signs, Art and computer hardware and software we designate or approve for use in connection with a Center. |
| Organizational Associates<br>Section 11.16 | Institutional Accounts or other commercial, training, trade, marketing, educational, social or religious organizations which we designate. |
| Our EBIT<br>Section 18.7(d) | Our Net Income before interest and income taxes. |
| Owner Training<br>Section 7.1 | The training on the operation of a Center that we will furnish to you and 1 other person (or, if you are a Business Entity, up to 2 of your owners). |

| Term | Definition |
|---|---|
| Owner<br>Section 20.16 | Any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in another person (or a transferee of this Agreement or an interest in you), including any person who has a direct or indirect interest in you or this Agreement and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets. |
| Payment Day<br>Section 6.3 | 3rd business day (or such other day as we may designate) following the end of the Accounting Period when Royalty payments must be made. |
| Person<br>Section 20.16 | Any individual or Business Entity. |
| Physicians<br>Section 4.1 | Independent or affiliated physicians whom we designate or approve who may provide medical services related to the Services. |
| Practice of a Profession<br>Section 4.4 | Ordering of tests, diagnosing diseases or medical conditions, prescribing or conducting treatment of individuals, performing operations, prescribing drugs for various human diseases, pain, injuries, deformities or other physical or mental conditions or engaging in other activities commonly referred to as the "Practice of Medicine," or other professions requiring licensure, certification or training under applicable law. |
| Practice of a Profession<br>Section 4.4 | To order tests, diagnose diseases or medical conditions, prescribe or conduct treatment of individuals, perform operations, prescribe drugs for various human diseases, pain, injuries, deformities or other physical or mental conditions or engage in other activities commonly referred to as the "Practice of Medicine," or other professions requiring licensure, certification or training under applicable laws. |
| Preferred Vendor Agreements<br>Section 5.18 | The agreements we may require you to enter into with Preferred Vendors in order to participate in the Preferred Vendor Programs. |
| Preferred Vendor Programs<br>Section 5.18 | Those programs and terms which we or our affiliates develop in connection with our, our affiliates' or our franchisees' receipt of benefits or certain negotiated terms from Approved Suppliers. |
| Preferred Vendors<br>Section 5.18 | Those Approved Suppliers which we designate for participation in Approved Vendor Programs. |
| Products<br>Section 1.1 | The weight management, nutritional and other products that we periodically designate or approve, including the Core Products, the Secondary Products and the Tertiary Products. |
| Professional Personnel<br>Section 11.12 | Your Professionals or other employees, contractors or agents who we designate who are subject to our insurance requirements. |

8

You /___ You ___

US ___

| <u>Term</u> | <u>Definition</u> |
|---|---|
| **Professional Training**<br>Section 7.2 | The professional training program that we will provide to your Medical Director and up to 1 Professional (or other employees or independent contractors we approve) working for or in connection with your Center. |
| **Professionals**<br>Section 4.2 | Such qualified medical office managers, dieticians, nutritionists, ARNPs, RN's, LPN's, Physicians' Assistants, medical technicians, medical assistants and similar types of personnel as we may designate from time to time |
| **Program Rules**<br>Section 5.18 | The rules we designate for Preferred Vendor Programs. |
| **Proprietary Materials**<br>Section 11.8 | All articles that you must purchase from manufacturers or us or our Approved Suppliers that are used in operating your Center and bearing any of the Marks, including employee clothing, advertising materials and the like. |
| **Protected Area**<br>Section 2.2 | The geographic area we may designate to which your territorial protections apply. |
| **Report Day**<br>Section 6.3 | The day we designate of each Accounting Period when you must report your Gross Sales to us for the preceding Accounting Period. |
| **Response Notice**<br>Section 16.2 | Written notice given to you not more than 90 days after you give us notice of your election to acquire a successor franchise of our decision: (1) to grant you a successor franchise; (2) to grant you a successor franchise on the condition that deficiencies of the Center, or in your operation of the Center, are corrected; or (3) not to grant you a successor franchise based on our determination that you and your owners have not substantially complied with this Agreement during its term. |
| **Royalty**<br>Section 6.3 | A royalty in the amount of 10% of your Gross Sales for each Accounting Period. |
| **Second Installment**<br>Section 18.5(e) | The second installment of the purchase price will equal to the total purchase price less the First Installment and will be paid to you at a time of our choosing, but not later than 90 days after the later of closing or the determination of the purchase price. |
| **Secondary Products**<br>Section 1.1 | Sauces, syrups, dips, barbecue sauces, dressings, dressing packets, candies and our educational products, vitamins, minerals and weight reduction supplements |
| **Section**<br>Section 20.16 | A section or subsection of this Agreement. |
| **Services**<br>Section 1.1 | The medical based, physician assisted or supervised weight reduction or weight management, health and nutritional services we designate or approve for use by your Center. |

CAL- 1st Franchise
Ho-Mar, LLC
Sarasota-Bradenton
September 2006

9

You ___ Yes ___                US ___

| Term | Definition |
|---|---|
| SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ Section 1.1 | The franchised weight reduction and weight management, nutritional and health businesses specializing in providing medical-based physician monitored and supervised weight reduction and weight management program providing the Services and the Products. |
| Site Section 2.1 | The location of your Center. |
| SMLC Section 1.6 | SM Licensing Corporation. |
| System Standards Section 11.1 | The mandatory and suggested specifications, standards, operating procedures and rules that we prescribe from time to time for the operation of Centers and information relating to your other obligations under this Agreement and related agreements. |
| System Section 1.1 | The distinctive business formats, methods, procedures, designs, layouts, signs, equipment, trade dress, standards and specifications and the Marks under which the Centers operate, all of which we (or our affiliates) may improve, further develop or otherwise modify from time to time. |
| Term Section 2.1 | The period that is 10 years from the Agreement Date. |
| Tertiary Products Section 1.1 | SMART FOR LIFE Scales for consumer use, SMART FOR LIFE Water Bottles, SMART FOR LIFE Pedometers, SMART FOR LIFE Tote Bags, SMART FOR LIFE Shirts, SMART FOR LIFE Hats and all other SMART FOR LIFE logo products for resale to the public. |
| Transfer Section 15.2 | Your (or your owners') voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition of any interest in: (1) this Agreement; (2) you; or (3) your Center. |
| Triggering Event Section 18.7(a) | (i) The sale of all or substantially all of our assets to an unaffiliated third party; (ii) the sale or exchange of more than 50% of our total issued and outstanding equity securities to an unaffiliated third party; (iii) a merger or consolidation of us with or into an unaffiliated third party in which neither we nor our affiliates obtain or maintain a controlling voting interest; (iv) an IPO; (v) the sale, conveyance, exchange or assignment by our shareholders in one transaction or series of related transactions, of 50% or more of our outstanding capital stock to persons who, prior to such sale, did not own more than 25% of our outstanding stock. |
| Your EBIT Section 18.7(d) | Net income from your Center before interest and income taxes. |
| Your Interest Section 18.7(b) | All of your or your owners interest in you, the Center and this Agreement and the assets comprising them. |

CAL. 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

10

Yes ___    You ___    US ___

EXHIBIT "B"
TO THE
U.S. MEDICAL CARE HOLDINGS, L.L.C.
FRANCHISE AGREEMENT
DATED September 21, 2006
WITH
FLO-MAR, LLC
(Name of Franchise Owner)

A.    Your Marketing Area:  The area described as follows: Sarasota, Florida

☐Check if map is attached.

_____ Your initials                    _____ Our Initials
_____ Your initials

B.    Your Protected Area:

☐ None;  or the area described as follows:  Zip Code plus one mile radius

☐Check if map is attached.

_____ Your initials                    _____ Our Initials
_____ Your initials

YOU:                                            US:

FLO-MAR, LLC                                    U.S. MEDICAL CARE HOLDINGS, L.L.C.

Print Name: Marian Zable, Member               Print Name: Sasson Moulavi, MD, Manager
Date:                                          Date: 9/21/06
Print Name: Floyd Cohen, MD, Member
Date: 21 Sept 06

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You: ___                                        US: ___

EXHIBIT "C" TO THE
U.S. MEDICAL CARE HOLDINGS, L.L.C.
FRANCHISE AGREEMENT
DATED September 21, 2006
WITH

FLO-MAR, LLC

(Name of Franchise Owner)

FORM OF PROMISSORY NOTE
N/A

CAI.- 1ª Franchise
Flo-Mar, LLC
Sarasola-Bradenton
September 2006

## PROMISSORY NOTE

$_____                                    Effective Date: _____, 2006
Boca Raton, Florida

_____ (the "Maker") promises to pay to the order of U.S. MEDICAL CARE HOLDINGS, L.L.C. (the "Lender"), at 3350 NW Boca Raton Boulevard, Suite B-38, Boca Raton, Florida 33431, or at such other address as he may direct from time to time, and his successors and assigns, the maximum principal sum of $_____ in accordance with the following provisions of this Promissory Note (the "Note"):

1.    **Interest.** Interest will accrue on the principal amount outstanding of this note at the annual rate of _____%, compounding monthly. Such interest will accrue on the total of the principal amount outstanding from time to time. Interest on this note will be calculated on the basis of a 360-day year.

2.    **Payments.** Starting on _____, __ 200___, the Maker will pay the first of _____ consecutive monthly installments of principal and interest in the amount of $_____, and each subsequent monthly installments of principal and interest will be due on the _____ of each month. Maker will pay the Lender all of the outstanding principal plus accrued, but unpaid, interest on or before the final monthly installment is due and payable.

3.    **Prepayment.** The Maker may pay to the Lender all or any part of the amount due under this note at any time without a prepayment penalty. Partial prepayments will not vary the obligation to pay the Lender the full amounts due when due.

4.    **Payment of indebtedness.** All payments Lender receives from Maker will be applied first against fees, costs and expenses reimbursement, second to accrued and unpaid interest, and third to outstanding principal.

5.    **Default.** Maker will be in default under this note if Maker fails to make any payment within ten (10) days after receiving written notice of such failure to make payment on the applicable due date. If Maker defaults, the entire principal balance of this note will be payable immediately at Lender's option upon notice to the Maker. Upon Maker's default, interest will accrue on the principal amount outstanding at an annual rate equal to the lesser of 18% or the maximum rate of interest permitted by applicable law. Any notices to be delivered by Lender pursuant to this note shall be delivered via reputable overnight courier (e.g., Fedex) or certified mail, return receipt requested, to:

_____
_____
_____
_____

Maker and Lender may change their address for purposes of receiving notice by delivering written notice of such change to LENDER. The Maker specifically agrees that this Note is a purchase money note and is the consideration for that certain Franchise Agreement dated _____, 200___ by and between the Maker and Lender. Any default by Maker under this Note is a breach of the Franchise Agreement.

2

CA1.- 1st Franchise
Bic-Mac, LLC
Sarasota-Bradenton
September 2006

6.   Collection Costs.  The Maker agrees to pay all reasonable costs the Lender incurs in the collection of any amounts the Maker owes under this note, including, attorneys' fees and paralegal fees, whether for investigations, settlements, trials, appeals or in bankruptcy proceedings and whether suit is brought or not and all other related costs and expenses. Collection costs will be added to the balance of principal.

7.   Waivers.  The Maker, for itself and its successors and assigns, waives any defense by reason of extension of time for reason of nonpayment.  The Maker also waives presentment, notice of dishonor, protest, demand and notice of protest and notice of dishonor, or any indulgence that may be granted from time to time.  The Lender's failure to assert any right or remedy under this note will not be a waiver of any of its rights.   The Maker, in any litigation arising out of or relating to this note in which a holder of the note is an adverse party, waives trial by jury and the right to interpose any defense, set-off or counterclaim of any nature or description.

8.   Law and Jurisdiction.  This note is governed by Florida law.  The Maker irrevocably consents to the jurisdiction and venue of the courts of Palm Beach County, Florida.

9.   Maximum Interest.  Despite any other provision of this note, in no event will the amount of interest due or payable under this note exceed the maximum contract rate of interest allowed by applicable law, as amended from time to time.  If any payment is made by the Maker or received by the Lender that exceeds the maximum contract rate of interest, such excess sum will be credited as a payment of principal, unless the Maker elects to have the excess sum returned.

10.  Documentary Stamp Tax.  Maker will pay and be responsible for the payment of any and all documentary stamp tax due and payable to the Florida department of revenue.

11.  Negotiability.  This note is fully negotiable by the Lender.

12.  Consideration.  The Maker acknowledges and agrees that this note has been signed and delivered in exchange for valuable consideration.

13.  Security Required.  This note is:  (a) secured by a security interest in Maker's assets and franchise pursuant to a security agreement made between Maker and Lender and the holder is entitled to the benefits of the security described therein.  Under certain conditions stated in the security agreement the entire principal of this note may become payable prior to the maturity stated herein.  Maker shall do and sign whatever Lender reasonably requires to perfect Lender's security interest; and (b) purchase money consideration for that certain Franchise Agreement and/or Area Development Agreement dated _____, 200__ between you, the Maker and us, the Lender (the "Agreements").  Any default under this Promissory Note shall constitute a default under the Agreements.

Intending to be bound, this Note is effective as of the actual date of signature and delivery, which is the date first above written (the "Effective Date").

Maker:

3

CAL- 1st Franchise
Flo-Man, LLC
Sarasota-Bradenton
September 2005

You ____  You ____                          US ____

CAL - 1st Franchise
Rio-Mar, LLC
Sarasota-Bradenton
September 2006

4

You _____ You _____

US _____

# FINANCING STATEMENT FORM
## GENERAL COLLATERAL

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

**B. SEND ACKNOWLEDGMENT TO:**
Name
Address
Address
City/State/Zip

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | | 1g. ORGANIZATIONAL ID#  NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | | 2g. ORGANIZATIONAL ID#  NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME U.S. MEDICAL CARE HOLDINGS, L.L.C. | | | | | |
|---|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS 3350 NW Boca Raton Blvd., Suite B-38 | CITY Boca Raton | | STATE FL | POSTAL CODE 33431 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:

The Debtor (Franchisee) grants to the Secured Party (Franchisor) a security interest in the following described property, located at _____

All of Debtor's accounts, fixtures, documents, equipment, inventory, instruments, chattel papers, general intangibles, and other personal property now owned or later acquired by Debtor for use in its SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ Franchised Center and all proceeds and products of the foregoing property.

5. ALTERNATE DESIGNATION (if applicable)
BAILEE/BAILOR   ☐ LESSEE/LESSOR   ☐ CONSIGNEE/CONSIGNOR   ☐
☐ AG. LIEN   ☐ NON-UCC FILING
SELLER/BUYER

6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☒ Florida Documentary Stamp Tax is not required.

7. OPTIONAL FILER REFERENCE DATA # _____

STANDARD FORM – FORM UCC-1 (REV.12/2001)
of State, State of Florida

Filing Office Copy

Approved by the Secretary

CAL. 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You _____   You _____

US _____

# FINANCING STATEMENT FORM

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

**GENERAL COLLATERAL**

**B. SEND ACKNOWLEDGEMENT TO:**
Name

Address

Address

City/State/Zip

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names**

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID# |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names**

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID# |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNOR of ASSIGNOR S/P) – INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

| 3a. ORGANIZATION'S NAME | U.S. MEDICAL CARE HOLDINGS, L.L.C. | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS 3350 NW Boca Raton Blvd., Suite B-38 | CITY Boca Raton | STATE FL | POSTAL CODE 33431 | COUNTRY USA |

**4. This FINANCING STATEMENT covers the following collateral:**

The Debtor (Franchisee) grants to the Secured Party (Franchisor) a security interest in the following described property, located at _____

All of Debtor's accounts, fixtures, documents, equipment, inventory, instruments, chattel papers, general intangibles, and other personal property now owned or later acquired by Debtor for use in its SIEGAL™ SMART FOR LIFE WEIGHT MANAGEMENT CENTERS™ Franchised Center and all proceeds and products of the foregoing property.

**5. ALTERNATE DESIGNATION (if applicable)**
☐ LESSEE/OR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG. LIEN ☐ NON-UCC FILING

**6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX**

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☒ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA #_____**

2

CAL- 1st Franchise
Flo-Mac, LLC
Sarasota-Bradenton
September 2006

Secretary of State, State of Florida

CAL· 1ˢᵗ Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

3

US

# FINANCING STATEMENT FORM – ADDENDUM

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

8a. ORGANIZATION'S NAME

| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

9. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - INSERT ONLY ONE DEBTOR NAME (10a OR 10b) – Do Not Abbreviate or Combine Names**

10a. ORGANIZATION'S NAME

| 10b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|---|
| 10c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |
| 10d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 10e. TYPE OF ORGANIZATION | 10f. JURISDICTION OF ORGANIZATION | | 10g. ORGANIZATIONAL NO. | |

**11. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)- INSERT ONLY ONE SECURED PARTY NAME (11a OR 11b)**

11a. ORGANIZATION'S NAME

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

13. Description of real estate:

14. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

only if applicable and check only one box.

15. Additional collateral description:

16. Check

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust

☐ Decedent's Estate

only if applicable and check only one box.

17. Check

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction – effective 30 years

☐ Filed in connection with a Public-Finance Transaction – effective 30 years

4

CAL- 1st Franchise
Fin-Mar, LLC
Sarasota-Bradenton
September 2006

Approved by the Secretary of State, State of Florida

5

CAL~ 1ˢᵗ Franchive
Bio-Mne, LLC
Sarasota-Bradenton
September 2006

EXHIBIT "D" TO THE
U.S. MEDICAL CARE HOLDINGS, L.L.C.
FRANCHISE AGREEMENT
DATED September  21 , 2006
WITH

FLO-MAR, LLC
(Name of Franchise Owner)

FORM OF UCC-1 FINANCIAL STATEMENT
N/A

CAL. 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

You_____ fina

5

US_____

## FINANCING STATEMENT FORM

**PURCHASE MONEY COLLATERAL**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

B. SEND ACKNOWLEDGEMENT TO:
Name
Address
Address
City/State/Zip

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY USA |
| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION Florida | 1g. ORGANIZATIONAL # |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID# NONE | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL # NG |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME   U.S. MEDICAL CARE HOLDINGS, L.L.C. | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS     3350 NW  Boca  Raton  Boulevard – Ste. B-38 | CITY    Boca Raton | STATE FL | POSTAL CODE 33431 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:

The Secured Party takes a purchase money security interest in all the Debtor's inventory of weight loss products and equipment, equipment, furniture, supplies and accessories at the property located at _____ . This security interest specifically includes inventory of the above types acquired by the Debtor after the date of this Financing Statement.

5. ALTERNATE DESIGNATION (if applicable): [ ] LESSEE/LESSOR  [ ] CONSIGNEE/CONSIGNOR  [ ] BAILEE/BAILOR  [ ] AG. LIEN  [ ] NON-UCC FILING  [ ] SELLER/BUYER

6. Florida DOCUMENTARY STAMP TAX ~ YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX

[ ] All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

[X] Florida Documentary Stamp Tax is not required.

7. OPTIONAL FILER REFERENCE DATA  #_____

STANDARD FORM - FORM UCC-1 (REV.12/2001)
by the Secretary of State, State of Florida

Filing Office Copy          Approved

6

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

# FINANCING STATEMENT FORM -- ADDENDUM

**8. NAME OF FIRST DEBTOR (1a OR 1b) ON RELATED FINANCING STATEMENT**

| 8a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 8b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**9. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - INSERT ONLY ONE DEBTOR NAME (10a OR 10b) -- Do Not Abbreviate or Combine Names**

| 10a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 10b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 10e. TYPE OF ORGANIZATION | 10f. JURISDICTION OF ORGANIZATION | 10g. ORGANIZATIONAL # NO |

**11. SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE of ASSIGNOR S/P)- INSERT ONLY ONE SECURED PARTY NAME (11a OR 11b)**

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**12.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**13.** Description of real estate:

**14.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

_only_ if applicable and check _only_ one box.

or

_only_ if applicable and check _only_ one box.

**15.** Additional collateral description:

**16.** Check

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust

☐ Decedent's Estate

**17.** Check

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction -- effective 30 years

☐ Filed in connection with a Public-Finance Transaction -- effecti

7

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

EXHIBIT "E" TO THE
U.S. MEDICAL CARE HOLDINGS, L.L.C.
FRANCHISE AGREEMENT
DATED September __/__, 2006
WITH
FLO-MAR, LLC
(Name of Franchise Owner)

### INITIAL ORDER

**CORE PRODUCTS:**

| | |
|---|---|
| Cookies (64 packages per box) | |
| Oatmeal/Raisin | 2 Boxes |
| Chocolate | 2 Boxes |
| Coconut | 1 Box |
| | |
| Shakes (50 packages per box) | |
| Vanilla | 1 Box |
| Chocolate | 1 Box |
| Strawberry | 1 Box |
| Egg Custard | 1 Box |
| Chocolate Malt | 1 Box |
| Pina Colada | 1 Box |
| | |
| Drops (30 bottles per box) | |
| Vanilla | 1 Box |
| Chocolate | 1 Box |
| Strawberry | 1 Box |
| | |
| Soups (100 packages per box) | |
| Chicken | 1 Box |
| | |
| Creamers (12 bottles per box) | |
| | |
| Coffee Creamer | 1 Box |
| | |
| SMWM Intiskill System Kit | |
| Merchandising Displays | |
| Education Materials Kit | |
| Osmosis System Kit | |

**SECONDARY PRODUCTS:**
**TERTIARY PRODUCTS:**

Total Cost: **$ TBD AT TIME ORDER IS PLACED** (to be determined based on quantity and product price at time of order)

CAL- 1st Franchise
Flo-Mar, LLC
Sarasota-Bradenton
September 2006

Yes _____ You _____                    US _____



Smart for Life
Weight Management Centers

February 14, 2007

Marian Zable
Floyd Cohen, MD
Flo-Mar, LLC
370 Golfview Road, #701
North Palm Beach, FL 33408

Re:    Amendment to Franchise Agreement Relating to Core Products

Dear Marian and Dr. Cohen:

As you know, as the franchise system has evolved, the business has changed and the terminology used in the Franchise Agreements has changed over time. You, and other franchisees, have asked for clarification as to the method of distribution of certain of the "Core Proprietary" weight-loss products that we and our affiliates offer. In some Franchise Agreements, these products were referred to as products under the SFL Program as Core Proprietary MR and sometimes as the Core Products.

Notwithstanding any contrary term in the Franchise Agreement, you and we agree that:

(1)    Core Proprietary Meal Replacement Products formerly referred to as Core Proprietary MR products under or part of the SFL Program will now be known solely as Core Products; and

(2)    The Core Products consist of the cookies whether round or square, shakes and soups that are branded and produced by us or our affiliates, and associated with our trademarks (the "Core Products") and specifically used as the meal replacements components of our weight management program, i.e., those products furnished to be the non dinner component of the program. They do not include products supplied and produced by others, and do not include products that may be developed in the future by affiliates that are not part of the SFL Program or the Core Program.

(3)    We will not authorize for sale, or sell, Core Products through any channels of distribution other than direct sales to clients of franchised Centers or Centers that are owned or controlled by us or our affiliates (collectively "System Center(s)"). Therefore, Core Products will only be sold to clients who are under physician supervision at System Centers. We will not authorize Core Products for sale in pharmacies, kiosks, over the internet or through any other alternate means for public distribution or consumption. However, we reserve the right to design methods of distribution so that clients of System Centers can acquire Core Products through e-commerce, catalog or similar means, but only if:

(a)    the sales are credited to the System Center that is treating that client (less reasonable ordering, administrative and shipping charges); and

Clarification Letter
5/14/2010
2/14/07

(b)   we will do so only in consultation with franchisees and in a manner designed to fully retain and protect the relationship between System Centers and their clients, and not to circumvent the physician supervision of the weight-management program of such clients.

This letter will amend your Franchise Agreement on the condition that on or before March 1, 2007:

(a)   you sign this agreement below and return it to us in the self addressed stamped envelope provided for your convenience; and

(b)   we also receive signed written agreements on these terms and conditions from all our other franchisees.

Sincerely yours,

U.S. Medical Care Holdings, L.L.C.

By: _____
Name:  Saeeon Moulavi, MD
Title:   Manager


AGREED TO AND ACCEPTED:

FLO-MAR, LLC

By: _____
Print Name: Floyd Cohen MD & Maria Zable PA-C
Title: CO-OWNER
Date: 2-16-07

www.cookiediet.com   or   1.866.321.THIN (8446)

Clarification Letter
Sarasota
2/14/07

RETAIL LEASE AGREEMENT

BETWEEN

SARASOTA PALMS PLAZA, LLC

AND

FLO-MAR, LLC

This Lease contains a continuous use provision; please refer to Section 16.1.

X ⁓⁓⁓

(1) LESSEE is not in default of any of the terms, covenants or conditions of this Lease beyond any applicable notice and cure periods; and

(2) This Lease has not been assigned for any use other than the use permitted in Section 3.0 above; and

(3) Intentionally Deleted

(4) LESSEE is not involved or in bankruptcy or receivership and has not made an assignment for benefit of creditors under applicable federal or state law. The foregoing shall not apply to: (i) any existing tenant(s) of the Shopping Center with leases in effect as of the date of this Lease (or any replacements thereof, whether by right of first refusal, right of first offer, or other similar right previously granted by LESSOR, or otherwise, any of their successors, assigns, sublessees, or transferees), whose lease(s) currently permit their premises to be used for such Exclusive Use or for any lawful use, and provided that nothing contained herein shall prevent LESSOR from renewing or extending such lease(s) or relocating or expanding the premises occupied by such tenant(s). A business (other than the business conducted in the Premises) shall not be deemed to use its premises in the Shopping Center "primarily" for the Exclusive Use unless (i) it devotes 30% or more of the Demised Premises to the Exclusive Use, or (ii) on an annual basis, 30% or more of the gross sales revenues from such premises are generated by the Exclusive Use.

(a)       LESSOR's obligations under this Section shall automatically cease and terminate, and LESSOR may lease space in the Shopping Center free and clear of the restrictions imposed by this Section, should the Premises cease to be used primarily for the Exclusive Use. The Premises shall not be deemed to be used primarily for the Exclusive Use unless: (i) at least 50% or more of the area of the Premises is devoted to the Exclusive Use, and (ii) on an annual basis, at least 50% or more of the gross revenues from the Premises are generated by the Exclusive Use.

(b)       LESSEE waives any remedy for money damages (nor shall LESSEE claim any money damages by way of setoff, counterclaim, or defense) based on any claim that LESSOR has violated this Article. LESSEE's sole remedy for violation of this Article by LESSOR shall be to institute an action or proceeding seeking specific performance, injunctive relief, or declaratory judgment.

(c) Notwithstanding any other provisions in this Lease to the contrary, if LESSEE exercises an option to extend the Lease Term at any time when LESSOR is concurrently in violation of this Article, and, at the time of LESSEE's election of its option to extend LESSEE has not filed suit against LESSOR to enforce its rights under this article for LESSOR's breach of its obligations under this Section, then LESSEE shall be deemed to have waived its rights and remedies available under this Article.

It is LESSOR's and LESSEE's belief that the use restriction granted to LESSEE in this Article is reasonable in territory, time, and person and otherwise meets applicable legal criteria so as to be enforceable under antitrust laws. However, LESSOR makes no representations, express or implied, as to the enforceability of the foregoing use restriction, or whether such restrictions are violative of any applicable state or federal laws. Notwithstanding the foregoing or any other Article of this Lease, if this use restriction is found to be in violation of any state or federal antitrust laws by final judgment of a court of competent jurisdiction, LESSOR will be absolved from liability for breach of this use restriction.

## 4.0 RENT.
LESSEE shall pay to LESSOR at the office of LESSOR or at such other place designated by LESSOR in lawful United States currency without notice, demand, deduction or set-off whatsoever the following rentals together with any sales, use or other taxes assessed from time to time on the Rent or on the use and occupancy of the Premises:

## 4.1 BASE RENT.
The monthly base rent of $4,869.33 plus all applicable sales tax due thereon shall be paid in monthly installments, in advance, on or before the first day of each calendar month during the LEASE term. Monthly Base Rent shall be increased on an annual basis on January 1 of each and every year of the LEASE by the greater of two percent (2%); or the percentage of increase in the Consumer Price Index (CPI) for the twelve (12) month period ending either June 30, or December 31, immediately preceding the anniversary date (e.g. if the lease anniversary is March 1, the CPI will be calculated based on the prior 12 month preceding period ending December 31. If the lease anniversary is September 1, the CPI will be calculated based on the prior 12 month preceding period ending June 30). The category title: Urban Wage Earners and Clerical Workers, U.S. City Average (1982-84=100) within the table "All Items" as issued by the U.S. Department of Labor, Bureau of Labor Statistics, will be the basis for determining the percentage of increase to the CPI. In the event the first year of this Lease is a partial year, the increase on January 1 shall be based on the portion of the year for which said Premises has been leased (e.g. if LESSEE leased space on March 1, 1975 then the increase in the Monthly Base Rent on January 1, 1976 would be 2% times 10/12 which equals 1.66%).

Payments of Rent not received by the fifth (5th) of the month shall be subject to a late charge of Ten Percent (10%) of payment due to offset administrative expenses and other costs incurred by LESSOR. The first full calendar month of Base Rent, Additional Rent, and all sales or use taxes imposed on the rent shall be paid on the execution of the LEASE. If the Commencement Date is other than the first day of a calendar month, the Base Rent for the period from the Commencement Date to the first day of the first full month shall be prorated on a per diem basis and shall be paid on the Commencement Date.

## 4.2 PERCENTAGE RENT AND MONTHLY SALES REPORTS: INTENTIONALLY DELETED

## 4.3 ADDITIONAL RENT.
It is the intent of the parties for the Base Rent payable to the LESSOR to be absolutely net of all expenses associated with the operation of the Shopping Center and all sales or use taxes imposed on the rent. Therefore, in addition to Base Rent, LESSEE shall pay the following sum, plus any sales or use taxes imposed, as Additional Rent:

(a)  TAXES.  LESSEE's Pro Rata Share (as hereinafter defined) of the amount of all real and personal property taxes and assessments (including without limitation sanitary taxes, extraordinary or special assessments and all costs and fees including reasonable attorneys' fees incurred by LESSOR in contesting or negotiating the same with public authorities) levied, imposed or assessed upon the Shopping Center during each LEASE Year, plus the full amount of any real property tax assessment that is directly attributable to improvements by LESSEE to the Premises as defined and permitted by Section 7.0.

(b)  INSURANCE.  LESSEE's Pro Rata Share of the total cost to LESSOR of all fire, extended coverage, liability, workmen's compensation and other insurance coverage carried by LESSOR with respect to the Shopping Center. If LESSEE's approved use or occupancy of the Premises shall cause any increase in the premiums for the insurance coverage of the Shopping Center as carried from time to time by LESSOR, then LESSEE shall pay to LESSOR as Additional Rent the entire increase in said premiums or that portion allocable to LESSEE if more than one lessee's use causes such an increase, and said payment shall be due with the next monthly Base Rent payment following LESSOR's written notice specifying the amount of such increase.

(c)  COMMON AREA MAINTENANCE.  For the maintenance of the Common Areas, an amount equal to LESSEE's Pro Rata Share of the Shopping Center's Operating Costs as that term is defined in Section 5.3. LESSOR shall establish the fiscal period for determining the Shopping Center Operating Costs.

(d)  OTHER ADDITIONAL RENT.  All other sums of money or charges required to be paid by LESSEE under this "other additional rent", which shall include but not be limited to late fees, attorney's fees incurred by LESSOR to enforce the provisions of

2

X _____

this LEASE including providing notices of any default whether monetary or non-monetary, under the provisions of this LEASE, or interest charges on past due payments which shall be collectible as Additional Rent with the next installment of Base Rent.

(e) **INTEREST ON PAST DUE OBLIGATIONS.**  Any amount due from LESSEE to LESSOR hereunder which is not paid when due, including any payment charges, shall bear interest at one and one-half percent (1½%) per month from the due date until paid unless otherwise specifically provided herein but the payment for such interest shall not excuse or cure any Default by LESSEE under this LEASE.

(f) **LESSEE's PRO RATA SHARE.**  LESSEE's Pro Rata Share is determined by dividing the approximate square footage of the Premises by the approximate square footage of the total leasable area of the Shopping Center. LESSEE's Pro Rata Share is subject to adjustment by LESSOR based on the foregoing formula if the leasable area of the Shopping Center is diminished by casualty, condemnation or similar takings, or other events reducing the leasable area or if the leasable area is increased by additions to the Shopping Center. To the extent any lessees of the Shopping Center pay taxes directly by any taxing authority or carry their own casualty insurance, as may be provided in their lease, the square footage of their stores shall not be counted as part of the total area of the Shopping Center and LESSEE's Pro Rata Share shall be adjusted with respect to such items.

(g) **PAYMENT OF ADDITIONAL RENT.**  Upon receiving written request from LESSEE, but not more than once each calendar year, LESSOR shall deliver to LESSEE a statement setting forth the monthly installment of Additional Rent LESSOR estimates will be needed to pay in full for the upcoming calendar year. If at any time during the calendar year LESSOR determines the initial estimate should be revised so it will more closely approximate the expected annual Additional Rent, LESSOR may revise the initial estimate by delivering to LESSEE a subsequent statement. LESSEE shall pay LESSOR, together with the Base Rent, on the first day of each month during this LEASE, the monthly installment of estimated Additional Rent as set forth in the last statement received by LESSEE. Within sixty (60) days following the end of each calendar year, LESSOR shall endeavor to deliver to LESSEE a statement of the actual Additional Rent payable by LESSEE for the previous calendar period. LESSOR's failure to subject statements as called for herein shall not be deemed to be a waiver of LESSEE's requirement to pay the sum herein provided. If the total amount of estimated payments paid by LESSEE for any calendar year is less than the actual amount payable by LESSEE, LESSEE shall pay the balance of Additional Rent in a lump sum within fifteen (15) days after LESSOR delivers the statement to LESSEE. If the total of the estimated payments is greater than the actual Additional Rent for the same period, LESSEE shall receive a credit against the next due payment of estimated Additional Rent. Should a credit be due LESSEE at the termination of this LEASE, LESSOR shall submit payment to LESSEE within sixty (60) days of notification that said credit is due LESSEE. The initial monthly contribution during this calendar year for the payment of Additional Rent as described in this Section shall be $996.00 plus all applicable sales tax due thereon per month.

(h) **VERIFICATION.**  LESSEE or its representative shall have the right to examine LESSOR's books and records with respect to the items in the foregoing statement of actual Additional Rent during normal business hours at any time within sixty 60 days following the furnishing by LESSOR to LESSEE of the statement. Unless LESSEE shall take written exception to any item within fifteen (15) days after the furnishing of the statement, said statement shall be considered as final and accepted by LESSEE. Any amount due to LESSOR as shown on any statement, whether or not written exception is taken thereto, shall be paid by LESSEE within fifteen (15) days after LESSOR shall have submitted the statement without prejudice to any such written exception.

(i) **PRORATION.**  If the first year of the LEASE commences on any day other than January 1, or if the last year of the LEASE ends on any day other than December 31, any payment due LESSOR by reason of any Additional Rent or estimated installment thereof shall be justly and fairly provided. In the event LESSOR estimates Additional Rent will be payable by LESSEE at the end of the calendar year and subsequent to LEASE expiration, LESSOR may deduct such estimated sums from LESSEE's Security Deposit prior to return of same to LESSEE but such deduction shall not remove LESSEE's obligation to pay its Pro Rata Share of actuation Additional Rent once such determination is made. This covenant shall survive the expiration or termination of this LEASE.

**4.4 APPLICATION OF PAYMENTS FROM LESSEE**
LESSOR shall apply the receipt of payments from LESSEE in the following order: First, toward the payment of any interest charges accrued against LESSEE's account; Second, toward the payment of any late fees or legal expenses incurred by LESSOR for additional administrative costs to enforce the provisions of the LEASE; Third, toward the payment of LESSOR's reimbursable expenses including any sales or use taxes imposed; and finally, toward the payment of rent and any sales or use taxes imposed.

**4.5 SECURITY DEPOSIT.**
LESSEE, concurrently with the execution of this LEASE, acknowledges on deposit with LESSOR a Security Deposit in the amount of $6,275.91, as security for the full and faithful performance of every provision of this LEASE to be performed by LESSEE. If LESSEE Defaults with respect to any provision of this LEASE including but not limited to the provisions relating to the payment of Base Rent or Additional Rent, LESSOR, in its sole discretion, may elect to use, apply or retain all or any part of the Security Deposit for the payment of any Base Rent or Additional Rent or any other sum in Default or for the payment of any other loss or damage which LESSOR may suffer by reason of LESSEE's Default. If any portion of the Security Deposit is so used or applied, LESSEE shall, within five (5) days after written demand therefore, deposit cash with LESSOR in an amount sufficient to restore the Security Deposit to its original amount and LESSEE's failure to do so shall be a material breach of this LEASE. LESSOR shall not be required to keep the Security Deposit separate from its general funds and LESSEE shall not be entitled to interest on such deposit. If LESSEE shall fully and faithfully perform each provision of this LEASE to be performed by it, the Security Deposit or any unused balance thereof shall be returned to LESSEE within thirty (30) days following LEASE expiration and upon LESSEE's vacating the Premises and removing all of its property. The Security Deposit shall not constitute prepaid rent or liquidated damages but may be applied by LESSOR toward the payment of the last rentals due under the LEASE. LESSOR may transfer the Security Deposit to a transferee of LESSOR's interest in the Premises or the Shopping Center whereupon LESSOR shall be discharged from any further liability to LESSEE for the Security Deposit. This provision shall also apply to subsequent transfers.

**4.6 CONTRACTUAL SECURITY INTEREST.**
In addition to any security or lien interest arising out of operation of law or statute, LESSEE hereby gives LESSOR a valid Security Interest to secure payment of all rent and other charges for the entire term of this LEASE and any damages or losses suffered by LESSOR as a result of any Default in this LEASE by LESSEE. This Security Interest is upon all inventory, goods, wares, equipment, fixtures, furniture, improvements and other personal property of LESSEE presently in or which may hereafter be situated on the Premises and all proceeds therefrom. Such property shall not be removed from the Premises without the consent of LESSOR and until any and all sums due LESSOR shall be fully paid and discharged. LESSEE agrees, upon request of LESSOR, to execute a financing statement in the form acceptable to LESSOR in LESSOR's exclusive judgment, such as, but not limited to, a U.C.C. Form No. 1. If LESSEE fails to deliver said statement, LESSOR shall have the right to execute the form as LESSEE's attorney-in-fact. Notwithstanding the above, LESSOR will subordinate its security interest to LESSEE's nationally recognized equipment lender or other nationally recognized institutional lender for purposes of a business loan.

Notwithstanding the foregoing, any medical records, including patient's charts, test results and weight loss records are excluded from landlord's lien, whether pursuant to this paragraph or Florida Statutes 83.11

So long as LESSEE is not in Default under this LEASE, LESSEE is hereby authorized to sell or dispose of any inventory in the ordinary course of business or to sell and replace any equipment, fixtures or furniture when such replacement is made necessary by normal wear and tear or as a result of theft, damage or destruction. LESSEE is strictly prohibited from liquidating its inventory or disposing of all or substantially all of its personal property without the prior written consent of LESSOR.

3

X _MB_

**6.0 COMMON AREAS.**

**5.1 USE OF COMMON AREAS.**
The use and occupancy by LESSEE of the Premises shall include the use in common with others entitled thereto of the common areas, employee parking areas, service roads, loading stations, sidewalks and customer parking areas within the Shopping Center together with such other facilities as may be designated from time to time by LESSOR (collectively referred to as the "Common Areas") provided however, the use of the Common Areas by LESSEE shall be subject to the regulations of the use thereof as may be prescribed by LESSOR from time to time during the LEASE. LESSOR reserves the right to amend the Rules and Regulations from time to time, which amendment shall become effective upon delivery of a copy of same to LESSEE.

**5.2 MODIFICATION.**
The Common Areas are the private property of LESSOR and are at all times subject to the unrestricted control of LESSOR. Exhibit "A" sets forth the general layout of the Shopping Center and shall not be deemed to be a warranty, representation or agreement on the part of LESSOR that the Shopping Center will be or is exactly as indicated on said diagram. LESSOR may increase, reduce or change the number, dimensions or location of the walks, buildings and parking areas in any manner whatsoever LESSOR shall deem proper and reserves the right to make alterations or additions to the building which the Premises are contained and to add buildings adjoining the same or elsewhere in the Shopping Center. If the amount or type of such areas is diminished, increased or otherwise altered, LESSOR shall not be subject to any liability nor shall LESSEE be entitled to any compensation nor diminution nor abatement of rent nor shall the diminution, enlargement or alteration of such areas be deemed constructive or actual eviction.

**6.3 COST OF MAINTENANCE.**
LESSEE shall reimburse LESSOR for the cost of maintenance, operation and administration of the Common Areas as hereinbefore provided. The term "Shopping Center Operating Costs" shall mean the total cost and expenses incurred in connection with the normal administration, operation, preventative and corrective maintenance and repair of the Shopping Center whether paid to employees of LESSOR or parties engaged by LESSOR including without limitation; landscaping; building repairs; line painting; building painting; roof cleaning; roof repair; bumpering and top coating; lighting; electricity; sanitary control; removal of trash; rubbish; garbage and other refuse; depreciation or rental on machinery or equipment used in such maintenance; the cost of personnel to implement such services (including social security, unemployment and disability insurance); property owner association fees assessed to the Shopping Center; legal fees; management fee; together with casualty, liability, workmen's compensation and other insurance.

**6.0 SIGNS.**
LESSEE shall not place, erect or install any signs on any portion of the Premises nor allow to be erected or installed any signs, printed displays or show window lettering visible from outside the Premises without the prior written approval of LESSOR. Any permitted sign shall comply with sign guidelines and regulations which have been established by LESSOR and with all applicable ordinances of municipalities having jurisdiction. Within 30 days of LESSEE opening for business, LESSEE, at LESSEE's expense, shall install channel letter backlit signage conforming to the sign criteria reflected in Exhibit "G." LESSOR shall have complete authority over size, art work, design, color, taste, text and content of all signs, which authority may be reasonably exercised to deny use of any sign or proposed sign. All pylon signage, if provided, is in the exclusive control of the LESSOR. All signage must meet sign criteria set forth by the LESSOR. LESSEE's use of the pylon sign, if provided, shall not constitute a tenancy and may be terminated by LESSOR at any time and for any reason. If provided, pylon sign structures are to be constructed by LESSOR at LESSEE's prorated expense and LESSEE shall be financially responsible for any sign panels placed on said pylon sign. All such signs shall be maintained in a good and safe condition and appearance by LESSEE at its own expense. LESSEE shall repair any damage to the Premises, either inside or outside, resulting from the erection, maintenance or removal of said signs.

Notwithstanding the foregoing, the LESSEE shall have use of one of the two top panels on the center's monument sign.

**7.0 IMPROVEMENTS AND ALTERATIONS OF PREMISES BY LESSEE.**
LESSEE may, at any time during the LEASE, with the written consent of LESSOR, make improvements or alterations to the Premises as LESSEE may from time to time deem necessary or desirable provided however, LESSEE shall not have the right to make any improvement or alterations that affect the structure, structural strength or outward appearance of the Premises or the Shopping Center. LESSEE acknowledges that any changes or alterations to the Premises desired by LESSEE or required by governmental laws, for example the Americans with Disabilities Act (ADA), now or at any time during LESSEE's occupancy of the Premises, shall be at the LESSEE's sole cost and expense. LESSEE shall submit to LESSOR complete and detailed plans and specifications for such work at the time approval is sought. LESSOR may withhold approval in its reasonable discretion. Any approval granted by LESSOR is conditioned on LESSEE providing an executed memorandum of LEASE putting all construction on notice that LESSEE cannot subject the Premises to a lien. Any improvements or alterations made to the Premises shall be in compliance with all insurance requirements and regulations and ordinances of governmental authorities and shall, upon the expiration or sooner termination of the LEASE, become the property of LESSOR provided however, LESSOR may at its option, require LESSEE, at LESSEE's sole cost and expense, to remove any such improvements or alterations at the expiration or sooner termination of the LEASE and to repair any damages to the Premises caused by such removal.

The interest of LESSOR in the Premises and the Shopping Center is not subject to liens for improvements or alterations made by LESSEE. LESSEE shall comply with the Construction Lien Law of the State of Florida as set forth in Florida Statutes, Chapter 713. LESSEE will not create nor permit to be created nor remain as a result of any action of work done or contracted for by LESSEE, any lien, encumbrance or charge levied on account of any imposition or any mechanic's, laborer's or materialman's lien which might be or become a lien, encumbrance or charge upon the Premises, the Shopping Center, or any part thereof, or the income therefrom, whether or not the same shall have any priority or preference over or ranking on a parity with the estate, rights and interest of LESSOR in the Premises or the Shopping Center, or any part thereof, or the income therefrom, and LESSEE will not suffer any other matter or thing whereby the estate, rights and interest of LESSOR in the Premises or the Shopping Center, or any part thereof, might be impaired. Any mechanic's, laborer's or materialman's lien shall be discharged in accordance with the following provisions:

If any mechanic's, laborer's or materialman's lien shall at any time be filed against the Premises or the Shopping Center or any part thereof as a result of any action or work done on behalf of or contracted for by LESSEE, LESSEE, within fifteen (15) days after notice of the filing thereof, shall cause it to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If LESSEE shall fail to cause such lien to be so discharged within the period aforesaid, then in addition to any other right or remedy available to LESSOR, LESSOR may, but shall not be obligated to, discharge such lien either by paying the amount claimed to be due or by transferring same to security and in any such event, LESSOR shall be entitled, if LESSOR so elects, to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of any judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by LESSOR and all costs, expenses and fees including without limitation attorney's fees incurred by LESSOR in connection with any mechanic's, laborer's or materialman's lien, whether or not the same has been discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise, together with interest thereon at one and one-half percent (1½%) per month from the respective dates of LESSOR's making of the payments and incurring of the costs and expenses, shall constitute Additional Rent payable by LESSEE to LESSOR upon demand.

Nothing contained in the LEASE shall be deemed or construed in any way as constituting the consent or request of LESSOR, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any alteration, addition, improvement or repair to the Premises or the Shopping Center or any part thereof or as giving LESSEE any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials that would give rise to the filing of any lien against the Premises or the Shopping Center or any part thereof not to subject LESSOR's estate in the Premises or the Shopping Center or any part thereof to liability under the Construction Lien Law of the State of Florida in any way, it being expressly understood that LESSOR's estate shall not be subject to any such liability.

4

X _M.B._

Nothing contained in this paragraph, or the LEASE, shall authorize LESSEE to do any act which may create or be the foundation for any lien, mortgage or other encumbrance upon the reservation or other estate of LESSOR, or of any interest of LESSOR in the Premises, the Shopping Center, or in the Property or improvements thereof; it being agreed that should LESSEE cause any alterations, changes, additions, improvements or repairs to be made in the Premises, or cause materials to be furnished or labor to be performed therein, neither LESSOR nor the Premises shall, under any circumstances, be liable for the payment of any expenses incurred or for the value of any work done or material furnished to the Premises or any part thereof. LESSEE shall, upon request of LESSOR, deliver such documents as may be required by LESSOR in order to effectuate the lien protection required by this Section, all such alterations, changes, additions, improvements and repairs and materials and labor shall be at LESSEE's expense and LESSEE shall be solely and wholly responsible to contractors, laborers and materialmen furnishing labor and materials to the Premises, or any part thereof.  LESSEE shall inform every service or material provider of the foregoing provisions prior to contracting with any of them for goods or services.

## 7.1 IMPROVEMENTS AND ALTERATIONS.
LESSOR hereby reserves the right at any time and from time to time during the LEASE to make any additions, alterations, changes or improvements (including without limitation building additional stories) to the building in which the Premises are contained and to build additional structures adjoining thereto.  LESSOR also reserves the right to construct other buildings and improvements in the Shopping Center from time to time and at any time during the LEASE including multi-level parking facilities and to make alterations thereto and to build additional stores on any such buildings.

## 7.2 REPAIRS BY LESSOR.
LESSOR agrees to keep and maintain in good order and repair only the structural components of the roof, structural components and exterior walls (exclusive of all signs, doors, windows and glass, including plate glass) of the Premises except as to maintenance and repair relating to LESSEE's exterior signs.  If any such maintenance and repairs are caused in part or in whole by the act, neglect, failure or omission of any duty by LESSEE, its agents; servants; employees, invitees or any damage is caused by breaking and entering, LESSEE shall pay to LESSOR the actual cost of such maintenance and repairs.  LESSOR gives to LESSEE exclusive control of the Premises and shall be under no obligation to inspect the Premises.  LESSEE shall at once report in writing to LESSOR any known defective condition which LESSOR is required to repair pursuant to this section.  LESSEE's failure to report to LESSOR any such condition or defect shall make LESSEE responsible to LESSOR for any liabilities, costs, expenses, and attorneys' fees incurred by LESSOR as result of such defect.  LESSOR shall not be liable for any failure to make such repairs or to perform any maintenance unless such failure persists for an unreasonable time after written notice of the need of such repairs or maintenance is given to LESSOR by LESSEE.  Except as herein provided regarding casualty loss, there shall be no abatement of rent and no liability of LESSOR by reason of any injury to or interference with LESSEE's business arising from the making of any repairs, alterations or improvements in or to any portion of the Shopping Center or the Premises or in and to fixtures, appurtenances and equipment therein.  LESSEE waives the right to make repairs at LESSOR's expense under any law, statute or ordinance now or hereafter in effect.

## 7.3 REPAIRS BY LESSEE.
LESSEE shall, at its own cost and expense, keep and maintain the Premises and appurtenances thereto and every part thereof in good order and repair except portions of the Premises to be repaired by LESSOR pursuant to Section 7.2 hereof.  Without limiting the foregoing, LESSEE agrees to keep in good order and repair and to replace as needed all fixtures, pertaining to heating, air conditioning (including compressors, fans and ducts), ventilation, water, sewer, electrical and sprinkler systems and LESSEE shall be liable for any damage to such systems resulting from LESSEE's misuse.  LESSEE shall obtain at its expense a service contract for repairs and maintenance of the heating and air conditioning system that conforms to the warranty requirements of said system.  Notwithstanding the preceding, LESSOR reserves the right to contract for such services, on behalf of LESSEE, and LESSEE shall be responsible for reimbursing LESSOR immediately for expenses of said repairs/maintenance.  LESSEE agrees to return the Premises to LESSOR at the expiration or sooner termination of the LEASE in as good condition and repair as when first received, reasonable wear and tear and damage by fire or other insurable casualty excepted.  Following the expiration or earlier termination date of the LEASE and prior to return of LESSEE's security deposit, LESSEE shall furnish LESSOR with an inspection report from a HVAC maintenance vendor acceptable to LESSOR, that states the Premise's heating, ventilation and air conditioning systems are operating properly and have not suffered from neglect.  Failure by LESSEE to provide LESSOR with a HVAC inspection report or for the report to state that the Premise's heating, ventilation and air conditioning systems have been damaged as a result of neglect shall result in LESSOR applying part or all of LESSEE's Security Deposit to obtain the inspection report or repair any damage, which repair may include replacement of equipment if the report so recommends, to the heating, ventilation or air conditioning systems.  All damage or injury to the Shopping Center, Premises, adjacent premises, the building, canopies, or the Common Areas caused by the act or negligence of LESSEE, its agents, employees, licensees, invitees or by visitors shall be promptly repaired by LESSEE at its sole cost and expense and to the satisfaction of LESSOR.  LESSOR may make such repairs which are not promptly made by LESSEE and charge LESSEE for the cost thereof and LESSEE hereby agrees to pay such amounts on demand as Additional Rent hereunder.

## 7.4 RUBBISH REMOVAL.
LESSEE shall keep the Premises clean, both inside and outside and will remove all refuse from the Premises.  LESSEE shall not burn any materials or rubbish of any description upon the Premises or Common Areas.  LESSEE agrees to keep all accumulated rubbish in covered containers and to have same removed regularly.  In the event LESSEE fails to keep the Premises and other portions heretofore described in the proper condition, LESSOR may cause the same to be done for and on account of LESSEE and LESSEE hereby agrees to pay the expense thereof on demand as Additional Rent.

## 7.5 SIDEWALKS.
LESSEE shall neither encumber nor obstruct the sidewalks adjoining the Premises nor allow the same to be obstructed or encumbered in any manner.  LESSEE shall not place or cause to be placed any merchandise, signs, vending machines or anything else on sidewalk or exterior of the Premises without prior written consent of LESSOR.

## 8.0 UTILITIES.
LESSEE shall pay the cost of water/sewer, gas, electricity, fuel, light, heat, power, telephone, cable and all other utilities furnished to the Premises or used by LESSEE in connection therewith, whether such utility costs are determined by separate metering or are billed by LESSOR to LESSEE as Additional Rent for LESSEE's proportionate share of the utility costs.  LESSEE shall not install any equipment nor shall LESSEE use the Premises in a manner that will exceed or overload the capacity of any utility facilities.  If LESSEE's use of the Premises shall require additional utility facilities, the same shall be installed only after obtaining LESSOR's written approval (which may be withheld in LESSOR's absolute discretion) and shall be installed at LESSEE's expense and in accordance with plans and specifications approved in writing by LESSOR.  If LESSEE's use or occupancy of the Premises results in an increase to LESSOR of any utilities expense or connection or user fees or charges for increased usage or capacity or assessments of any kind whatsoever, LESSEE shall pay the entire amount thereof within ten (10) days of LESSOR's written demand.  In no event shall LESSOR be liable for any interruption or failure in the supply of utilities to the Premises.  The initial monthly contribution during this calendar year for the payment of water and sewer charges attributable to water and sewer usage at the Premises shall be $110.67 plus all applicable sales tax due thereon per month, which sum may vary during subsequent years.

## 9.0 PERSONAL PROPERTY TAXES.
LESSEE shall pay, prior to delinquency, all taxes, both real and personal assessed against or levied upon the Premises and upon its fixtures, signs, furnishings, equipment, leasehold improvements and all other personal property of any kind owned by or used in connection with the Premises by LESSEE.  In the event any of LESSEE's leasehold improvements, equipment, furniture, fixtures and other personal property shall be assessed and taxed with the real property, LESSEE shall pay to LESSOR the full amount of such taxes applicable to LESSEE's property within ten (10) days after delivery of LESSEE by LESSOR of a statement in writing

5



setting forth the amount of such taxes applicable to LESSEE's property. LESSOR maintains the right but not the obligation to pay said taxes for the benefit of LESSEE and considers same as Additional Rent due under this LEASE.

## 10.0 INSURANCE.

### 10.1 LIABILITY INSURANCE.

LESSEE shall carry at its own expense Comprehensive General Public Liability and Property Damage Insurance with combined single limits of not less than $1,000,000 with insurance companies authorized to do business in Florida and satisfactory to LESSOR, insuring LESSOR, LESSOR'S AGENT and LESSEE against any and all areas appurtenant thereto including loss of income. Upon written request by LESSOR, LESSEE shall also insure any holder of a first mortgage on the Premises, against any liability arising out of the ownership, use, occupancy or maintenance of the Premises, including loss of income, and LESSEE shall also maintain such Workmens Compensation coverage in full force and effect as may be required under Florida law. The insurance policy or policies shall contain provisions prohibiting the modification or cancellation of insurance without at least thirty (30) days prior written notice to LESSOR. LESSEE shall deliver said policies or certificates thereof to LESSOR prior to LESSEE's occupancy of the Premises and thereafter, renewal policies or certificates shall be delivered to LESSOR not less than thirty (30) days prior to the expiration of the policies of insurance. The limit of any such insurance shall not however, limit the liability of LESSEE hereunder. LESSEE may provide this insurance under a blanket policy provided said insurance shall have a LESSOR's protective liability endorsement attached thereto. The failure of LESSEE either to effect said insurance in the names herein called for or to pay the premiums required or to deliver said policies or certificates to LESSOR shall be a Default under this LEASE and LESSOR shall have all remedies available to it as stated within Section 16.1.

### 10.2 PROPERTY INSURANCE.

LESSEE shall obtain and also pay for and maintain, in full force and effect during the LEASE, a standard form policy of fire insurance with standard form of extended coverage endorsement covering the fair market value of all stock and trade, trade fixtures, equipment and other personal property located in the Premises and used by LESSEE in connection with its business. LESSEE shall replace, at its sole cost and expense, all plate and other glass damaged or broken from any cause whatsoever in and about the Premises. LESSEE shall procure and maintain, at its own expense, insurance covering all plate and other glass damaged or broken from any cause whatsoever in and about the Premises for and in the name of the LESSOR. LESSEE shall deliver certificates of such insurance to LESSOR as provided in the first section of this Article.

### 10.3 SUBROGATION.

As long as their respective insurers so permit, LESSOR and LESSEE hereby mutually waive their respective rights of recovery against each other to the extent of losses covered by insurance for any loss insured by fire, extended coverage and other property insurance policies existing for the benefit of the respective parties. Each party shall apply to their insurers to obtain said waivers and each party shall obtain any special endorsements if required by their insurer to evidence compliance with the aforementioned waiver.

## 11.0 INDEMNIFICATION.

### 11.1 LIMITED LIABILITY.

LESSOR or its agents shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the building or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other place resulting from dampness or any other cause whatsoever unless caused by or due to the gross negligence or willful misconduct of LESSOR, its agents, servants, or employees. LESSOR or its agents shall not be liable for interference with the light, air or for any latent defect in the Premises. LESSOR shall not be liable for any such damage caused by other lessees of the Shopping Center or persons in or about the Premises or the Shopping Center, occupants of adjacent property or the public by operations in construction of any private, public or quasi-public work. All property of LESSEE kept or stored on the Premises shall be so kept or stored at the risk of LESSEE only and LESSEE shall hold LESSOR harmless from any claims arising out of damage to the same including SUBROGATION claims by LESSEE's insurance carrier unless such damage shall be caused by the willful act or gross neglect of LESSOR. LESSEE acknowledges that the police and law enforcement security protection provided by law enforcement agencies for the Premises is limited to that provided to other businesses or enterprises situated in Sarasota County, and any special security measures deemed necessary for additional protection of the Premises shall be at the sole responsibility and expense of LESSEE. LESSEE agrees to look solely to LESSOR's estate and property in the Shopping Center, or the proceeds thereof, for the satisfaction of LESSEE's remedies for the collection of a judgment or other judicial process requiring the payment of money by LESSOR in the event of any Default by LESSOR, and no other property or assets of LESSOR shall be subject to levy, execution or other enforcement procedure for the satisfaction of LESSEE's claims.

### 11.2 INDEMNIFICATION.

LESSEE shall indemnify and hold harmless LESSOR against and from any and all claims arising from LESSEE's use of the Premises or from the conduct of its business or from any activity, work or other things done, permitted or suffered by LESSEE in or about the Premises and shall further indemnify and hold harmless LESSOR against and from any and all claims arising from any breach or Default in the performance of any obligation on LESSEE's part to be performed under the terms of this LEASE or arising from any act or negligence of the LESSEE or any officer, agent, employee, guest or invitee of LESSEE and from all costs, attorney's fees, whether at trial or on appeal and liabilities incurred in or about the defense of any such claim or any action or proceedings brought thereon. If any action or proceeding is brought against LESSOR by reason of such claim, LESSEE, upon notice from LESSOR, shall defend the same at LESSEE's expense by counsel reasonably satisfactory to LESSOR. LESSEE, as a material part of the consideration to LESSOR, hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause other than LESSOR's gross negligence or wilful misconduct and LESSEE hereby waives all claims in respect thereof against LESSOR. LESSEE shall give prompt notice to LESSOR in case of casualty or accidents in the Premises.

## 12.0 DAMAGE OR DESTRUCTION.

If the Premises or the building of which the same are a part are damaged by fire or other insured casualty and the insurance proceeds have been made available therefore by the holder(s) of any mortgages covering the Premises, the damage shall be repaired by and at the expense of LESSOR to the extent of such available insurance proceeds provided such repairs can, in LESSOR's sole opinion, be made within one-hundred and twenty (120) days after the occurrence of the casualty without the payment of overtime or other premiums. Until such repairs are completed, the Base Rent and Additional Rent shall be abated in proportion to that part of the Premises which is unusable by LESSEE in the conduct of its business, as determined in the sole discretion of LESSOR. If the damage is due to the fault or neglect of LESSEE or its employees, contractors, agents or invitees, there shall be no abatement of Base Rent or Additional Rent. If the Premises are damaged as a result of any cause not covered by fire and extended coverage insurance or if the insurance proceeds have not been made available to it if in LESSOR's opinion the repairs cannot be made within one hundred-twenty (120) days, either party shall have the option of giving Notice to the other of anytime within one hundred-twenty (120) days after such damage, to terminate this LEASE as of the date specified in such Notice which date shall be no more than thirty (30) days after the giving of such Notice. In the event of giving such Notice, this LEASE shall expire and all interest of the LESSEE in the Premises shall terminate on the date so specified in such Notice and the Base Rent and Additional Rent shall only be paid to the date of said termination.

Notwithstanding anything to the contrary contained in this Article, LESSOR shall not have any obligation whatsoever to repair, reconstruct or restore the Premises when the damage resulting from any casualty covered under this Article occurs during the last twelve (12) months of the LEASE or any extension thereof.

Except as provided in this Article, there shall be no abatement of rent and no liability of LESSOR by reason of injury to or interference with LESSEE's business or property arising from the making of any repairs, alterations or improvements in or to any

6

X [signature]

portion of the building or the Premises or to fixtures, appurtenances and equipment therein. LESSEE understands and agrees LESSOR shall have no obligation to carry insurance of any kind on LESSEE's furniture and furnishings or on any fixtures or equipment removable by LESSEE under the provisions of this LEASE and LESSOR shall not be obligated to make any repairs thereto or to replace the same.

**13.0 CONDEMNATION.**
If the whole of the Premises or so much thereof as to render the balance unusable by LESSEE shall be taken under power of eminent domain or otherwise transferred in lieu thereof, this LEASE shall automatically terminate as of the date of such condemnation authority or taking whichever is later. No award for any total or partial taking shall be apportioned and LESSEE hereby assigns to LESSOR any award which may be made in such taking in condemnation together with any or all rights of LESSEE nor or hereafter arising in or to the same or any part thereof provided however, nothing contained herein shall be deemed to give LESSOR any interest in or require LESSEE to assign to LESSOR any award made to LESSEE for the taking of personal property as provided hereunder or the interruption of or damage to LESSEE's business. In the event of a partial taking which does not result in the termination of this LEASE, the Base Rent shall be apportioned according to the part of the Premises remaining usable by LESSEE.

**14.0 ASSIGNMENT AND SUBLETTING.**
LESSEE shall not, either voluntarily or by operation of law, sell, assign, hypothecate or transfer this LEASE or sublet the Premises or any part thereof or permit the Premises or any part thereof to be used for any purpose other than as set forth in Section 2 hereof. Unless approved in writing by LESSOR, such approval not to be unreasonably withheld, any sale, assignment, mortgage, transfer or subletting of this LEASE or the Premises or any parts hereof or thereof contrary to the provisions of this Article shall be void and shall, at the option of LESSOR, constitute a Default under the LEASE. If LESSEE is a corporation, any merger, consolidation or liquidation or any change in ownership or power to vote of thirty percent (30%) or more of the total outstanding stock ownership shall constitute an assignment under this LEASE. Assignment approval of the LEASE by LESSOR shall be conditioned on the reimbursement to LESSOR for expenses, which shall not be less than five hundred dollars ($500.00), incurred in LESSOR's review of the documents effecting assignment and on ASSIGNEE's assumption of payment responsibility for Base Rent, Percentage Rent and Additional Rent, as defined in this Lease. The current LESSEE shall be liable for any partial or estimated payment toward future payment of Additional Rent following determination by LESSOR of the actual Pro Rata charges due from the Premises for the LEASE year during which the LEASE assignment occurred. Notwithstanding the foregoing, Lessee may sublet not more than 40% of the premises, so long as they continue to occupy at least 60% of the premises so long as the use of such sublet is approved by LESSOR which approval will not be unreasonably withheld.

In the event that the rental due and payable by a sublessee (or a combination of the rental payable under such sublease plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this lease, or if with respect to a permitted assignment, permitting license or other transfer to LESSEE by LESSOR, the consideration payable to LESSEE by the assignee, licensee, or other transferee exceeds the rental payable under this lease, then LESSEE shall be bound and obligated to pay LESSOR all such excess rental and other excess consideration within ten (10) days following receipt thereof by LESSEE from such sublessee, licensee, or other transferee, as the case may be.

Additionally, LESSOR acknowledges that LESSEE has executed a conditional assignment of lease to its franchisor, US Medical Care Holdings, LLC and, therefore, agrees that said entity may become an assignee of the Lease pursuant to the terms of the collateral assignment and the underlying franchise agreement between the LESSEE and US Medical Care Holdings, LLC; however, LESSEE will not be relieved of liability under the Lease in the event of such assignment.

**15.0 SUBORDINATION.**
This LEASE is subject and subordinate to any and all mortgages or deeds of trust now existing or which may hereafter be executed covering the Premises or the real property of which the same are a part or any leasehold estates affecting the same for the full amount of all advances made or to be made thereunder together with interest thereon and without regard to the time or character of such advances and all renewals, modifications, spreaders, consolidations, replacements, further advances and extensions of such mortgages, deeds of trust or leasehold estates. As such, LESSEE hereby recognizes that LESSOR's mortgagee shall have the right to accept or reject this LEASE and any amendments thereto. LESSEE agrees to execute, acknowledge and deliver upon request, any and all documents or instruments requested by LESSOR to evidence the subordination of this LEASE to any such mortgage, deeds of trust or leasehold estates provided the holder for any such mortgage, deed of trust or leasehold estate agrees in the event of foreclosure or other action taken by its holder thereof, this LEASE and the rights of LESSEE shall not be disturbed but shall continue in full force and effect for so long as LESSEE is not in Default hereunder further provided however, the holder of such mortgage, deed of trust or leasehold estate shall not be liable for any accrued obligation of LESSOR or for any act or omission of LESSOR, whether prior to or after such holder becoming the owner of the Premises and such holder shall not be subject to any offsets or to counterclaims which shall have accrued to LESSEE against LESSOR prior to the date upon which such holder becomes the owner of the Premises, other than rights of offset accruing to the LESSEE against LESSOR arising out of LESSEE curing Default of the LESSOR with respect to the LESSOR's obligations to maintain and repair the improvements located upon the Property. LESSEE agrees to give any mortgagees prompt written Notice of Default by LESSOR under the LEASE with respect to its maintenance and repair obligations. LESSEE hereby agrees to attorn to any person, firm or corporation purchasing or otherwise acquiring the Premises at any sale or other proceedings or pursuant to the exercise of any rights, powers or remedies under such mortgages or deeds of trust or leasehold estate as if such person, firm or corporation had been named as LESSOR herein. LESSEE agrees to execute, acknowledge and deliver in recordable form to any proposed mortgage or purchaser or to LESSOR or to such other person designated by LESSOR, a certificate certifying (if such be the case) this LEASE is in full force and effect and there are no defenses or offsets thereto (or if LESSEE claims any defenses or offsets, stating those claimed by LESSEE); LESSEE has accepted possession of the Premises in the condition it exists as of the date of such certificate and LESSEE agrees to notify any proposed mortgagee or purchaser of any Default by LESSOR hereunder which would entitle LESSEE to cancel this LEASE or abate the rents, additional rents or other sums payable hereunder and agreeing that notwithstanding any provision hereof to the contrary, no Notice of Cancellation shall be effective unless any proposed mortgagee or purchaser shall have received Notice of the Default giving rise to such cancellation and shall have failed within sixty (60) days after receipt of such notice to cure such Default or if such Default cannot be cured within sixty (60) days, shall have failed within sixty (60) days after the receipt of such Notice to commence and to thereafter diligently pursue any action necessary to cure such Default. It is expressly understood and agreed any such statement may be relied upon by any prospective purchaser or encumbrancer of all or any portion of the real property of which the Premises are a part. LESSEE's failure to deliver such statement within ten (10) days after LESSOR's written request therefore shall be conclusive upon LESSEE that this LEASE is in full force and effect without modification except as may be represented by LESSOR and there are no uncured Defaults in LESSOR's performance hereunder. LESSEE hereby appoints LESSOR the attorney-in-fact of LESSEE irrevocable to execute and deliver any document or documents provided for herein for and in the name of LESSEE.

**16.0 DEFAULT.**

**16.1 DEFAULT.**
If LESSEE shall fail: (a) to pay the Base Rent or Additional Rent or any other item to be paid by LESSEE hereunder within five (5) days due or; (b) to perform any other term, covenant, or condition of this LEASE and such failure shall not have been cured or commenced to be cured to the satisfaction of LESSOR within five (5) days after written Notice thereof by LESSOR to LESSEE or; (c) to continuously operate its business, or if LESSEE vacates or abandons the Premises or (d) to use and occupy the Premises as specifically set forth in Paragraph 3.0 of this LEASE or; (e) to open within ninety (90) days after the commencement date as set forth in Paragraph 2.1, LESSOR may, at its option, declare LESSEE to be in Default hereunder and thereupon LESSOR shall be entitled, without further Notice, to exercise any one or more of the remedies provided herein or permitted by law. LESSEE and Guarantor, if any, waive their right to any statutory notice under Chapter 83, Florida Statutes, specifically including, but not limited to Section 83.20. Additionally, the making by LESSEE of any general assignment or general arrangement for the benefit of creditors, or the

7

X

filing by or against LESSEE of a petition to have LESSEE adjudged a bankrupt, or a petition or reorganization or arrangement under any law relating to bankruptcy; or the appointment of a trustee or a receiver to take possession of substantially all the LESSEE's assets located on the Premises or LESSEE's interest in the LEASE, where possession is not restored to LESSEE within thirty (30) days; or the attachment, execution or other judicial seizure of substantially all of LESSEE's assets located on the Premises or of LESSEE's interest in the LEASE, where such seizure is not discharged within thirty (30) days shall also constitute a Default by LESSEE. Upon Notice of Default or the performance of any term, covenant or condition of this LEASE, other than the payment of Base Rent or Additional Rent, LESSEE agrees to cure or proceed with due diligence to cure such Default within five (5) days of the Notice. If LESSEE shall fail to do so, LESSOR may, at its option, cure the Default in which case all costs and expenses, including reasonable attorney's fees, incurred by LESSOR, together with interest at one and one-half percent (1½%) per month shall be deemed to be Additional Rent to be paid by LESSEE, said payment due on the next regular Base Rent payment date.

In the event of Default, LESSOR may immediately or any time thereafter, and without further Notice or demand, reenter and take possession of the Premises and remove all persons and property therefrom as provided below and at that time or any time thereafter at its option terminate this LEASE and LESSOR, at its option, shall thereupon be entitled to recover from LESSEE the present value, at the time of such termination, and the excess, if any, of the amount of Base Rent, Additional Rent and charges equivalent to rent reserved in this LEASE for the balance of the LEASE over the reasonable rental value of the Premises for the same period. LESSOR may elect to reenter and take possession of the Premises without terminating this LEASE and if such election is made, LESSOR may at its sole option, relet the Premises or any part thereof for such term or terms, which may be for a term extending beyond the term of the LEASE, at such rental or RENTALS and upon such other terms and conditions as LESSOR in its discretion may deem advisable, with the right to make alterations and repairs to the Premises. Upon any reletting, LESSOR shall receive and collect the rents therefor, applying the same first to the payment of such expenses as LESSOR may have paid, assumed or incurred in recovering possession of the Premises, including costs, expenses and attorney's fees and for placing the same in good order and condition or repairing or altering the same for reletting and all other expenses, commissions and charges paid, assumed or incurred by LESSOR in or about reletting the Premises and then to the fulfillment of the obligations of LESSEE. LESSOR agrees to act reasonably to mitigate LESSEE's damages but shall not be required to initiate or pursue reletting of the Premises. In any event and whether or not the Premises or any part thereof is relet, LESSEE shall pay to LESSOR all such amounts required to be paid by LESSEE up to the time of reentry by LESSOR and thereafter LESSEE shall, if required by LESSOR, pay to LESSOR until the end of the LEASE an equivalent amount of all Base Rent and Additional Rent and other charges required to be paid by LESSEE under the terms hereof, less the avails if any, of such reletting after payment of the expenses of LESSOR as aforesaid and the same shall be due and payable on the first day of each calendar month during the balance of the LEASE. In the alternative, LESSOR may, without reentering and taking possession of the Premises, declare the entire remaining Base Rent and Additional Rent and charges equivalent to rent to be immediately due and payable and shall be entitled to recover from LESSEE the amount of Base Rent and Additional Rent and charges equivalent to rent reserved in this LEASE for the balance of this LEASE. In the event LESSOR elects to mitigate its damages, no amounts shall be due LESSEE should proceeds from reletting exceed LESSEE's rent due under this LEASE.

Upon Default and in addition to any other rights or remedies which LESSOR may have, if LESSOR has elected to reenter, LESSOR may remove all persons and property from the Premises and dispose or discard such property in any manner whatsoever, including being stored in a public warehouse or elsewhere at the cost of and for the account of LESSEE, all without service of additional Notice to LESSEE or any person claiming an interest in such property or resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby.

## 16.2 RIGHTS AND REMEDIES.
The various rights and remedies granted to LESSOR may be exercised concurrently and shall be cumulative and in addition to any others LESSOR may be entitled to by law and the exercise of one or more rights or remedies shall not impair LESSOR's right to exercise any other right or remedy. The failure or forbearance of LESSOR to enforce any right or remedy in connection with any Default shall not be deemed a waiver of such Default nor a consent to a continuation thereof nor waiver of the same Default at any subsequent date.

Any waiver of rights by LESSOR may be in writing and shall apply only to that written waiver and shall not have general or prospective application. LESSOR may, at its option, accept partial payments of Base Rent or Additional Rent without waiving any rights concerning the existence of any monetary or non-monetary Default condition under this LEASE, which Default condition shall serve and continue unaffected by receipt of any such payment.

## 16.3 WAIVER OF JURY.
If LESSOR shall acquire possession of the Premises by summary proceedings, or in any other lawful manner without judicial proceedings, it shall be deemed a re-entry within the meaning of that word as used in this LEASE. If LESSOR commences summary proceedings or other action for nonpayment of rent or other charges provided for in this LEASE, LESSEE shall not interpose any counterclaim of any nature or description in such proceedings or action, except a "Permitted Counterclaim", as hereinafter defined. LESSEE and LESSOR both waive trial by jury of any or all issues arising in any action or proceedings between the parties hereto or their successors, under or connected with this LEASE or any of its provisions.

If, at least sixty (60) days prior to receiving written notice ("LESSOR's Notice") that LESSEE is or will be in Default in any respect(s) under this LEASE, LESSOR receives, by registered or certified mail, return receipt requested, notice from LESSEE ("LESSEE's Notice") stating that LESSOR is or will be in Default under this LEASE for failure to comply with any specified obligation(s), and if any matter referred to in LESSOR's Notice becomes the subject of litigation in which LESSOR seeks against LESSEE summary proceedings or other action for nonpayment of rent or other charges, then a counterclaim based exclusively on LESSOR's failure to comply with such obligation(s) will constitute a Permitted Counterclaim.

LESSOR shall not be in default in the performance of any of its obligations contained in this LEASE unless and until LESSOR shall have failed to perform such obligation within ninety (90) days (with such additional time as is reasonably required to correct any such default) after written notice by LESSEE to LESSOR properly specifying why LESSOR has failed to perform any such obligation. Provided further that LESSEE shall be excused for the period of any delay, and shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this LEASE and prevent it from doing so by cause or causes beyond the LESSOR's control, which shall include, without limitation, all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any material or services, acts of God or any other cause, not within the reasonable control of the LESSOR.

The term "LESSOR" used in this LEASE shall only mean the owner or mortgagee in possession for the time being of the building in which the Premises are located. It is specifically understood and agreed that there shall be no personal liability of LESSOR with respect to any of the covenants, conditions and provisions of this LEASE. In the event of a breach or default by the LESSOR of any of its obligations under the LEASE, LESSEE shall look solely to the equity of the LESSOR in the shopping center for satisfaction of any judgment obtained by LESSEE against LESSOR and neither the LESSOR nor any of its officers or directors, or agents, shall be liable for or have any liability for any amounts whatsoever, including any deficiencies.

Any counterclaim brought herein by LESSEE shall not excuse payment of rent to LESSOR as set forth by Chapter 83, Florida Statutes.

## 17.0 ACCESS BY LESSOR.
LESSOR and its agents shall have the right to enter the Premises at all reasonable times for the purpose of examining or inspecting the same, showing the same to prospective purchasers or lessees of the Shopping Center and making such alterations, repairs, improvements or additions to the Premises or the Shopping Center of which they are a part as LESSOR may deem necessary or desirable. For the purposes of constructing and maintaining improvements and/or making alterations, Lessee's located above

B.

✕ MB

and/or adjacent to the LESSEE's Premises shall be granted access to LESSEE's Premises as may be necessary for said purposes. Nothing herein contained however, shall be deemed or construed to impose upon LESSOR any obligations, responsibility or liability whatsoever, for the care, maintenance or repair of the Premises or the Shopping Center of which they are a part or any part thereof except as otherwise herein specifically provided. During the last six (6) months of the LEASE, LESSOR shall have the right to place upon the Premises the usual Notices indicating the Premises to be for lease or sale and LESSEE shall not interfere with such Notices. LESSOR may enter the Premises whenever reasonably necessary or in the case of an emergency.

**18.0 SALE BY LESSOR.**
In the event of any transfer or transfers of LESSOR's interest in the Premises or the Shopping Center, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of LESSOR occurring from and after the date of such transfer provided however, any funds in the hands of LESSOR at the time of such transfer, in which LESSEE has an interest, shall be turned over to the transferee and any amounts then due and payable to LESSEE by LESSOR under any provisions of this LEASE shall be paid to LESSEE, it being intended hereby that the covenants and obligations contained in this LEASE on the part of LESSOR shall, subject as aforesaid, be binding on LESSOR, its successors and assigns only during their respective successive periods of ownership. LESSEE agrees to look solely to LESSOR's estate and property in the Shopping Center or the proceeds thereof for the satisfaction of LESSEE's remedies for the collection of a judgment or other judicial process requiring the payment of money by LESSOR in the event of any Default by LESSOR hereunder and no other property or assets of LESSOR shall be subject to levy, execution or other enforcement procedure for the satisfaction of LESSEE's claims. LESSEE shall, upon request by LESSOR, provided an estoppel certificate to LESSOR in such form as LESSOR may reasonably request. LESSEE shall execute an estoppel notice within ten (10) days of receiving notice from LESSOR.

**19.0 SURRENDER OF PREMISES.**
At the expiration or termination of this LEASE, LESSEE shall surrender the Premises to LESSOR broom clean and in as good a condition and repair as reasonable and proper. If not then in Default, LESSEE shall, except as provided in Section 7.0 hereof, have the right at the end of the LEASE to remove any equipment, furniture, trade fixtures or other personal property placed in the Premises by LESSEE provided LESSEE promptly repairs any damage to the Premises of the Shopping Center caused by such removal. Any liability of LESSEE hereunder shall survive termination of this LEASE, whether by expiration of the LEASE, eviction or otherwise. If LESSEE fails to remove any property belonging to it within thirty (30) days of LESSOR's Notice to remove such property or subsequent to a court order directing such removal, all such property shall be deemed abandoned by LESSEE and shall become the property of LESSOR and LESSOR shall dispose of the property as it sees fit in its sole discretion and shall not be obligated or liable to LESSEE for said property.

**20.0 NOTICES.**
Any Notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery or by mail and if given by mail should be deemed sufficiently given three (3) days following the date transmitted by registered or certified mail, postage prepaid, return receipt requested, addressed to LESSEE or to LESSOR at the address noted on the first page hereof. Either party may, by Notice to the other, specify a different address for Notice purposes. Notwithstanding the foregoing, upon LESSEE's taking possession of the Premises, the Premises shall constitute LESSEE's address for Notice purposes. A copy of all Notices required or permitted to be given to LESSOR shall be concurrently transmitted to such party or parties at such address as LESSOR may from time to time hereafter designate by Notice to LESSEE.

**21.0 INABILITY TO PERFORM.**
This LEASE and the obligations of LESSEE hereunder shall not be affected or impaired because LESSOR is unable to fulfill any of its obligations hereunder or is delayed in doing so if such inability or delay is caused by reason of strike or other labor troubles, civil commotion, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material, service or financing, energy shortage, acts of God or by any other causes beyond the control of LESSOR. If LESSOR is unable to give possession of the Premises to LESSEE within one (1) year from the date hereof, this LEASE may be terminated by the LESSOR, by reason thereof, and neither party shall be subject to any liability therefore except LESSOR shall return to LESSEE all monies which LESSOR has heretofore received from LESSEE.

**22.0 ADVERTISING AND PROMOTION FUND.  INTENTIONALLY DELETED**

**23.0 RULES AND REGULATIONS.**
LESSOR reserves the right to make, and LESSEE and/or its related entities hereby agrees to comply, with the Rules and Regulations with respect to the parking area, ground and the building of which the Premises are a part, including but not limited to the following:

(a) To continuously during the full term of this LEASE beginning with the Lease Term hereof and every extension hereof keep the entire Premises occupied and open for business during the hours hereinafter specified.

(b) To load and unload goods only at such times, in such areas through such entrances as may be designated for such purposes by LESSOR. Trailers or trucks shall not be permitted to remain parked overnight in any area of the Shopping Center, whether loaded or unloaded.

(c) To keep all garbage and refuse in the kind of container specified by LESSOR and to place the same outside of the Premises, prepared for collection in the manner and at the times and places specified by LESSOR and in accordance with municipal regulations.

(d) To keep the outside areas immediately adjoining the Premises clean and not to burn, place or permit any rubbish, obstruction or merchandise in such areas.

(e) To keep the Premises clean, orderly, sanitary and free from objectionable odors and from insects, vermin and other pests.

(f) To warehouse, store and/or stock in the Premises only such goods, wares and merchandise as LESSEE intends to offer for sale at retail at, in, from or upon the Premises. This shall not preclude occasional emergency transfers of merchandise to the other stores of LESSEE if any, not located in the Shopping Center. LESSEE shall use for office, clerical or other non-selling purposes only such space in the Premises as is from time to time reasonably required by LESSEE's business in the Premises.

(g) Not to use or operate any machinery that, in LESSOR's opinion, is harmful to the building or disturbing to other tenants in the Shopping Center of which the Premises are a part nor shall LESSEE use any loud speakers, televisions, phonographs, radios or other devices in a manner so as to be heard or seen outside of the Premises nor display merchandise on the exterior of the Premises either or sale or for promotion purposes.

(h) Not to create or maintain nor allow others to create or maintain, any nuisances, including without limiting the foregoing general language, loud noises, sound effects, bright lights, changing, flashing, flickering or lighting devices or similar devices, smoke or dust, the effect of which will be visible from the exterior of the Premises.

(i) Not to conduct any auction, fire, bankruptcy or selling-out sale on or about the Premises.

(j) Not to conduct any other business or enterprise within five (5) miles of the Premises during the term hereof.

9

X MB

(k)  LESSEE agrees to keep its windows, in the Premises, illuminated and its signs and exterior lights well lighted everyday during the term of this LEASE from dusk to at 11:00 p.m. excluding Sundays and holidays.  LESSEE agrees that its store shall open for business by at least 10:00 a.m. and remain open for business until at least 4:00 p.m. Monday through Friday. In the event LESSEE fails to maintain store operating hours in accordance with this Paragraph, LESSEE agrees to pay, as Additional Rent, $100.00 per day until LESSEE operating hours are in accordance with the provisions of this Paragraph.

(l)  LESSOR agrees to furnish LESSEE a key without charge at the beginning of the Lease term.  LESSEE may change locks upon occupancy, but will maintain any master keying system.  LESSEE shall not install additional locks on doors without prior written consent of LESSOR.  LESSEE shall not make or cause to be made duplication of keys procured from LESSOR without prior written approval of LESSOR.  All keys to the Leased Premises shall be surrendered to LESSOR upon termination of this Lease.

(m)  LESSEE shall not conduct or permit any frying, grilling or broiling in the business operation.  Any LESSEE permitted by LESSOR to conduct cooking on the Premises shall be required to have proper fire preventative hood system and must install a grease trap and provide evidence of a monthly service agreement on said grease trap.  If the grease trap is not being properly maintained, LESSOR reserves the right to maintain at LESSEE's expense.  In addition, all exhaust hood systems need to be cleaned regularly to minimize grease/oil build-up and said systems must be equipped with a catch basin to collect any excess grease.

(n)  All owners/employees shall only park in areas designated by LESSOR as owner/employee parking areas in order to allow for acceptable spaces for the general public and to encourage retail sales.  LESSEES who fail to comply with this designated parking regulation are deemed in default of this lease agreement.  LESSOR reserves the right to assess LESSEE a charge of twenty-five dollars ($25.00) per day, or any part thereof, when LESSEE, or LESSEE's employees, use parking not designated by LESSOR.  All vehicles owned or used by LESSEE, or LESSEE's employees, must be currently licensed and operable, with no flat tires, capable of being started by internal battery capacity, and movable by the vehicle's own engine and drive train.  Vehicles not conforming to the aforesaid requirements may be removed by LESSOR, without notice, with the cost of such removal to be paid by LESSEE.  Any signage displayed on operable vehicles  is restricted to a size which does not require the issuance of a permit by government authorities for use.

LESSOR shall be allowed to promulgate any and all additional rules and regulations as it deems appropriate for the shopping center which shall be in writing and delivered to LESSEE and which shall thereafter be part of the terms and provisions of the LEASE.

## 24.0 ATTORNEY'S FEES.
LESSEE shall be liable for and shall pay LESSOR for the expense of LESSOR's attorney's fees for any legal matter, including non-adjudicated matters like the preparation of a notice of default under this LEASE, dispute, action or proceeding commenced by LESSOR to enforce LESSEE's obligations under this LEASE provided, however, in the event such action or proceeding is adjudicated, the non-prevailing party shall be liable for and shall pay the expense of the prevailing party's attorney's fees and court costs, including any fees and costs arising from proceedings to determine the reasonableness of fees and costs to be awarded to the prevailing party. If either party hereto without fault is made party to any litigation instituted by or against any other party to this LEASE, such other party shall indemnify and hold harmless LESSOR or LESSEE, as the case may be, against all costs and expenses, including reasonable attorney's fees incurred in connection therewith.  "Attorney's fees", as referred to in this LEASE, shall include fees incurred by LESSOR after an occurrence of a monetary or non-monetary Default at after the recognition of an issue by LESSOR deemed significant enough in the exclusive judgment of LESSOR to be the basis of any legal action, whether or not such action is commenced, that seeks any type of relief or declaratory judgment, which shall include fees and expenses of its attorneys for all legal services, negotiation services and collection services through trial and appeal, and such fees shall be payable by LESSEE as Additional Rent.

## 25.0 TIME OF ESSENCE.
Time is of the essence with respect to the performance of each of LESSEE's covenants of this LEASE and the strict performance of each shall be a condition precedent to LESSEE's rights to remain in possession of the Premises or to have this LEASE continue in effect.

## 26.0 HOLDING OVER.
Should LESSEE continue in occupancy of the Premises after the termination or expiration of this LEASE, LESSEE shall become a LESSEE from month to month only upon each and all of the terms herein provided as may be applicable to such month to month tenancy and any such holding over shall not constitute a renewal or extension of the LEASE.  During such holding over, LESSEE shall pay, at LESSOR's sole discretion, rent at twice the monthly rate provided for herein during the period immediately proceeding the hold over period.

If LESSEE fails to surrender the Premises upon termination of the LEASE in addition to its other liabilities to LESSOR arising therefrom, LESSEE shall indemnify and hold harmless LESSOR and shall be liable to LESSOR for any and all liability resulting from such failure, including, without limitation, claims made by any successor LESSEE which arise as a result of LESSEE's conduct and failures.

## 27.0 PARTIAL INVALIDITY.
Any provision of this LEASE which shall be held to be invalid, void of illegal shall in no way affect, impair or invalidate any other provision hereof and such other provisions shall remain in full force and effect.

## 28.0 BROKERS.
LESSEE warrants it has had no dealings with any real estate broker or agent in connection with the negotiation of this LEASE except Real Property Specialists, Inc., and Doke Brinkman of Coldwell Banker.  It knows of no other real estate broker or agent who is or might be entitled to a commission in connection with this LEASE, and LESSEE agrees to indemnify and hold LESSOR/LESSOR's AGENT harmless from and against any and all claims for any such commissions.

## 29.0 WAIVER.
No waiver by LESSOR of any provision of this LEASE shall be deemed to be a waiver of any other provision hereof or of any subsequent breach by LESSEE of the same or any other provision.  LESSOR's consent or approval of any act by LESSEE requiring LESSOR's consent or approval shall not be deemed to render unnecessary the obtaining of LESSOR's consent or approval of any act by LESSEE requiring LESSOR's consent or approval of any subsequent act of LESSEE whether or not similar to the act previously consented to or approved.  No act or thing done by LESSOR or by LESSOR's agents during the LEASE shall be deemed an acceptance of or surrender of the Premises and no agreement to accept such surrender shall be valid unless in writing and signed by LESSOR.  No employee of LESSOR or of LESSOR's agents shall have any power to accept the keys to the Premises prior to the expiration or termination of this LEASE and the delivery of the keys to any such employee shall not operate as a termination of this LEASE or surrender of the Premises.  LESSOR may, at its option, accept partial payments of Base Rent or Additional Rent, without waiving any rights concerning the existence of any monetary or non-monetary Default under this LEASE, which Default shall serve and continue unaffected by the receipt of any such partial payment.

## 30.0 LEASE GUARANTEE.
If LESSEE is a corporation or a partnership, the person signing this LEASE on behalf of such corporation or partnership hereby warrants he has full authority from such corporation or partnership to sign this LEASE and obligate the corporation or partnership hereunder and said person hereby agrees to execute a personal guarantee of all terms, conditions and obligations of LESSEE, said guarantee attached hereto as Exhibit "B".

X

If LESSEE is an individual, LESSEE unconditionally guarantees to LESSOR and becomes personally liable for the full and timely payment, whether by declaration, acceleration or otherwise, of all rents, common area charges and other payments of any nature whatsoever during the term of this LEASE and any extensions or renewals thereof, along with any other amounts which may become due, including without limitation, all costs and expenses of enforcement and collection including reasonable attorney's fees.

**31.0 SUCCESSORS AND ASSIGNS.**
Except as otherwise provided in this LEASE, all of the covenants, conditions and provisions of this LEASE shall be binding upon and shall inure to the representatives, successors, and assigns.

**32.0 HEADINGS; LESSOR AND LESSEE.**
The article and section captions contained in this LEASE are for convenience only and do not in any way limit or amplify any term or provision hereof. The terms "LESSOR" and "LESSEE" as used herein shall include the plural as well as the singular, the neuter shall include the masculine and feminine genders and if there is more than one LESSEE, the obligations herein imposed upon LESSEE shall be joint and several.

**33.0 NO ESTATE BY LESSEE.**
This LEASE shall create the relationship of lessor and lessee between LESSOR and LESSEE and no estate shall pass out of LESSOR. The leasehold interest created by this LEASE shall not be treated as an asset of LESSEE's or any guarantor's estate. LESSEE has only a right of use not subject to levy or sale and not assignable by LESSEE except as expressly provided herein. LESSEE hereby waives any and all rights of redemption conferred by statute or otherwise, if any.

**34.0 RELOCATION WITHIN THE SHOPPING CENTER.**
Recognizing that the LESSOR's supply of rental space and the needs of LESSEES for rental space may vary from time to time, and in order for LESSOR to accommodate LESSEE and prospective LESSEES, LESSOR expressly reserves the right (but will in no event be obligated) prior to and/or during the term, at its expense, to remove LESSEE from the premises and relocate LESSEE in other comparable space of LESSOR's choosing of approximately the same dimensions and size within the Shopping Center, which other space will be decorated by LESSOR at its expense, as hereinafter specified. LESSEE agrees to fully cooperate with LESSOR and its agents and employees in all aspects of the relocation. LESSOR may use installations, equipment, fixtures, machinery, decorations and materials from LESSEE's then-existing space, and/or other materials, so that the space in which LESSEE is relocated will be comparable in its interior design and decoration to the space from which LESSEE is removed. During the relocation period, LESSOR will use reasonable efforts not to unduly interfere with LESSEE's business activities, and LESSOR agrees to substantially complete the relocation within a reasonable time under all then-existing circumstances. This LEASE and each of its terms and conditions will remain in full force and effect and be applicable to any such new space, and such new space will be deemed to be the premises demised hereunder; upon request LESSEE will execute and deliver to LESSOR any documents which may be called for to evidence and confirm the relocation (but it will be effective even in the absence of such confirmation). LESSOR's obligation for expenses of removal and relocation will be the actual cost of relocating and decorating LESSEE's new space as specified above, and LESSEE agrees that LESSOR's exercise of its election to remove and relocate LESSEE will not release LESSEE in whole or in part from its obligations hereunder for the full term. No rights herein granted to LESSEE, including the right of peaceful possession, will be deemed breached or interfered with by reason of LESSOR's exercise of the relocation right reserved herein.

**35.0 GOVERNING LAW.**
This LEASE is made and accepted by the parties in the State of Florida with reference to the laws of such state and shall be construed, interpreted and governed by and in accordance with the laws of the State of Florida. LESSEE agrees that LESSOR may institute any legal proceedings with respect to this LEASE or the Premises in the Court of Orange County and submits itself to the jurisdiction of such court. If LESSEE is a corporation chartered other than in the State of Florida, LESSEE acknowledges and agrees it is "doing business" in the State of Florida and appoints the Secretary of State of Florida as its agent for service of process for all matters pertaining to this LEASE or the Premises unless LESSEE has qualified to do business in Florida and has registered another person with the Secretary of State of Florida as its agent for service of process within the State of Florida.

**36.0 RADON GAS.**
Radon gas is a naturally occurring radioactive gas that when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from the county public health unit. This notice is given pursuant to 404.056(8) Florida Statutes.

**36.5 MOLD/MILDEW**
LESSEE is advised that mold and/or other microscopic organisms may exist at the Premises and that mold and/or other microscopic organisms may cause physical injuries, including, but not limited to, allergic reactions, respiratory reactions or other problems, particularly in persons with immune system problems, young children and elderly persons.

LESSEE ACKNOWLEDGES THIS RISK AND AGREES TO ACCEPT FULL RESPONSIBILITY FOR ANY AND ALL RISKS RELATED TO MOLD OR MICROSCOPIC ORGANISMS THAT MAY BE PRESENT IN THE PREMISES. LESSEE AGREES TO RELEASE, HOLD HARMLESS AND INDEMNIFY LESSOR, LESSOR'S OFFICERS, AGENTS, HEIRS, EXECUTORS, EMPLOYEES, AND SUCCESSORS FROM ANY AND ALL LIABILITY OR DAMAGES, WHETHER FINANCIAL OR OTHERWISE, ARISING FROM OR RELATED TO PRESENCE OF OR GROWTH OF MOLD OR OTHER MICROSCOPIC ORGANISMS IN THE PREMISES.

LESSOR, its officers, agents, and employees, are not qualified to inspect leased premises for mold or to make recommendations or determinations regarding possible health or safety issues. The purpose of this disclosure is to place LESSEE on notice of the need to conduct his own due diligence regarding these issues using appropriate, qualified experts.

**37.0 HAZARDOUS SUBSTANCES.**
The term "Hazardous Substances", as is used in this LEASE, shall include, without limitation, flammables, explosives, radioactive materials, asbestos, polychlorinated biphenyls (PCB's), chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, toxic substances or related materials, petroleum and petroleum products, and substances declared to be hazardous or toxic under any law or regulation now or hereafter enacted or promulgated by any governmental authority.

   (a) **LESSEE'S RESTRICTIONS.** LESSEE shall not cause or permit to occur:

      (i)  Any violation of any federal, state or local law, ordinance, or regulation now or hereafter enacted, related to environmental conditions on, under or about the Premises or arising from LESSEE's use or occupancy of the Premises, including but not limited to, soil and ground water conditions; or

      (ii)  The use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substance without LESSOR's prior written consent, which consent may be withdrawn, conditioned or modified by LESSOR in its sole and absolute discretion in order to insure compliance with all applicable Laws (hereinafter defined). As such Laws may be enacted or amended from time to time.

   (b) **ENVIRONMENTAL CLEAN-UP.**

      (i)  LESSEE shall, at LESSEE's own expense, comply with all laws regulating the use, generation, storage,

X ~~MB~~

transportation or disposal of Hazardous Substances (the "Laws").

(ii)  LESSEE shall, at LESSEE's own expense, make all submissions to, provide all information required by and comply with all requirements of all governmental authorities (the "Authorities") under the Laws.

(iii)  Should any Authority or any third party demand a cleanup plan be prepared or undertaken because of any deposit, spill, discharge or other release of Hazardous Substances that occurs during the term of this Lease, at or from the Premises or which arises at any time from LESSEE's use or occupancy of the Premises, LESSEE shall, at LESSEE's own expense, prepare and submit the required plans and all related bonds and other financial assurances and LESSEE shall carry out all such cleanup plans.

(iv)  LESSEE shall promptly provide all information regarding the use, generation, storage, transportation or disposal of Hazardous Substances requested by LESSOR.  If LESSEE fails to fulfill any duty imposed under this Paragraph 38 (b) within thirty (30) days following its request, LESSOR may proceed with such efforts and in such case, LESSEE shall cooperate with LESSOR in order to prepare all documents LESSOR deems necessary or appropriate to determine the applicability of the Laws to the Premises and LESSEE's use thereof and for compliance therewith and LESSEE shall execute all documents promptly upon LESSOR's request and any expenses incurred by LESSOR shall be payable by LESSEE as Additional Rent.  No such action by LESSOR and no attempt made by LESSOR to mitigate damages under any Law shall constitute a waiver of any of LESSEE's obligations under this Paragraph 38 (b).

(c)  LESSEE'S INDEMNITY.

(i)  LESSEE shall indemnify, defend and hold harmless LESSOR, its respective officers, directors, beneficiaries, shareholders, partners, agents and employees from all fines, suits, procedures, claims and actions of every kind and all costs associated therewith including attorneys' and consultants' fees, arising out of or in any way connected with any deposit, spill, discharge or other release of Hazardous Substances that occurs during the term of this LEASE, at or from the Premises or which arises at any time from LESSEE's use or occupancy of the Premises or from LESSEE's failure to provide all information, make all submissions and take all steps required by all Authorities under the Laws and all other environmental laws.

(ii)  LESSEE's obligations and liabilities under Paragraph 38 (b) shall survive the expiration or other termination of this LEASE.

## 38.0 EXHIBITS AND ADDENDUM.
Exhibit "A", "B", "C", and "D", are attached hereto and made a part hereof.

## 39.0 NO RECORDING.
This LEASE shall not be recorded in the public records without LESSOR's prior written consent.  However, a Memorandum of LEASE, acceptable to LESSOR, may be executed and delivered by the parties hereto for the purpose of recording in the public records.

## 40.0 FACSIMILE/HANDWRITTEN PROVISIONS.
A facsimile copy of this agreement and any signatures hereon shall be considered for all purposes as originals.  Typewritten or handwritten provisions, riders and addenda shall control all printed provisions of this agreement in conflict with them.

## 41.0 CONSTRUCTION OF AGREEMENT.
The parties to this LEASE have jointly participated in the negotiation of its terms and have had the complete opportunity to engage legal counsel to assist in the review of this LEASE and, as a result, no provision of this LEASE shall be construed against either LESSOR or LESSEE for any purpose.

## 42.0 RELATIONSHIP OF PARTIES.
Nothing contained in this LEASE shall be deemed or construed as creating the relationship of principle and agent or a partnership or joint venture between the parties hereto.  It is understood and agreed that neither the method of computing rents nor any other provision contained herein or any acts of the parties hereto shall be deemed to create any relationship between the parties other than that of LESSOR and LESSEE.

## 43.0 FINANCIAL STATEMENTS.
LESSEE has provided LESSOR with a current copy of its financial statement and tax return.  Additionally, LESSEE agrees to supply LESSOR and/or LESSOR's lender, potential lenders, or potential purchasers or the shopping center with LESSEE's financial statement, tax return, and store ranking, both locally and nationally if applicable, upon LESSOR's written request.

## 44.0 CONFIDENTIALITY.
LESSOR and LESSEE acknowledge that the terms and provisions of this LEASE have been negotiated based upon a variety of factors, occurring at a coincident point in time, including, but not limited to: (i) the individual principals involved and the financial strength of LESSEE, (ii) the nature of LESSEE's business and use of the Premises, (iii) the current leasing market place and the economic conditions affecting rental rates, (iv) and the present and projected lessee mix of the Shopping Center.  Therefore, recognizing the totality, uniqueness, complexity and interrelation of the aforementioned factors, the LESSEE agrees not to disseminate in any manner whatsoever, (whether by word of mouth, mechanical reproduction, physical tender or by any manner of visual or aural transmission or review) the terms and conditions of this LEASE to third parties who (i) are presently lessees in the Shopping Center or (ii) could in any way presently or in the future be considered as prospective lessees for this or any other leasehold property with which LESSOR may be involved.

## 45.0 ENTIRE AGREEMENT.
LESSEE acknowledges it has read this entire LEASE and all Exhibits and evidences same by initialing all pages of the LEASE and understands and accepts all the terms and conditions contained in the LEASE.  This LEASE and the Exhibits and Addendum if any attached hereto, constitute the entire agreement between the parties with respect to the subject matter hereof and no prior agreement or understandings with regard to any such matter shall be effective for any purpose.  No provision of this LEASE may be amended except by an agreement in writing signed by the parties or their respective successors in interest.

12

IN WITNESS WHEREOF, the parties hereto have signed and sealed this LEASE as of the day and year first above written.

Witnessed as to LESSOR

Print Name: _____

Print Name: _____

LESSOR:  Sarasota Pointe Plaza, LLC
By: Retail Investment Specialists, LLC, Member

By: _____
    Alan C. Kaberon
    Manager of Retail Investment Specialists, LLC

DATE EXECUTED: _10-30-06_

Witnessed as to LESSEE

Print Name: Dextorarrapto

Print Name: Dextorarrapto
Bugiarapato
MILTON DEXTER

LESSEE: FLO-MAR, LLC

By: _Marion Zable_ Manager
    Marian Zable

DATE EXECUTED: _10-22-06_

13

X ᴍᵶ

EXHIBIT "A"

SITE PLAN
Conceptual Site Plan – SUBJECT TO CHANGE
THIS SITE PLAN IS FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT TO BE RELIED UPON AS AN ACCURATE "AS BUILT" SITE PLAN



14

EXHIBIT "B"

PERSONAL GUARANTY OF PAYMENT
AND PERFORMANCE OF LEASE OBLIGATIONS

(Individual Guarantor)

For and in consideration of, and as a material inducement for, the granting, execution and delivery by Sarasota Palms Plaza, LLC ("LESSOR", which term shall be deemed to include the named LESSOR and its successors, successors-in-title and assigns), of that certain Lease dated _____, 2006 (the "LEASE"), between LESSOR and FLO-MAR, LLC (LESSEE), covering certain Premises in the Sarasota Palms Plaza Shopping Center located in Sarasota County, Florida, and in further consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by LESSOR to the undersigned, the receipt and sufficiency of which are hereby acknowledged, Floyd Cohen, MD and Marian Zable, resident(s) of the State of Florida (individually and collectively, if more than one, "Guarantor"), jointly and severally, if more than one, hereby unconditionally and absolutely guarantees to LESSOR the full and prompt payment when due of all sums now or hereafter payable by LESSEE to LESSOR pursuant to the terms of the LEASE, including, without limitation, all "Base Rent", "Percentage Rent", additional rent and all other sums, fees and charges of every description payable by LESSEE under the terms of the LEASE (collectively, the "Rents"), and the full and prompt performance of all obligations, covenants, and conditions to be observed and performed by LESSEE under the terms of the LEASE. If at any time LESSEE shall default in the payment of any Rents, or in the performance and observance of any of the obligations, covenants and conditions set forth in the LEASE, Guarantor shall immediately pay such Rents to LESSOR, and shall immediately and faithfully perform and fulfill all such obligations, covenants and conditions, and also shall pay to LESSOR all damages that may arise in consequence of any default by LESSEE under the LEASE, including, without limitation, all reasonable attorney's fees and expense suffered or incurred by LESSOR and resulting from, incident to, or otherwise arising out of or in connection with a default by LESSEE under the LEASE, or the enforcement of the LEASE or the enforcement of this Guaranty.

This Guaranty shall be a continuing guaranty, and the liability of Guarantor hereunder shall not be affected, modified or diminished in any way by reason of (a) any modification, amendment, assignment, subletting, option, extension or renewal of the LEASE, (b) any release, compromise or indulgence now or hereafter granted by LESSOR with respect to the LEASE, or to any person or entity now or hereafter liable thereunder or hereunder; (c) any consent, action, inaction or omission under or in respect of the LEASE; (d) any bankruptcy, insolvency, reorganization, liquidation, arrangement, assignment for the benefit of creditors, receivership, trusteeship or similar proceeding affecting LESSEE; or (e) the assertion or the failure or assert by LESSOR against LESSEE of any of the rights or remedies reserved to LESSOR pursuant to the LEASE, or which otherwise may be available to the LESSOR at law or in equity. No such action which LESSOR shall take or fail to take in connection with the LEASE, nor any course of dealing with LESSEE or any other person, shall release Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against LESSOR. The provisions of this Guaranty shall extend and be applicable to all renewals, extensions, amendments, modifications, assignments and subleases of the LEASE, and any and all references herein to the LEASE shall be deemed to include any such renewals, extensions, amendments, modifications and subleases thereof.

This Guaranty is an absolute and unconditional guaranty of payment and performance of all obligations of LESSEE to LESSOR under the LEASE, and not of collection. The liability of Guarantor under the Guaranty shall be direct and immediate and not conditioned or contingent upon the pursuit of any remedies against LESSEE or any other person. Guarantor expressly agrees that this Guaranty shall be enforceable against Guarantor without the necessity of any suit or proceeding on LESSOR's part of any kind or nature whatsoever against LESSEE and without the necessity of any notice of nonpayment, nonperformance or nonobservance or any notice of acceptance of this Guaranty or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives. In the event of a default under the Lease or this Guaranty, LESSOR shall have the right to enforce its rights, powers and remedies thereunder or hereunder in any order, and all rights, powers and remedies available to LESSOR in such event shall be nonexclusive and cumulative of all other rights, powers and remedies now or hereafter provided thereunder or hereunder or by law or in equity; and no exercise of partial exercise of any such right or remedy under the LEASE or this Guaranty is or shall be construed to be exclusive of or a waiver of any other right or remedy. No delay on the part of the LESSOR in exercising any right, power or privilege, or failure to exercise the same, shall operate as a waiver of or otherwise affect any such right, power or privilege, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. If the obligations guaranteed hereby are partially paid or performed, this Guaranty shall nevertheless remain in full force and effect, and Guarantor shall remain liable for the entire unpaid balance of the Rents and the performance of all other obligations of LESSEE guaranteed hereby, even though any rights which Guarantor may have against LESSEE may be destroyed or diminished by the exercise of any such remedy. Until all of the obligations of LESSEE to LESSOR under the LEASE have been paid and performed in full, Guarantor shall have no right of subrogation to LESSOR against LESSEE, and Guarantor hereby waives any rights to enforce any remedy which LESSOR may have against LESSEE.

Guarantor warrants and represents to LESSOR that all financial statements heretofore and hereafter delivered by him or her to LESSOR are and shall be true, correct and complete in all respects, and fully and accurately present the financial condition of Guarantor as of the date(s) thereof. Upon the request of LESSOR, Guarantor agrees to deliver to LESSOR a current financial statement of Guarantor, which shall be prepared in all reasonable detail and in accordance with generally accepted accounting principles consistently applied.

Guarantor shall, at any time and from time to time, upon ten (10) days written request from LESSOR, execute, acknowledge and deliver to LESSOR or its designee(s) a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating such modifications). Guarantor agrees that any such certificate may be relied upon by LESSOR and its designee(s), including any prospective purchaser of any existing or prospective mortgagee of LESSOR's interest in the "Shopping Center" (as such term is defined in the LEASE) or any part thereof.

If Guarantor defaults in the performance or observance of any provision contained herein, or breaches any warranty or representation contained herein, or makes a general assignment for the benefit of creditors, or petitions or applies to any tribunal for the appointment of a trustee or receiver of the whole or any substantial party of the business, estate or assets of Guarantor, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or if any such petition or application is filed or any such proceedings are commenced against Guarantor and Guarantor by any act consents thereto or acquiesces therein, or an order is entered appointing any such trustee or receiver, or adjudicating Guarantor bankrupt or insolvent, or approving a petition in any such proceedings, and such order remains in effect for more than sixty (60) days, then, at the option of LESSOR, and in addition to constituting a default hereunder, the same shall constitute a "Default" under and as defined in the LEASE, and LESSOR shall thereupon have all remedies contemplated under the LEASE upon the occurrence of a Default thereunder.

This Guaranty may not be changed orally, and no obligation of Guarantor can be released or waived by LESSOR or any officer or agent of LESSOR, except in writing signed by a duly authorized officer of LESSOR and bearing the seal of LESSOR; nor shall any such release or waiver be applicable except in the specific instance for which given. This Guaranty shall be irrevocable by Guarantor so long as the LEASE shall remain in effect and until all obligations guaranteed hereby have been paid and performed in full in accordance with the terms of the LEASE.

15

X _____

In the event a court of competent jurisdiction shall find that the LESSEE is not liable under the LEASE because the act of creating the obligations thereunder is ultra vires, or the officers or persons creating same acted in excess of their authority, and for these reasons, any sums due to LESSOR or obligations required to be performed pursuant to the LEASE cannot be enforced against LESSEE, such fact shall in no manner affect Guarantor's liability hereunder, but Guarantor shall be liable to the same extent as Guarantor would have been if all of the terms, conditions, covenants and agreements of said LEASE had been enforceable against LESSEE.

If for any reason LESSOR is required to refund or pay the amount of any payment paid by LESSEE to LESSOR to any other party, such payment paid or due from LESSEE to LESSOR shall not constitute a release of Guarantor from any liability hereunder, but Guarantor agrees to pay such amount to LESSOR upon demand.

This Guaranty shall be governed and construed in accordance with the law of the State or Commonwealth in which the Shopping Center is located. Guarantor hereby submits to personal jurisdiction in the State or Commonwealth in which the Shopping Center is located for the enforcement of this Guaranty, and waives any and all personal rights under the law of any state to object to jurisdiction within such State for the purposes of litigation to enforce this Guaranty. Guarantor agrees that LESSOR may institute any legal proceedings with respect to this Guaranty in the Court of Orange County, Florida, and submits itself to the jurisdiction of such court. Nothing contained herein, however, shall prevent LESSOR from bringing any action or exercising any rights against Guarantor, or against any property of Guarantor, within any other state or county.

If any provision of this Guaranty or the application thereof to any person or circumstance shall be held void, invalid or unenforceable to any extent, the remainder of this Guaranty, and the application of such provision to persons or circumstances other than those as to which it is held void, invalid or unenforceable, shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

The liability of Guarantor hereunder is co-extensive with that of LESSEE under the LEASE, and with any other guarantor who may have guaranteed or who hereafter may guarantee the obligations of LESSEE under the LEASE, and LESSOR may release or settle with any one or more such guarantors at any time or from time to time without affecting the continuing liability of Guarantor hereunder. This Guaranty shall in no event be impaired by any change which may arise by reason of the dissolution, liquidation or merger of LESSEE, if a corporation or partnership, or the death of LESSEE or Guarantor, if individuals. Guarantor's transfer of any assets now held by Guarantor to Guarantor's spouse or any other individual or entity during the term of LEASE shall be deemed to be a fraudulent transfer which shall entitle LESSOR to exercise its Default remedies under the LEASE, Chapter 726, Florida Statutes, and as otherwise provided at law and in equity.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed under seal as of the date of the LEASE as set forth in the first paragraph of this Guaranty.

Witnesses:

_(signature)_

Print Name: _(signature)_

_(signature)_

Print Name: _(signature)_

_(signature)_

Floyd Cohen, MD

Date Executed: 22 Oct 06

_(signature)_

Print Name: _(signature)_

_(signature)_

Marian Zable

Date Executed: 10-22-06

MILTON DEXTER

_(signature)_

*Two Witness Sign

16

X _(signature)_

EXHIBIT "C"
SARASOTA PALMS PLAZA SIGN CRITERIA
SARASOTA, FLORIDA

**STORE FRONT SIGNAGE CRITERIA**

All signs shall be designed, constructed and located in accordance with the following design criteria and shall be subject to the approval of the LESSOR.

**SIGN CRITERIA**

These sign criteria have been established for the purpose of assuring a uniform LESSEE signage program. Conformity will be strictly enforced and any nonconforming signs will be disapproved. Under no circumstances will any handwritten signs be allowed to be displayed in the windows of the premises or otherwise displayed in a way to be seen from the outside of the premises.

**A. GENERAL REQUIREMENTS**

1. The LESSEE shall submit or cause to be submitted to the LESSOR for approval before fabrication one (1) sepia and four (4) prints of detailed drawings indicating the location, size, layout, design and color of the proposed sign(s), including all lettering and/or graphics.

2. All permits for signage and the installation thereof shall be obtained by the LESSEE or its representative from the Sarasota County Zoning Department.

3. All signs shall be constructed and installed at the LESSEE'S expense, including the removal of all existing signs.

4. All signs shall bear the UL label, and their installation shall comply with all local building and electrical codes.

**B. GENERAL SPECIFICATIONS**

1. All signs shall be single letters, individually illuminated internally, channel letters with metal sides and plastic faces, lettering with 1" black trim (letter color to be approved by LESSOR). No box type signs will be permitted.

2. No animated flashing or audible signs will be permitted.

3. No exposed lamps or tubing will be permitted.

4. All cabinets, conductors, transformers and other equipment shall be concealed. Visible fasteners will not be permitted.

5. No exposed crossovers or conduits will be permitted.

6. Electrical service to all signs shall be on the LESSEE'S meter.

7. Painted lettering will not be permitted.

**C. EXTERIOR SIGN DESIGN REQUIREMENTS**

1. All exterior signs must be single Helvetica letters of 5" minimum depth with individual internal illumination. No box sign will be permitted.

2. Maximum height of a sign is not to exceed 24 inches.

3. Maximum width of a sign is not to exceed 2/3 the width of the store front.

4. Maximum area of a sign is not to exceed 20 square feet.

5. Major LESSEE Signage; size and location will be at the complete discretion and approval of the LESSOR and Sarasota County and will be mounted per sign criteria.

**D. CONSTRUCTION REQUIREMENTS**

1. All signs, bolts, fastenings and clips shall be of enameling iron with porcelain enamel finish, stainless steel, aluminum, brass or bronze, or carbon bearing steel with painted finish. No black iron material of any type will be permitted.

2. All letters shall be mounted on a raceway with transformers inside raceway.

3. All letters shall be fabricated using full welded construction.

4. Location of all penetrations for conduit and sleeves, etc. required for sign installation on buildings shall be indicated by the sign contractor on drawings submitted to the LESSOR.

5. All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight manner.

6. No labels will be permitted on the exposed surface of signs except those required by local ordinance, which labels shall be applied in an inconspicuous location.

7. The LESSEE'S sign contractor shall repair and/or replace any damage to work of others caused by his work.

8. The LESSEE shall be fully responsible for work performed by the LESSEE'S sign contractor.

9. Threaded rods or anchor bolts shall be used to mount letters. Angle clips attached to sides of letters will not be permitted.

**E. RESTRICTIONS**

No signs will be permitted other than those mentioned in this Exhibit "C".

17

X MJ

EXHIBIT "D"

DESCRIPTION OF LESSOR'S WORK AND LESSEE'S WORK

DESCRIPTION OF LESSOR'S WORK:
LESSOR will, at its sole cost and expense, provide the following tenant finish:

a.  Partitions: demising walls per leased area ready for paint. Walls will be extended to under side of roof deck without insulation. Interior partition wall will be at LESSEE's cost.

b.  Store front: building standard store front with a single door entrance.

c.  Ceilings: 2' x 4' fissured white acoustical tile lay in panels.

d.  Floor: concrete floor broom clean (no covering).

e.  Restroom finish:      Partition walls
                          Door with privacy hardware
                          2' x 4' acoustical ceiling
                          Framed mirror
                          Paper towel dispenser
                          One pair of grab bars
                          Toilet paper dispenser
                          Incandescent light fixture over lavatory
                          Exhaust fan

f.  Electrical:           One 100 amp, 120/208 volts with 3 phase
                          Standard 2' x 4' troffers per plans
                          Wall mounted duplex electrical outlets per plans
                          All fixtures will be switched from lighting panel in LESSEE's store
                          Hook up of HVAC unit on roof
                          Exterior sign outlet will be provided
                          All telephone systems by LESSEE
                          Exit lights per code
                          Battery packs per code

g.  Plumbing:             One floor mounted water closet
                          One wall hung lavatory

h.  Heating/Air Conditioning   Air conditioning/heating system (sized for normal retail use) shall be provided to serve open area
                          No provisions for interspace partition distribution

LESSOR will deliver the Premises when the above work is substantially complete. Delivery of the Premises is not conditioned on Certificate of Occupancy, which LESSEE shall be responsible for obtaining for LESSEE's use of the Premises.

DESCRIPTION OF LESSEE'S WORK:
LESSEE may install such tenant improvement fixtures and finishes in the Premises as LESSEE deems necessary or desirable, provided for in Section 7.0 of this LEASE. LESSEE's work will be completed at LESSEE's sole cost and expense. In addition to actual construction and materials cost, LESSEE shall be responsible for any additional design costs and governmental fees (including impact fees), if any, associated with LESSEE's occupancy.

LESSEE shall engage LESSOR's roofing company for roof penetrations so as not to void warranties. All roof or wall penetrations must be sealed, caulked and watertight. Damage resulting from improper installation of fixtures or equipment will be repaired at the expense of LESSEE. Any dumpster brought onto the property needs to be put on plywood sheets over 2 x 12 runners, and the location of the same shall be coordinated with the LESSOR. Construction dumpsters that are not emptied as needed will be emptied by the LESSOR at the LESSEE's expense.  LESSEE shall be responsible for any damage done to concrete or asphalt in connection with LESSEE's work.

18

UCC FORM

UNIFORM COMMERCIAL CODE

State of Florida
FINANCING STATEMENT
This Financing Statement is presented to a filing officer pursuant to the Uniform Commercial Code.

FORM UCC-1 (REV. 1993)

| 1. Debtor (Last Name First if an individual)<br>**Marian Zablo** | | 1a. Date of Birth or FEIN |
| --- | --- | --- |
| 1b. Mailing Address<br>**370 Gollviny Rd #701** | 1c. City, State<br>**West Palm Beach FL** | 1d. Zip Code<br>**33408** |
| 2. Additional Debtor or Trade Name (Last Name First if an individual) | | 2a. Date of Birth or FEIN |
| 2b. Mailing Address | 2c. City, State | 2d. Zip Code |
| 3. Secured Party (Last Name First if an individual)<br>**Sarasota Palm Plaza, LLC** | | |
| 3a. Mailing Address<br>**6700 Conroy Rd., Suite 230** | 3b. City, State<br>**Orlando, FL** | 3c. Zip Code<br>**32835** |
| 4. Assignee of Secured Party (Last Name First if an individual) | | |
| 4a. Mailing Address | 4b. City, State | 4c. Zip Code |

5. This Financing Statement covers the following types or items or property (include description of real property on which located and owner of record when required. If more space is required, attach additional sheet(s)).

All furnishings, fixtures, and equipment or inventory, including but not limited to chairs, computers, and office furniture, now owned or hereinafter acquired by Debtor located at:

Sarasota Palms Plaza, LLC

and all additions of accessories thereto including replacements and proceeds, all cash and non-cash proceeds of the foregoing, including insurance and the proceeds of insurance.

6. Check only if Applicable:  ☐ Products of collateral are also covered.   ☐ Proceeds of collateral are also covered.   ☐ Debtor is transmitting utility.

7. Check appropriate box:   ☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
(one box must be marked)   ☐ Florida Documentary Stamp Tax is not required.

| 8. In accordance with s. 679.407(2) F.S., this statement is filed without the Debtor's signature to perfect a security interest in collateral:<br>☐ already subject to a security interest in another jurisdiction when it was brought into this state or debtor's location changed to this state.<br>☐ which is proceeds of the original collateral described above in which a security interest was perfected.<br>☐ as to which the filing has lapsed. Date filed _____ and previous UCC-1 file number _____<br>☐ acquired after a change of name, identity, or corporate structure of the debtor. | 9. Number of additional sheets presented: _____<br><br>This Space for Use of Filing Officer |
| --- | --- |
| 10. Signature(s) of Debtor(s)<br>*Marian Zable* | |
| 11. Signature(s) of Secured Party or if Assigned, by Assignee(s) | |
| 12. Return Copy to:<br>Name<br>Address   Sarasota Palms Plaza, LLC<br>Address   6700 Conroy Rd., Suite 230<br>City, State, Zip   Orlando, FL 32835 | |

STANDARD FORM - FORM UCC-1

Approved by Secretary of State, State of Florida

19

X _MZ_

RETAIL LEASE AGREEMENT

THIS LEASE, made as of this __30__ day of __October__, 2006 by and between Sarasota Palms Plaza, LLC, or assigns, as OWNER c/o Real Property Specialists, Inc. as AGENT, 6700 Conroy Rd., Suite 230, Orlando, FL 32835 ("LESSOR") and FLO-MAR, LLC, whose principal address is 370 Golfview Road #701, West Palm Beach, FL 33405 ("LESSEE").

This Lease contains a continuous use provision; please refer to Section 16.1.

**1.0 PREMISES.**
LESSOR does hereby lease to LESSEE and LESSEE hereby leases from LESSOR that certain space identified as Store Number 8776 and 8772 (the "Premises"), containing approximately 2,656 square feet of floor area, having an address, which address shall be used for any Notice requirements herein, listed as 8776 and 8772 S. Tamiami Trail, Sarasota, FL 34238, and located within The Sarasota Palms Plaza, a shopping center located at the northwest corner of Tamiami Trail and Wheel Road in Sarasota, Florida (the "Shopping Center"). The location and dimensions of the Premises are delineated on Exhibit A attached herein and incorporated by reference herein. The Premises do not include any space above the interior surface of the ceiling nor any part of the exterior walls of the building in which the Premises are located or of the walks and other Common Areas, as defined herein, beyond the Premises or of the land upon which the Premises are located. LESSOR has the right to change square footage and corresponding rent, if necessary, to accommodate functional design of Premises.

This LEASE is subject to the terms, covenants and conditions herein set forth and the LESSEE covenants, as a material part of the consideration for this LEASE, to keep and perform each and all of said terms, covenants and condition. This LEASE is also subject to LESSOR, at its sole cost and expense as soon as is reasonably possible after the execution of this LEASE, commencing and pursuing completion of improvements to be erected by LESSOR to the extent shown on the attached Exhibit "D" labeled "Description of LESSOR's work and LESSEE's work."

**2.0 TERM AND COMMENCEMENT DATE.**

**2.1 LEASE TERM.**
The terms and provisions of this LEASE shall be binding upon LESSEE as of the Date of Execution. The primary term of the LEASE (the "LEASE Term") shall be five (5) full calendar years and shall commence sixty (60) days after LESSOR notifies LESSEE that the construction of the Premises of all of LESSOR's work in accordance with this LEASE has been substantially completed thus, resulting in a sixty day free rent period.

If not in default, LESSEE shall have the right to extend this Lease for two (2) extension terms of five (5) full lease years subject to the terms, covenants and provisions of this Lease. LESSEE may exercise each said option by giving LESSOR written notice thereof no less than six (6) months prior to the beginning of each such period of extension.

**2.2 ACCEPTANCE OF PREMISES.**
LESSEE acknowledges it has fully inspected and accepts the Premises in its present "as is" condition, and acknowledges that LESSOR has no further responsibility for maintenance of the Premises except as may be set forth herein, acknowledging that LESSOR will substantially complete construction of the Premises to be leased to allow occupancy, in accordance with Exhibit "D". Furthermore, LESSEE acknowledges that any changes or alterations to the Premises desired by LESSEE or required by governmental laws, for example the Americans with Disabilities Act (ADA), now or at any time during LESSEE's occupancy of the Premises, shall be at the LESSEE's sole cost and expense.

**2.3 FAILURE TO OPEN.** In the event LESSEE fails to take possession on or before the Commencement Date and open the Premises for business, fully fixtured, stocked and staffed within 90 days following the Commencement Date, LESSOR shall have, in addition to any and all remedies herein provided, the sole option to immediately cancel and terminate this LEASE.

**2.4 QUIET ENJOYMENT.**
Upon LESSEE'S paying the rent reserved hereunder and observing and performing all of the covenants, conditions and provisions on LESSEE'S part to be observed and performed hereunder, LESSEE shall have quiet possession of the Premises for the entire term hereof, subject to the provisions of this LEASE.

**2.5 LEASE YEAR DEFINED.**
The term "LEASE Year" shall mean a period of twelve (12) consecutive full calendar months. If the Commencement Date is not the first day of a calendar month, then the first LEASE Year shall consist of the first twelve (12) consecutive full calendar months of this LEASE plus the partial month beginning on the Commencement Date and ending on the last day of that month. Each succeeding LEASE Year shall commence upon the first day of the calendar month coinciding with or following the anniversary date of the Commencement Date of the LEASE Term.

**2.6 EFFECTIVE DATE.**
LESSOR and LESSEE acknowledge that certain obligations under various articles of this LEASE may commence prior to the Commencement Date of the LEASE Term (e.g. construction, indemnities, liability insurance, defaults, etc.) and agree that this is a binding and enforceable agreement as of the date LESSOR executes this LEASE (the "Effective Date").

**3.0 USE.**
LESSEE shall use and occupy the Premises for Medical Weight Loss Clinic and related dietary products of the "Cookie Diet" and shall not use or occupy the Premises or permit the same to be used for any other purpose. LESSEE agrees it will not interfere with or infringe on the use rights of other lessees of the Shopping Center, as described in "Exhibit A", which may be updated from time to time with new tenants. LESSEE is specifically prohibited from using and/or occupying the Premises for any use in conflict with any existing exclusive uses that may have been granted to other lessees in the Shopping Center, or for any use prohibited by governing jurisdictions or deed restrictions. The permitted uses do not constitute an exclusive use and the LESSEE recognizes that LESSOR may lease other space in the shopping center for the same or similar uses. LESSEE hereby acknowledges that the use was a material inducement for LESSOR entering into this LEASE, and that a key factor in the economic success of the Shopping Center is an appropriate tenant mix. LESSOR, in its sole discretion, shall determine the appropriate mix of tenants and uses for the Shopping Center. LESSEE shall not use or occupy the Premises for purposes other than for that use specifically identified herein nor in violation of any law, ordinance, regulation or directives of any governmental authority having jurisdiction thereof nor contrary to the certificate of occupancy issued for the building of which the Premises are a part and shall, upon five (5) days written notice from LESSOR, discontinue any use of the Premises which is other than that use specifically identified herein or desired by any governmental authority to be in violation of any law, ordinance, regulation or directive of said certificate of occupancy. In addition, LESSEE's use of the Premises may be subject to additional restrictions in the event the Premises are located within a Planned Unit Development (PUD) or Development of Regional Impact (DRI). LESSEE acknowledges that damages arising from any violation of LESSEE's use restriction will be difficult to determine and will be irreparable and therefore LESSEE acknowledges LESSOR's right to obtain an injunction to enjoin any such violation and that LESSOR will only have to post a minimum bond in the amount of $100.00. During the LEASE, LESSEE shall be in continuous use and occupancy of the Premises and shall not vacate or abandon same and its failure to do so shall constitute a default under this LEASE.

**3.1 EXCLUSIVE USE.**
LESSOR shall not lease space in the Shopping Center to any other LESSEE whose primary use (as defined in this paragraph) is a Weight Loss Clinic (the aforesaid use is hereinafter referred to as the "Exclusive Use"), provided that:

1

X